**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 10-81834-CV-RYSKAMP

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. TIFFANY BUMBURY, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| MED-CARE DIABETIC & MEDICAL SUPPLIES, INC., | ) |
| a Florida corporation, EAST END ASSOCIATES, INC., | ) |
| a Florida corporation, DANIEL M. PORUSH, Individually, | ) |
| LAWRENCE P. SILVERMAN, Individually, JORDAN | ) |
| SHAMAH, Individually, STEVEN SILVERMAN, | ) |
| Individually, LORRI SILVERMAN, Individually, and | ) |
| LISA PORUSH, Individually, | ) |
| | ) |
| Defendants. | ) |

_____/

**SECOND AMENDED COMPLAINT**

Plaintiff and Relator Tiffany Bumbury alleges as follows:

**I.     Nature of the Case**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and false claims made and presented, and caused to be made and presented, by the Defendants and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended (the "Act").  The violations of the Act involve claims for reimbursement that Defendants made and caused to be made to Medicare since at least 2004 to the present that the Defendants knew were false and/or ineligible for reimbursement.

2.      The Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the false claims submitted to the Government.  The Act allows any person having information regarding a false or fraudulent claim against the Government to bring an action for herself (the "relator") and for the Government and to share in any recovery.

3.      Based on those provisions, plaintiff/relator in this case seeks to recover damages and civil penalties arising from the Defendants' presentation of false records, claims, and statements to the United States Government and its agents in connection with Defendants' claims for reimbursement for durable medical equipment ("DME") provided and allegedly provided to beneficiaries under the Medicare program.

## II.      **The Parties**

4.      Plaintiff and relator, Tiffany Bumbury, is a resident of Brooklyn, NY, and a former employee of Defendant East End Associates, Inc., which maintains office space in New York, NY.  Ms. Bumbury brings this action for violations of 31 U.S.C. § 3729 *et seq.*, on behalf of herself and the United States Government and its agency, the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), pursuant to 31 U.S.C. § 3730(b)(1).  Ms. Bumbury has direct and personal knowledge that the Defendants (as defined *infra* in Paragraph 16) have and are engaged in a conspiracy and scheme to submit false claims to the Medicare program for improperly solicited DME sales, for medically unnecessary DME equipment provided to Medicare beneficiaries, for non-rendered DME, and for DME claims generated and resulting from violations from the Medicare Anti-kickback Statutes, 42 U.S.C. § 1320a-7b(b).

5.      As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), the relator, simultaneously with the filing of her initial Complaint in December 2010, provided to the Government a statement of all material evidence and information related to this Complaint.  This disclosure statement supports the existence of the submission of knowingly false or fraudulent claims for payment or approval, the knowing, making, using, and causing to be made and used, false records or statements material to a false or fraudulent claim, and the existence of a conspiracy to do both under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)(B) and (C). Subsequent to filing her initial Complaint, Relator provided the United States with additionally acquired information supporting the allegations contained in the Complaint and the Amended Complaint.

6.      The United States of America is named as a Plaintiff because funds of the United States of America were and are being paid to Defendants as a result of the false claims scheme alleged in this Amended Complaint.

7.      Defendant Med-Care Diabetic & Medical Supplies, Inc. ("Med-Care") is a Florida corporation that was registered with the Florida Secretary of State on November 8, 1999, with a principal place of business of 933 Clint Moore Road, Boca Raton, Florida 33487.  The registered agent for the company is Steven Silverman, D.C.  Med-Care's corporate officers are Steven Silverman, Lorri Silverman, and Lisa Porush.  Med-Care filed a fictitious name registration with the Florida Secretary of State on October 3, 2007, to do business in Florida under the name "Christian Healthcare Network."  Med-Care has a NPI number of 1619978434, and it submits claims to Medicare under that number.  Among other things, Med-Care, directly and through its affiliation with East End Associates, Inc., is a national supplier of DME that operates telemarketing call centers in Boca Raton, FL, and New York, NY, both of which improperly

target and solicit Medicare beneficiaries in direct violation of Federal law.  From 2009 to 2012, Med-Care received more than $84 million from Medicare in connection with its improper and illicit DME marketing and sales scheme.  Upon information and belief, in 2012, Med-Care's Medicare payment privileges were suspended in connection with its improper conduct.  Only through the submission of false information to Medicare regarding its marketing activities was Medicare able to restore its provider number.  As discussed more fully herein in Section VII, the Relator's allegations regarding Med-Care were recently confirmed by a 2013 Congressional investigation by the U.S. Senate's Committee On Homeland Security and Governmental Affairs (Subcommittee on Financial and Contracting Oversight), which scrutinized Med-Care's Medicare-related, illegal DME marketing tactics.  Co-Defendant Steven Silverman, D.C., a Med-Care principal, was subpoenaed to testify before the Subcommittee after he refused to voluntarily appear and/or provide any other information regarding Med-Care's operations and/or marketing tactics.

8.     Defendant East End Associates, Inc. ("East End Associates"), is a Florida corporation that was registered with the Florida Secretary of State on July 7, 2008, with a principal place of business of 225 East 73rd Street, Apartment 11G, New York, NY 10021.  The registered agent for East End Associates is Steven Silverman, whose address is listed as 3234 Harrington Dr., Boca Raton, FL 33496.  East End Associates filed a fictitious name registration with the Florida Secretary of State on September 8, 2009, to do business in Florida under the name "Christian Diabetic Network."  East End Associates operates and staffs a telemarketing call center in New York, NY, to conduct prohibited telephone solicitations of Medicare beneficiaries, and others, for the purpose of generating DME orders for Med-Care, which in turn submits claims to Medicare.  Upon information and belief, Med-Care paid remuneration to East

End Associates and/or its principals for generating referrals of Medicare beneficiaries, which created an illegal kickback relationship between Med-Care and East End Associates, and which tainted the universe of such referrals from East End Associates.

9.      Defendant Daniel M. Porush is a principal of Med-Care (although his name does not appear as an officer of the company in corporate filings and, upon information and belief, does not appear on any CMS-required documentation, such as CMS-855s), and he is a driving force behind the submission of false claims and false statements to Medicare by Med-Care.  Mr. Porush is actively involved in the operation and management of Med-Care's Boca Raton office and, upon information and belief, has an undisclosed ownership interest in Med-Care.  Mr. Porush was also previously listed as a managing member, along with Steven Silverman and Lorri Silverman, in a Florida corporation by the name of "Med-Care RX Pharmacy, LLC," which had the same street address as Med-Care.  Med-Care RX Pharmacy, LLC, filed a notice with the Florida Secretary of State on November 1, 2010, that it was ceasing to do business as of that date.

Mr. Porush is a convicted felon who was previously charged in the Southern District of New York with conspiracy to commit securities fraud, conspiracy to commit money laundering, conspiracy to defraud the United States through the unlawful obstruction of justice, and perjury, all in connection with a high-profile securities boiler room pump-and-dump operation that involved deceitful, high-pressure telemarketing (and which was the inspiration for the movie "Boiler Room" and for which there is a second film due out later this year starring Leonardo DiCaprio named "The Wolf of Wall Street"). A copy of the original Information charging Mr. Porush is attached hereto as **Exhibit 1**.  In 2002, Mr. Porush pled guilty to eleven felony counts, was ordered to pay more than $200 million in restitution, and was sentenced to forty-eight

months imprisonment and three years of supervised release.  A copy of the "Judgment Including Sentence" is attached hereto as **Exhibit 2**.  In early 2005, following his stint in federal prison, Mr. Porush sought to relocate to South Florida and requested that his three-year term of probation be transferred to the Southern District of Florida, which was approved.  A copy of the "Transfer of Jurisdiction" is attached hereto as **Exhibit 3**.  Upon information and belief, upon his release from prison, and while on probation in Florida, Mr. Porush again began engaging in and/or directing deceitful, high-pressure telemarketing activities through Med-Care and/or its affiliates, although this time he specifically targeted Medicare beneficiaries.  Attached as composite **Exhibit 4** are Florida corporate records reflecting Mr. Porush's incorporation of "Christiandiabetics.org, Inc.," on September 12, 2005, with an initial physical address next to Med-Care (and which was changed shortly thereafter to Med-Care's exact address).  With respect to Med-Care, Mr. Porush is compensated both directly as a payroll employee and off the books as an undisclosed principal/owner through, among other things, regular payments by Med-Care to "Blue Giant Enterprises, Inc.," a company purportedly owned by Lisa Porush, who is Mr. Porush's wife and the current Vice-President of Med-Care, and through the use of a corporate credit card that Mr. Porush utilizes to make exorbitant expenditures for living and other personal expenses.  Attached as composite **Exhibit 5** are corporate records regarding Ms. Porush's ownership of Blue Giant Enterprises, as well as a Citibank statement for Blue Giant's "operating account" for the period November 18th-30th, 2010, which reflects a November 19, 2010, incoming wire transfer from Med-Care in the amount of $258,574.00.  Attached as **Exhibit 6** is Mr. Porush's Med-Care American Express card statement for the period ending November 28, 2010, which reflects payments for personal expenses including $5,439.56 to Woodfield Country Club (where he resides), and over $20,000 to a high-end jewelry/art boutique in Palm Beach, FL.

The address for Blue Giant Enterprises is 3776 Coventry Lane, Boca Raton, FL 33496, which is the Porush's private residence in Woodfield Country Club in Boca Raton, FL, that was recently placed on the market for $3.75 million.  Attached as composite **Exhibit 7** are records relating to the Porush's private residence at Woodfield Country Club, which is also the apparent headquarters of Blue Giant Enterprises.  Mr. Porush is also currently leasing at least one Rolls-Royce for $12,000/month that is paid for by Blue Giant Enterprises.  Attached as **Exhibit 8** is a June 6, 2013, account statement from Rolls-Royce Motor Cars addressed to Blue Giant Enterprises at 3776 Coventry Lane, Boca Raton, FL 33496.

In addition to his criminal conviction, Mr. Porush has also been subjected to civil liability, permanent injunctions, and regulatory discipline (such as through the National Association of Securities Dealers) in connection with his fraudulent telemarketing conduct.  For example, on August 22, 2000, in connection with a securities fraud complaint filed by the Securities and Exchange Commission, a "Final Judgment of Permanent Injunction" was entered against Mr. Porush that stated in pertinent part, "[I]t is hereby ordered, that Daniel M. Porush, his agents, servants . . . disgorge $157,000 he received from the alleged transactions in securities" and that permanently enjoined Mr. Porush from violating Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14e-3 promulgated thereunder.  A copy of the docket in that matter is attached hereto as **Exhibit 9** (*see* DE #21).  Upon information and belief, Mr. Porush is a resident of Boca Raton, FL.

10.     Defendant Lawrence P. Silverman is the President of East End Associates and is in charge of East End Associates' New York telemarketing call center.  Lawrence P. Silverman manages the New York telemarketing call center and the telemarketers employed by East End Associates.  Among other things, Mr. Silverman instructs and directs the telemarketers to make

prohibited contact with Medicare beneficiaries and further instructs and directs them to make false statements to the Medicare beneficiaries who are improperly contacted in order to generate DME orders for Med-Care.

11.     Defendant Jordan Shamah is a floor supervisor in charge of East End Associates' New York telemarketing call center.  Among other things, Jordan Shamah instructs and directs the telemarketers to make prohibited contact with Medicare beneficiaries and further instructs and directs them to make false statements to the Medicare beneficiaries who are improperly contacted in order to generate DME orders for Med-Care.  Upon information and belief, Mr. Shamah is a resident of Long Island, NY.

12.     Defendant Steven Silverman, D.C., is a corporate officer and registered agent of Med-Care, the entity which is submitting the false claims and false statements to Medicare.  As explained above, after first refusing to voluntarily appear, Dr. Silverman was subpoenaed to appear and testify at a May 2013 Congressional hearing that was investigating, among other things, Med-Care's aggressive and improper Medicare marketing activities.  During that hearing, Mr. Silverman made false statements regarding Med-Care's marketing activities, including falsely denying that Med-Care employees told beneficiaries that DME is being provided to them for "free"; falsely denying that Med-Care cold-calls Medicare beneficiaries; and falsely claiming that Mr. Porush was merely an "employee" of Med-Care as opposed to a principal/owner of the company.  Upon information and belief, Dr. Silverman is a resident of Boca Raton, FL.

13.     Defendant Lorri (a/k/a "Lori") Silverman is a corporate officer of Med-Care, the entity which is submitting the false claims and false statements to Medicare.  Upon information and belief, Ms. Silverman is a resident of Boca Raton, FL.[1]

14.     Defendant Lisa Porush is the Vice-President of Med-Care, the entity which is submitting the false claims and false statements to Medicare, as well as President of Blue Giant Enterprises, which is her private residence-based "entity" that receives large sums of money from Med-Care.  Upon information and belief, Ms. Porush is a resident of Boca Raton, FL.

15.     Each of the Defendants is a knowing participant in the scheme to submit false claims to Medicare, and to create false statements and records material to the submitted false claims. Each of the Defendants is responsible in some actionable manner for the events, occurrences, injuries, and damages alleged herein.

16.     The term "Defendants" as used herein refers collectively to the aforementioned entities (i.e., Med-Care and East End Associates), who acted by and through their officers, principals and managerial employees, the aforementioned individuals (i.e., Daniel Porush, Lawrence Silverman, Jordan Shamah, Steven Silverman, Lorri Silverman, and Lisa Porush), and each of them.

17.     The corporate officers, principals and managerial employees of the Defendant entities (i.e., Daniel Porush, Lawrence Silverman, Jordan Shamah, Steven Silveman, Lorri Silverman, and Lisa Porush), in doing the acts and things described in this Complaint, were acting within the course and scope of their respective agencies and/or employment with the Defendant entities, and each of them, with the knowledge and consent of all the Defendants.

---

[1] Ms. Silverman's first name appears as both "Lorri" and "Lori" in various documentation.

18.     At all relevant times, each Defendant was the authorized agent of each other Defendant.

**III.     Jurisdiction and Venue**

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

20.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that, "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." *Id.* Section 3732(a) also authorizes nationwide service of process.  During the relevant period, Defendants Med-Care, Daniel Porush, Steven Silverman, Lorri Silverman, and Lisa Porush, resided in and/or transacted business in the Southern District of Florida.

21.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants Med-Care, Daniel Porush, Steven Silverman, Lorri Silverman, and Lisa Porush can be found in, reside in, and or transact business within this district.

**IV.     Nature of the False and Fraudulent Claims**

22.     The Defendants have been and remain collectively engaged in an illegal scheme to submit false and fraudulent claims to the Medicare Program through: 1) a telemarketing scheme designed to make prohibited unsolicited telephone calls from two call centers (one in Boca Raton, FL, and one in New York, NY) to Medicare beneficiaries regarding the provision of DME and then improperly billing Medicare for that DME; 2) sending DME to Medicare

beneficiaries that was improperly solicited, excessive in amount, unrequested by the beneficiary, and/or medically unnecessary, and then improperly billing Medicare for that DME; 3) billing Medicare for non-rendered DME; 4) violating the Medicare Anti-Kickback Statute through the routine waiver of co-payments and deductibles and the provision of allegedly "free" DME to Medicare beneficiaries in order to entice them to order DME from Med-Care; and 5) violating the Medicare Anti-Kickback Statute through Med-Care's illegal relationship with and payments to East-End Associates for referrals of Medicare beneficiaries.  The claims submitted by Med-Care to Medicare resulting from this scheme were not eligible for payment under applicable law and are therefore "false claims" for purposes of the Act.

23.     As background, Medicare is a federally-funded health insurance program for the elderly and the disabled.  Medicare was created in 1965 in Title XVIII of the Social Security Act and is codified at 42 U.S.C. § 301 *et seq*.  Medicare is administered by CMS and is funded through HHS.

24.     Claims submitted to Medicare for reimbursement must satisfy the requirements of the Social Security Act, as well as applicable regulations, procedures, and instructions. Providers participating in Medicare are required to familiarize themselves with all applicable laws, regulations, procedures, and instructions and to certify on each claim that it is being submitted in full compliance with governing law.  Federal regulations also require providers to furnish CMS, through its intermediaries, all information necessary to assure proper payment under the Medicare program.  A copy of a notice of "Medicare DMEPOS Supplier Standards" recovered from Med-Care's Boca Raton office is attached as **Exhibit 12**, which specifically provides that, "A supplier must agree not to initiate phone contact with beneficiaries, with a few

exceptions allowed.  This standard prohibits suppliers from calling beneficiaries in order to solicit new business."

25.     Medicare has multiple "parts."  For example, Medicare Part A, the Basic Plan of Hospital Service, covers the cost of hospital and related ancillary services, such as home health agencies and skilled nursing facilities.  Medicare Part B covers the cost of physician services and related ancillary services, including DME.  Under applicable regulations, to be reimbursable under Medicare Part B, DME orders must be, among other things, ordered by a physician, be medically necessary, be an item or service which is specifically covered by the Medicare Program, and not be the result of prohibited, unsolicited telemarketing.

26.     In some cases, Medicare Part B will cover specific DME items such as diabetic testing supplies, nebulizers, continuous positive airway ("CPAP") devices for apnea, and massage therapy devices.  These are examples of the types of DME that Med-Care improperly billed to Medicare (through Medicare's DME fiscal intermediaries in Florida, Palmetto GBA and CIGNA).

27.     Section 1834(a)(17)(A) of the Social Security Act (codified at Title 42 of the U.S. Code) expressly prohibits suppliers of DME (such as Med-Care) and their agents from making unsolicited telephone calls to Medicare beneficiaries regarding the furnishing of covered items, except in certain limited circumstances not present here.  *See id.* (stating, "A supplier of a covered item under this subsection may not contact an individual enrolled under this part by telephone regarding the furnishing of a covered item to the individual unless 1 of [3 exceptions] . . .  applies:").  More specifically, for example, DME suppliers can telemarket Medicare beneficiaries: (1) if the supplier has written permission from the beneficiary (which Med-Care generally did not have); or (2) if the supplier is only contacting the beneficiary regarding the

same item it previously provided (Med-Care routinely contacted beneficiaries that it had initially improperly solicited regarding many different types of DME that it had not previously provided to those beneficiaries).

28.     Section 1834(a)(17)(B) specifically prohibits payment by the Medicare Program to a DME supplier that submits a claim to Medicare which was generated through prohibited telephone solicitation, either directly or through the use of an agent.  *See id.* (stating, "If a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier.").

29.     Notwithstanding the express prohibition against unsolicited telemarketing, Med-Care, through its agents, employees and/or East End Associates, routinely made unsolicited telephone calls to Medicare beneficiaries regarding the furnishing of DME in violation of section 1834(a)(17)(A) and improperly submitted false claims for payment that were the result of the unsolicited telephone calls in violation of section 1834(a)(17)(B).

30.     Claims submitted to Medicare for DME provided to Medicare beneficiaries that were the result of prohibited, unsolicited telephone calls, such as those submitted by Med-Care, are false claims.

31.     Thus, all claims submitted to Medicare by Med-Care that were the product of the prohibited, unsolicited telephone calls were false and subject the Defendants to liability under the Act.

32.     Section 1862(a)(1)(A) of the Social Security Act provides that only medically necessary services, as defined in the Act and associated regulations, provided to Medicare beneficiaries are covered and payable services.   Accordingly, the submission of claims to

Medicare for DME which was not medically necessary for the treatment of a covered disease or condition of a Medicare beneficiary is a false claim under the Act.

33.     Thus, all claims submitted to Medicare by Med-Care that were for medically unnecessary DME or otherwise non-covered items of DME were false and subject the Defendants to liability under the Act.

34.     The Medicare Anti-kickback Statute, 42 U.S.C. § 1320a-7(b)(b), prohibits the offering or giving of anything of value (including routine waivers of co-payments and deductibles, and providing free or reduced-cost equipment), either directly or indirectly, to induce the ordering of any item or service which may be covered by the Medicare Program.

35.     Claims submitted to Medicare for DME orders which were generated through prohibited inducements in violation of the Medicare Anti-kickback Statutes are rendered false claims as a result of the violation of the Medicare Anti-kickback Statute.

36.     Thus, all claims submitted to Medicare by Med-Care for DME that were generated through prohibited inducements to Medicare beneficiaries (such as routine waivers of co-payments and deductible, and the providing of "free" or reduced-cost equipment) were false and subject the Defendants to liability under the Act.

37.     Similarly, all claims submitted to Medicare by Med-Care for DME that were generated through Med-Care's illegal kickback relationship with East End Associates were false and subject the Defendants to liability under the Act.

38.     At all times relevant to this Amended Complaint, Medicare contracted with multiple entities to process claims for DME.  These included, but were not limited to, Palmetto GBA and CIGNA, which served as the contracted DME regional contractor for the Southeast United States.  As a result, Med-Care was required to and did submit its Medicare claims for

payment for the DME to one of Medicare's contractors, which varied depending upon the time period and the location of the supplier or beneficiary.  Those contractors would then request payment from the United States on behalf of Defendants and forward payment to Med-Care. Examples of Medicare remittances sent to Med-Care are attached hereto as **Exhibit 13**.

39.     In addition to submitting claims under Medicare Part B, Med-Care also submitted false and fraudulent claims for DME to a number of Medicare Advantage Plans under Medicare Part C.  The same pertinent marketing and billing restrictions and requirements applicable to Medicare Part B apply to claims submitted under Medicare Part C.

## V.     Relator Bumbury's Direct and Personal Knowledge

40.     Ms. Bumbury has direct and personal knowledge of the violations alleged herein as a result of her employment as a telemarketer between August 4, 2010, and November 1, 2010, for the above entities and individuals.   During the scope and course of Ms. Bumbury's employment, and as instructed and directed by the Defendants, she personally solicited Medicare beneficiaries (as well as private insurance beneficiaries) to market and sell DME.  Ms. Bumbury was employed in the New York call center, which is located at 336 W 37th Street, Suite 300, New York, NY 10016.

## VI.    Specific Allegations

41.     The Defendants have been and are engaged in a conspiracy and scheme to submit false claims to the Medicare Program for DME including, but not limited to, diabetic supplies, nebulizers, CPAP devices, back braces, and massage therapy devices.   The individual Defendants manage and operate the entity Defendants (i.e., Med-Care and East End Associates), with Med-Care submitting Medicare claims for DME sales generated at both centers.  Attached as composite **Exhibit 14** are internal e-mails between principals of the two entities (including

"Danny" [Porush] and "Steve" [Silverman]) divvying up expenses, as well as handwritten notes calculating the combined profits and expenses from the New York and Florida operations.

42.     At the time of the Relator's employment, the New York telemarketing call center ran two shifts of approximately 17 telemarketers a day, Monday through Thursday, and a single shift of telemarketers on Fridays and Saturdays.  The telemarketers made unsolicited contact with prospective purchasers, including Medicare beneficiaries, sometimes through the use of autodialing telephone equipment. Based upon the repeated advertisements placed by the Defendants for telemarketers since Relator's departure, as well as the information contained in Section VIII, similar operations continue to the present day.

43.     There is a second call center located at 933 Clint Moore Road, Boca Raton, FL 33487.  The Boca Raton call center employed approximately 100 telemarketers, who also made unsolicited contact with prospective purchasers, including Medicare beneficiaries, sometimes through the use of autodialing telephone equipment.  Upon information and belief, similar operations continue to the present day.  Distribution of medical supplies principally occurs from the Boca Raton office, as well as at least some of the administrative functions of Med-Care.

44.     The telemarketers, including Ms. Bumbury, were provided a "script" by the Defendants to use which included materially false statements including, but not limited to, that the beneficiary was being contacted because the beneficiary had requested information regarding DME.  However, no such request was actually made by the beneficiary, and the beneficiaries regularly confirmed to Ms. Bumbury that they had not requested to be contacted, nor had they ever heard of Med-Care, the Christian Healthcare Network (which is a registered fictitious name for Med-Care), or the Christian Diabetic Network (which is a registered fictitious name for East

End Associates).  Upon information and belief, approximately 70% of the unsolicited calls made by the telemarketers are to Medicare beneficiaries.

45.     Ms. Bumbury was also instructed by the Defendants, as were the other telemarketers she worked with, that the telemarketers did not need to always follow the script and should say whatever they needed to say, and make whatever representations they needed to make, to obtain billing information (including Medicare billing information) and to secure a sale.

46.     The false representations that were used by the telemarketers included, but were not limited to: 1) telling the beneficiary that they were being provided the product for "free ;" 2) telling the beneficiary that the beneficiary or someone in their family had specifically requested and/or authorized Med-Care to call the beneficiary; 3) telling the beneficiary that the beneficiary's physician had asked Med-Care to call the beneficiary; 4) telling the beneficiary that the caller was associated with "Med-Care" but pronouncing it like "Med-i-care" in an effort to trick the beneficiary; 5) telling the beneficiary that they were calling on behalf of the "Christian Healthcare Network" and/or the "Christian Diabetic Network" and that these were charitable organizations that donate their proceeds to causes such as veterans groups; 6) telling the beneficiary that they were associated with the "American Diabetic Association"; and 7) telling the beneficiary that the telemarketer was calling on behalf of the beneficiary's current DME supplier to upgrade their diabetic testing equipment, and then the beneficiary would be switched to Med-Care without the beneficiary's knowing consent.

47.     On the basis of Relator's direct and personal knowledge of the Defendants' business practices, as well as information developed by Relator through additional investigation, Relator alleges on information and belief that these prohibited practices are widespread in Defendants' business.

48.     In furtherance of the scheme, Med-Care routinely sent false correspondence to physicians nationwide stating that Med-Care had received (as opposed to solicited) a request to supply the physician's patient with, for example, diabetic testing supplies, and asking the physician to complete the enclosed "Physician Order Form."   In doing so, Med-Care also actively concealed its fraudulent scheme from the ordering physicians, who would not have ordered the equipment if they knew the truth.   Examples of these letters are attached hereto as composite **Exhibit 15**.   In fact, these types of bogus communications to physicians were part of the impetus for the 2013 Congressional investigation into Med-Care's improper marketing activities that was led by the U.S. Senate's "Committee On Homeland Security and Governmental Affairs (Subcommittee on Financial and Contracting Oversight)."   Attached as **Exhibit 16** is a January 16, 2013, letter from Dr. Charlotte Kennedy to HHS-OIG (cc'd to U.S. Senators Claire McCaskill and Roy Blunt) cited during the Congressional investigation, which complained about Med-Care's marketing tactics ("Please be advised that every single one of these patients did not request and of these devices or products.   There were cold calls to their homes and, in fact at one point, one patient was badgered several times over several days . . . .").

49.     As a consequence of Med-Care's marketing tactics, Medicare beneficiaries would be shipped orders for DME from Med-Care that had been improperly solicited in the first instance and, in many cases, that the beneficiaries did not request, desire and/or need.   More specifically, in addition to the improperly solicited DME orders, Med-Care also routinely sent and billed Medicare for DME that exceeded the beneficiary's needs in terms of quantity (e.g., Med-Care would sometimes send a diabetic patient far more diabetic testing strips than needed and/or ordered, and Med-Care would sometimes send excessive quantities of items such as albuterol that would expire before they could even be utilized by the beneficiary); Med-Care

would send and bill Medicare for additional types of DME that the beneficiary had not requested and/or that was medically unnecessary (e.g., Med-Care would send a diabetic patient, in addition to diabetic testing supplies, a back brace, a nebulizer, a CPAP machine, etc.); and/or DME that the beneficiary specifically told Med-Care not to send.  Ms. Bumbury is personally aware of beneficiaries complaining about the receipt of unwanted product.  Examples of records confirming rejections of unwanted orders by beneficiaries are attached hereto as **Exhibit 17** and are discussed in Section VIII.

50.     The telemarketers were paid, in addition to an hourly wage, a commission of between $2.50 and $10 per item sold.  The telemarketers had a quota of 15 to 20 sales a week per telemarketer.   Payroll records reflecting commission and other payments to the Defendants' employees and/or agents are attached hereto as **Exhibit 18**.

51.     These quotas were generally met by the telemarketers in New York, and upon information and belief, the telemarketers in Florida regularly exceed this quota.  Therefore, upon information and belief, Med-Care is originating 5,000 or more new orders a month.  Attached as composite **Exhibit 19** are documents reflecting substantial Medicare billing by Med-Care, including one showing over $500,000 in Medicare claims during the fourth quarter of 2010.

52.     The telemarketers in New York, NY, are paid through East End Associates.   A copy of Ms. Bumbury's pay stub is attached hereto as **Exhibit 20**.  The telemarketers in Boca Raton, FL, are paid through Med-Care.

53.     Claims submitted by Med-Care to Medicare are false because they are generated through prohibited telephone solicitation by Med-Care and East End Associates.

54.     Claims submitted by Med-Care to Medicare are false because a portion of the DME it provides to Medicare beneficiaries is not medically necessary.

55.     Claims submitted by Med-Care to Medicare for some of the DME are false because the DME was not provided to and/or retained by the beneficiary.  With respect to DME that was returned to Med-Care by the beneficiaries, Med-Care failed to voluntarily refund such payments to Medicare as required by Federal law.

56.     Claims submitted by Med-Care to Medicare are false because they are generated in violation of the Medicare Anti-kickback Statute as a result of the DME having been offered to Medicare beneficiaries at no cost to them (routine waiver of co-payments and deductibles) or are allegedly offered for "free," but then billed to the Medicare program.

57.     Claims submitted by Med-Care to Medicare are false because they are generated in violation of the Medicare Anti-kickback Statute as a result of Med-Care's illegal kickback relationship with East End Associates.

58.     The payments received for the above violations were also rendered false through Med-Care's failure to timely self-disclose and refund the payments it received within 60 days of Med-Care's awareness and identification of known overpayment(s) resulting from the above violations.

**VII.    U.S. Congressional Investigation of Med-Care Confirms Relator's Allegations**

59.     On April 5, 2013, three years subsequent to the filing of Relator's initial Complaint, U.S. Senator Claire McCaskill, Chairman of the Subcommittee on Financial and Contracting Oversight, and U.S. Senator Ron Johnson, Ranking Member, sent correspondence to Defendant Steve Silverman informing him of an upcoming hearing entitled, "Oversight and Business Practices of Durable Medical Equipment Companies."  A copy of this letter is attached hereto as **Exhibit 21**.  To assist with the upcoming hearing, the Senators requested that Dr.

Silverman provide certain information including, among other things, Med-Care's "total revenue received from Medicare reimbursements each year from 2010 to 2012," as well as Med-Care's "total expenditures for advertising and direct marketing of company products to Medicare recipients for each year from 2010 to 2012." The letter noted that after receipt and review of this information, Dr. Silverman would learn whether he was going to be invited to testify at the hearing. Dr. Silverman refused to provide this information.

60.    On April 12, 2013, Senator McCaskill and Senator Johnson sent a second letter to Dr. Silverman, this time inviting him to voluntarily testify at the upcoming hearing. A copy of this letter is attached hereto as **Exhibit 22.** As explained in the letter:

> The purpose of the hearing is to review payments by the Centers for Medicare & Medicaid Services (CMS) under Medicare Part B to suppliers of medical products such as diabetic testing equipment, CPAP machines, power mobility devices, and back braces, also known as durable medical equipment. The hearing will also examine the promotion and marketing of these types of products by durable medical equipment companies to patients and their doctors. The hearing will also assess CMS' oversight of durable medical equipment reimbursements under Medicare Part B, including its efforts to control costs and detect and prevent abusive practices and improper payments.
>
> Your testimony should address Med-Care Diabetic & Medical Supplies, Inc.'s sale and reimbursement of durable medical equipment to Medicare beneficiaries under Medicare Part B. Specifically, you should be prepared to discuss payments by CMS from 2010 through 2012, including any overpayments that have been identified by CMS for durable medical equipment. You should also be prepared to discuss the promotion and marketing of durable medical equipment to Medicare beneficiaries, including your compliance with applicable statutes and regulations. In addition, you should be prepared to answer questions regarding audits or closed investigations that relat[e] to the sale of durable medical equipment under Medicare Part B.

61.    On April, 18, 2013, Senator McCaskill and Senator Johnson sent a third letter to Dr. Silverman advising him that the Subcommittee was issuing a subpoena for his testimony, in part because Dr. Silverman had refused to respond to the Subcommittee's repeated requests for

information and because his "refusal to assist the Subcommittee is adversely affecting the Subcommittee's ability to conduct oversight."  A copy of this letter is attached hereto as **Exhibit 23**.

62.     On April 23, 2013, the Majority Staff published a "Memorandum" to the Members of the Subcommittee on Financial and Contracting Oversight regarding the hearing on "Oversight and Business Practices of Durable Medical Equipment."  A copy of the Memorandum is attached hereto as **Exhibit 24**.  The Memorandum incorporated information that was obtained from CMS and explained that, "The purpose of the hearing is to examine payments by the Centers for Medicare and Medicaid Services (CMS) under Medicare Part B to suppliers of medical products such as diabetic testing equipment, CPAP machines, power mobility devices, also known as durable medical equipment.  The hearing will also examine durable medical equipment suppliers' promotion and marketing of these types of products to patients and their doctors."  *Id.*, p. 1.  The Memorandum further explained that, "Durable medical equipment has proven to be an area ripe for fraud and improper payments.  Medicare estimates for the last four years indicate that more than 60% of payments for durable medical equipment may be improper.  In addition, durable medical equipment suppliers are among the most frequent subjects of criminal fraud prosecutions in Medicare, Medicaid, and the Children's Health Insurance Program."  *Id.*, p. 4.  The Memorandum also observed that, "Improper payments under Medicare represent a potentially huge loss to the taxpayer.  From 2009 to 2012, Medicare paid more than $34 billion for durable medical equipment under Medicare Part B.  Of that amount, more than $21 billion may have been improperly paid."  *Id.*  This means that almost two-thirds of the DME billed to Medicare may have been improperly paid.

63.     Also pointed out in the Memorandum is that, "Telemarketing of durable medical equipment is an area of particular concern.  The Office of Inspector General for the Department of Health and Human Services issued fraud warnings relating to telemarketing in 2003 and 2010."  *Id.*, p. 7.  Copies of these two HHS-OIG fraud warnings are attached hereto as composite **Exhibit 25**.    Similarly, on June 13, 2012, the HHS-OIG issued a Final Report entitled, "Medicare Contractors Lacked Controls To Prevent Millions in Improper Payments for High Utilization Claims for Home Blood-Glucose Test Strips and Lancets."  A copy of this report is attached hereto as **Exhibit 26**, which estimated that in connection with a review of claims at just four of its administrative contractors for CY 2007 that, "[t]he contractors improperly paid a total of approximately $209 million to [diabetic test strips and lancets]  suppliers."  *Id.* at p. 5.

64.     With respect to Med-Care, the Majority Staff Memorandum **[Exhibit 24]** specifically observed the following:

(a)     "Med-Care, a medical company based in Boca Raton, Florida, is a national supplier of durable medical equipment to Medicare beneficiaries.  From 2009 to 2012, Med-Care received more than $84 million from Medicare for durable medical equipment.  Over that time, period, Med-Care's annual payments increased by more than 270%, from $9.3 million in 2009 to $34.8 million in 2012."  *Id.*, p. 8.

(b)     "A sample of claims paid to Med-Care revealed that approximately 68% of Med-Care's claims were improper.  CMS' regional Recovery Audit Contractor, a contractor charged with identifying and recovering improper payments and making fraud referrals, found that over 400 of the more than 590 Med-Care claims reviewed were improper and demanded than Med-Care return $146,689 in overpayments.  If CMS were

to determine that the same rate of error exists throughout Med-Care's claims, Med-Care could owe up to $57 million in overpayments to the federal government." *Id.*

(c) "Sample reviews of Med-Care claims by Medicare Administrative Contractors (MACs), contractors responsible for Medicare claims processing and payment reviews, have resulted in very high error rates. Since 2011, Noridian, one of several MACs working for CMS, has reviewed more than 3,300 claims by Med-Care and denied 62% to 99% of claims depending on the review. Another MAC, National Government Services, reviewed a sample of 1,202 Med-Care claims and denied payment for 1,186, or approximately 99%. A third MAC, National Heritage Insurance Company, reviewed 138 Med-Care claims for diabetic testing supplies since August 2012 and denied payment for 85%." *Id.*

65.    On April 24, 2013, the Subcommittee met and heard testimony from: (1) Dr. Peter Budetti, Deputy Administrator and Director, Center for Program Integrity, CMS; (2) Laurence Wilson, Director, Chronic Care Policy Group, Center for Medicare, CMS; and (3) Charlene Stanley, Zone Program Integrity Contractor Operations Director, AdvanceMed Corporation. The hearing was continued until May 22, 2013. At the outset of the hearing, Senator McCaskill observed that, "Last year, the Federal Government spent nearly $9 billion on payments for medical equipment under Medicare Part B, and we are not even sure about that figure. CMS estimates that as much as 66 percent of this, almost $6 billion, may have been improperly paid to companies who submitted claims for equipment that was not medically necessary, was not properly justified, or was never even delivered. One significant concern is that the prevalent practice among some medical equipment companies is that they aggressively call, e-mail, and write Medicare beneficiaries to directly market their products." *Id.* at p. 3.

66.     On May 22, 2013, Dr. Silverman, after being subpoenaed, appeared before the Subcommittee, along with the principal of a similar DME supplier, Jon Letko of U.S. Healthcare Supply, LLC.   Mr. Letko declined to answer any questions, citing his Fifth Amendment privilege.  Dr. Silverman did testify, however, and a transcript of his testimony is attached hereto as **Exhibit 27.**  Dr. Silverman falsely testified under oath that Med-Care does not engage in illegal telemarketing, that it does not wrongfully acquire Medicare beneficiary information for use in marketing, and that it has the proper back-up "documentation" to justify each call it makes. *Id.* at p. 30.

67.     As a result of, among other things, the Congressional investigation and Med-Care's prior interactions with CMS (including receipt of the Medicare DME supplier standards, CMS's suspension of Med-Care's provider number in 2012, and multiple audits by Medicare contractors in 2011 and 2012), Med-Care was on specific notice of wrongfully received payments that were caused by its prohibited marketing activities.  Despite being on notice that Med-Care had received millions of dollars in Medicare overpayments, and despite an affirmative legal obligation to voluntarily repay the overpayment, Med-Care failed to return those overpayments to CMS in direct violation of Federal law and the False Claims Act.

## VIII.   <u>Specific False Claims Examples</u>

68.     All claims submitted by Med-Care in connection with the following Medicare beneficiaries were false claims because they were all the result of unsolicited telemarketing calls to Medicare beneficiaries by Med-Care in direct violation of Federal law, involved inducements prohibited by the AKS, were not rendered or retained by the Medicare beneficiary, were not medically necessary, and/or a combination thereof:

(a)      Medicare beneficiary "K.W." of Cedar Rapids, Iowa 52404.   Beginning in approximately February 2013, K.W. began receiving both unsolicited telemarketing phone calls and unsolicited DME from Med-Care.   During the first unsolicited telemarketing call, a Med-Care telemarketer told K.W. that Med-Care was "Medicare approved" and that Med-Care could send her "free" diabetic testing supplies, an offer which K.W. accepted.   K.W. thereafter began receiving numerous unsolicited calls from Med-Care offering a variety of DME items, including a new CPAP machine and nebulizer.   K.W. stated that she specifically told the Med-Care telemarketer that she did not need or want a new CPAP or nebulizer because she already had one of each.   Notwithstanding, in March 2013, Med-Care shipped a new CPAP and nebulizer to K.W., along with 675 doses of albuterol.   With respect to the 675 doses of albuterol for her nebulizer, K.W.'s prescription only called for usage three times a day as needed.   At three times a day, K.W. would only need 180 doses every three months (at maximum), and most of the stock sent by Med-Care would have expired in the next three months.   K.W. called Med-Care to complain and was told by Med-Care that she could "just keep" the items.   K.W. nevertheless shipped the DME back to Med-Care and demanded to be reimbursed for her shipping expenses.   Along with the shipment, K.W. included a completed "Customer Satisfaction Questionnaire" in which she complained about the recent receipt of "very heavy" packages containing a new CPAP and nebulizer that she had not requested.   K.W. stated on the questionnaire that, "It will cost me an arm and a leg to return these because they are so heavy.   SO, here's my deal – you reimburse me my postage OR I will turn you in for Medicare fraud.   I do not need these and I told you that. You sent them anyway, so that is wasting of Medicare Money which costs us all.   I will give you until May 1st to get a check to me or I will turn you in.   If you think I am joking, you better think again."   Med-Care paid K.W. for the shipping.   Attached as composite **Exhibit 28** are K.W.'s

questionnaire and an April 18, 2013, letter K.W. sent to Noridian Administrative Services (a CMS contractor) complaining of Med-Care's fraudulent conduct. The specific false claims include, but are not necessarily limited to, the following:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Medicare Paid | Wellmark BlueCross Paid (Medicare Supp.) |
|---|---|---|---|---|---|---|
| 13060846588000 | 02/21/13 | 1.0 Pos airway press headgear (A7035-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $50.00 | $29.66 | |
| 13060846588000 | 02/21/13 | 1.0 Pos airway pressure tubing (A7037-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $46.00 | $30.62 | |
| 13060846588000 | 02/21/13 | 6.0 Pos airway pressure filter (A7038-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $36.96 | $24.19 | |
| 13060846588000 | 02/21/13 | 1.0 Filter, non disposable w/ pap (A7039-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $15.64 | $11.44 | |
| 13060846588000 | 02/21/13 | 1.0 CPAP full face mask (A7030-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $226.37 | $140.83 | |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $226.37 | $140.83 | $35.21 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $195.00 | $156.00 | $39.00 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $50.00 | $29.66 | $7.42 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $46.00 | $30.62 | $7.65 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $36.96 | $24.19 | $6.05 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $15.64 | $11.44 | $2.86 |
| 13060846586000 | 02/23/13 | 6.0 Disposable nebulizer sml vol (A 7004-NU) NEW | Med-Care Diabetic | $60.00 | $0.00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | EQUIPMENT | | | | |
| 13060846586000 | 02/23/13 | 6.0 Disposable compressor filter (A 7013-NU) NEW EQUIPMENT | Med-Care Diabetic | $12.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 3.0 Aerosol mask used w/ nebulizer (A 7015-NU) NEW EQUIPMENT | Med-Care Diabetic | $15.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 1.0 Nebulizer with compression (E0570-RRKH) Rental | Med-Care Diabetic | $30.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 675.0 Albuterol non-comp unit (J7613-KO) | Med-Care Diabetic | $1,012.50 | $0.00 | |
| 13060846586000 | 02/23/13 | 1.0 Disp fee inhal drugs/90 days (Q0514) | Med-Care Diabetic | $66.00 | $8.50 | |
| 13060846586000 | 02/23/13 | 6.0 Nebulizer administration set (A7003-NU) NEW EQUIPMENT | Med-Care Diabetic | $60.00 | $0.00 | |
| 05130776483500 | 02/23/13 | Home Injections | Med-Care Diabetic | $1,012.50 | $0.00 | $33.08 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $60.00 | $0.00 | $17.82 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $60.00 | $0.00 | $11.76 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $15.00 | $0.00 | $6.12 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $12.00 | $0.00 | $5.40 |
| 05130776483500 | 02/23/13 | Home Medical Care | Med-Care Diabetic | $66.00 | $8.50 | $57.50 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $30.00 | $0.00 | $17.44 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $450.00 | $165.46 | $41.36 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $200.00 | $57.87 | $14.47 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $96.00 | $27.00 | $6.75 |
| 1306584198400 | 03/01-05/31/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | |
| 1306584198400 | 03/01- | 1.0 Blood glucose monitor | Med-Care | $200.00 | $57.87 | |

| | 05/31/13 | home (E0607-NUKX) NEW EQUIPMENT | Diabetic | | | |
|---|---|---|---|---|---|---|
| 05131016338400 | 03/23/13 | Home Medical Equipment | Med-Care Diabetic | $30.00 | $13.95 | $3.49 |
| 13086858577000 | 03/23/13 | 1 Nebulizer, with compressor (E0570) | Med-Care Diabetic | $30.00 | $13.95 | |
| 05131196348500 | 03/25/13 | Home Medical Equipment | Med-Care Diabetic | $500.00 | $224.88 | $56.22 |
| 05131196348500 | 03/25/13 | Home Medical Equipment | Med-Care Diabetic | $150.00 | $83.40 | $20.85 |
| 13102840342000 | 03/25/13 | 1 Humidifier, heated, used with positive airway pressure device (E0562) | Med-Care Diabetic | $500.00 | $224.88 | |
| 13102840342000 | 03/25/13 | 1 Continuous airway pressure (cpap) device (E0601) | Med-Care Diabetic | $150.00 | $83.40 | |

(b)     Medicare beneficiary "K.M." of Salisbury, MO 65281.  Beginning in approximately 2012 and continuing into 2013, K.M. received unsolicited telemarketing phone calls and unsolicited DME from Med-Care.  K.M. agreed to accept the "free" DME from Med-Care.  During at least one of these unsolicited calls, Med-Care telemarketers pronounced "Med-Care" like "Med-i-care."  The Med-Care sales pitch also included the assertion that, "You don't have to pay for this."  K.M. subsequently noticed that a bill for the "free" DME was submitted to both Medicare and her private insurer, which upset K.M. based on the representation that the DME was "free" and because K.M. never gave Med-Care her Medicare number.  K.M. also learned that Med-Care called her personal physician (whose name she had not given to Med-Care) and falsely informed the physician that KM desired to switch to Med-Care as her DME supplier.  The specific false claims include, but are not limited to, the following:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Medicare Paid | United of Omaha Paid (Medicare Supp.) |
|---|---|---|---|---|---|---|
| 12303875963000 | 09/14-12/13/12 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.90 | |
| 12303875963000 | 09/14/12 | 1.0 Lancet device each (A4258-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $0.00 | |
| 12303875963000 | 09/14/12 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $1.18 | |
| 12359861283000 | 12/14-03/13/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.90 | |
| 12359861283000 | 12/14-03/13/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $26.78 | |
| 12359861283000 | 12/14-03/13/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $145.49 | |
| 583720938500 | 12/14-03/13/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.90 | $1.97 |
| 583720938500 | 12/14-03/13/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $26.78 | $6.70 |
| 583720938500 | 12/14-03/13/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $145.49 | $36.37 |
| 13085831166000 | 03/22/13 | 1.0 Lancet device each (A4258-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $3.70 | |

| 13085831166000 | 03/22-06/21/13 | 3.0 Lancets per box (A4259-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | |
| 13085831166000 | 03/22-06/21/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DEMPOS DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $146.64 | |
| 13085831166000 | 03/22-06/21/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.96 | |
| 13085831166000 | 03/22/13 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $0.00 | |
| 583871960800 | 03/22/13 | 1.0 Lancet device each (A4258-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $3.70 | $12.85 |
| 583871960800 | 03/22-06/21/13 | 3.0 Lancets per box (A4259-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | $6.75 |
| 583871960800 | 03/22-06/21/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DEMPOS DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $146.64 | $36.66 |
| 583871960800 | 03/22-06/21/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.96 | $1.99 |
| 583871960800 | 03/22/13 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $0.00 | $1.50 |

(c)    Medicare beneficiary "G.W." of Muskegon, MI 49941.  G.W. has received many

unsolicited packages from Med-Care containing diabetic testing supplies.  G.W. called Med-Care

and instructed them to not send her anything else unless she called them first.  Med-Care has sent

G.W. so many unnecessary items that G.W. has a "big bag full of stuff" that G.W. was

considering giving away.  Pictures of the unnecessary DME are attached hereto as **Exhibit 29.**
Med-Care billed G.W.'s Medicare Advantage plan for the DME.  The specific false claims
include, but are not limited to, the following:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Amount Paid (Medicare Supp.) |
|---|---|---|---|---|---|
| 59605043259622 | 03/09/13 | Blood glucose test or reagent strips for home blood glucose (A4253) | Med-Care Diabetic | $600.00 | $273.60 |
| 59605043259622 | 03/09/13 | Lancets, per box of 100 (A4259) | Med-Care Diabetic | $128.00 | $0.00 |
| 59605043259622 | 03/09/13 | Normal, low and high calibrator solution/chips (A4256) | Med-Care Diabetic | $28.00 | $10.30 |

(d)    Medicare beneficiary "N.D." of Osceola, IN 46561.  N.D. is disabled and
diabetic.  N.D. was solicited by phone by Med-Care without his request, which made N.D. upset.
N.D. asked the Med-Care representative several times how they got N.D.'s name, phone number,
and how they knew N.D. had diabetes because N.D. had not solicited Med-Care.  The Med-Care
telemarketer had difficulty answering N.D.'s questions and suggested that N.D.'s wife had made
a request via computer, which was false.  N.D. nevertheless agreed to receive the "free" items
from Med-Care, and Med-Care has since that time sent him numerous diabetic testing supplies
and a CPAP device.  Med-Care has been supplying N.D. with DME for more than a year.  The
specific false claims are all claims submitted by Med-Care to Medicare in connection with DME
supplied by Med-Care to N.D.

(e)    Medicare beneficiary "B.C." of Matthews, NC 28105.  B.C. is diabetic and
received unsolicited telemarketing calls from Med-Care representatives, as well as unsolicited
DME from Med-Care, which B.C. returned to Med-Care.  B.C. did agree to receive the "free"

diabetic testing supplies, but Med-Care began sending more supplies than B.C. needed and additional DME that B.C. never requested, such as COPD-related items.  The normal sales pitch to B.C. included statements such as, "It's all free, you don't pay a penny."   B.C. alerted her physician about her receipt of the unsolicited DME items and suspected that Med-Care was committing Medicare fraud.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C.

(f)     Medicare beneficiary "B.K." of Cleveland, TN 37323.  B.K.'s relationship with Med-Care began with unsolicited telemarketing calls.   B.K. accepted Med-Care's offer to provide her with "free" diabetic testing supplies, which Med-Care provided.   B.K. often thereafter received more testing supplies than she needed and demanded on several occasions that Med-Care stop sending her packages.   Beginning approximately a year ago, on numerous occasions, B.K. would receive an unsolicited shipment of DME from Med-Care, which B.K. would send back to Med-Care, and that Med-Care would then turn around and send back to B.K. The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.K.

(g)     Medicare beneficiary "B.C." of Angleton, TX 77515.  B.C.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer who offered her "free" diabetic testing supplies.   The telemarketer falsely told B.C. that Med-Care received her name and number from B.C.'s personal physician, who the telemarketer claimed had informed Med-Care that B.C. needed diabetic testing supplies.   B.C. agreed to receive the testing supplies, which Med-Care provided.   Following this initial shipment, B.C. received many unsolicited phone calls from Med-Care, as well as a second, unsolicited shipment of diabetic testing supplies that contained an excessive amount of supplies that she did not need.   After receiving this

second, large shipment B.C. called Med-Care to demand that they not send her anything else unless she requested it.  B.C. saw billing records from "Texan Plus," her Medicare Advantage plan, associated with the Med-Care DME.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C.

(h)     Medicare beneficiary "C.B." of Payson, UT 84651.  C.B. is diabetic and received unsolicited telemarketing calls from Med-Care and eventually accepted Med-Care's offer to provide her with "free" diabetic testing supplies.  After the initial shipment, C.B. often received more testing supplies than she needed and asked Med-Care on several occasions to stop sending such a large quantity.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to C.B.

(i)     Medicare beneficiary "J.P." of Pass Christian, MS 39571.  J.P. has received many unsolicited packages from Med-Care containing diabetic testing supplies in 2012 and 2013.  J.P. is homebound and has had her niece take them to the post office in town to send them all back.  On one of the returned packages, the following note is written: "Please do not send this without my permission I'm reporting this to Medicare."   The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.P.

(j)     Medicare beneficiary "S.B." of Sullivan, IL 61951.  S.B. is diabetic and confirmed that she received unsolicited telemarketing calls from Med-Care in 2012 but refused Med-Care's offer to provide her with "free" diabetic testing supplies.  Med-Care sent her diabetic testing supplies anyway, which S.B. returned.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.B.

(k)     Medicare beneficiary "L.M." of Carthage, MO 64836.  L.M. is diabetic and over the course of approximately a year, routinely received diabetic testing supplies from Med-Care

that he never requested.   The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to L.M.

(l)      Medicare beneficiary "J.G." of Lake Oswego, OR 97035.  J.G. is diabetic and began his relationship with Med-Care through unsolicited calls from Med-Care representatives. Med-Care has also sent J.G. unsolicited DME, which he has generally returned to Med-Care unopened.   Med-Care has specifically sent J.G. unneeded diabetic testing supplies that he had not asked for and did not need.  J.G. recently called Med-Care and expressly told them, "Do not send me anything else unless I ask for it."  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.G.

(m)      Medicare beneficiary "S.M." of Woodridge, IL 60517.  S.M.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer in 2013 who offered S.M. "free" diabetic testing supplies.  S.M. agreed to receive the testing supplies, which Med-Care provided.  Med-Care thereafter started sending S.M. additional DME that S.M. did not request and did not want, including a CPAP machine for sleep apnea.  S.M. specifically told the Med-Care telemarketer that she did not want or need a new CPAP device because she already had one, and that she returned the CPAP device to Med-Care. The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.M.

(n)      Medicare beneficiary "S.T." of Bedford, IN 47421.  S.T. is diabetic, and her first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer who offered her "free" diabetic testing supplies in 2012.  S.T. agreed to receive the testing supplies, which Med-Care provided.   Med-Care also offered to provide S.T. with a new CPAP machine and

related DME, which S.T. agreed to receive.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.T.

(o)      Medicare beneficiary "L.E." of Imlay City, MI 48444.  L.E., who is diabetic, has routinely received unsolicited DME from Med-Care, which he has generally returned to Med-Care unopened.  Med-Care first began sending unsolicited boxes of DME to his residence "two or three years ago."  L.E. observed that after he returned unsolicited DME to Med-Care, his Medicare billing summary notice showed that Med-Care had billed Medicare for those items anyway.  L.E. called Medicare to complain about Med-Care.  Med-Care also sent L.E. an unsolicited brace for L.E.'s back, despite the fact that L.E. did not have any back problems and did not need it.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to L.E.

(p)      Medicare beneficiary "B.C." from Montrose, WV 262983.  B.C. is disabled and diabetic, and his first contact with Med-Care was an unsolicited phone call from Med-Care regarding his interest in receiving diabetic testing supplies.  Following this initial call, B.C. stated that Med-Care began sending him diabetic testing supplies "over and over" without his consent.  B.C. recalls that Med-Care called him "at least a dozen times" in a short period of time and so he called them back and instructed Med-Care not to call him anymore and to not send him anything else "ever again."  B.C. stated that after he instructed Med-Care to stop calling him, Med-Care began "harassing" him and calling him even more frequently.  B.C. stated that he recently called Med-Care again and had to speak to "at least four different people" regarding his situation, and that Med-Care has now stopped calling him.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C.

(q)      Medicare beneficiary J.P., from Sheridan, IN 46069.  J.P. is diabetic, and his first contact with Med-Care was an unsolicited telemarketing call approximately two years ago. J.P. recalled that the telemarketing representative explained during that initial call that J.P.'s doctor has asked Med-Care to give J.P. a call, which J.P. questioned.  Nevertheless, J.P. accepted Med-Care's offer to provide him with diabetic testing supplies.  J.P. stated that Med-Care thereafter started sending him "too much" and that he felt like Med-Care was "shoving it" at him. J.P. also stated that he called Med-Care and told the representative to stop sending DME. J.P. observed that Med-Care sometimes called him "5 times a week."  J.P. stated that he therefore called and repeatedly complained to Med-Care demanding they stop calling him.  J.P. also recalled that Med-Care wanted to send him a CPAP, but he refused.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.P.

### Count I
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### False Claims

69.      Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 68 of this Amended Complaint.

70.      This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

71.      Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or at least with reckless disregard to the truth or falsity thereof) submitted or caused to be submitted false claims to Medicare (under both Medicare Parts B and C) for payment by the United States from approximately 2004 to present.

72.     The United States, Medicare, its fiscal intermediaries, and Medicare Advantage plans, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

73.     By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged in the amount of tens of millions of dollars in Medicare funds.

74.     Thus, Defendants violated the False Claims Act, in that they knowingly presented and to caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

**Count II**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**False Statements**

75.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 66 of this Amended Complaint.

76.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

77.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or at least with reckless disregard to the truth or falsity thereof) made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(B).

78.     The United States, Medicare, its fiscal intermediaries, and Medicare Advantage plans, unaware of the falsity of the records, statements, and claims made or submitted by

Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

79.     By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged in the amount of tens of millions of dollars in Medicare funds.

80.     Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(B).

**<u>Count III</u>**
**Violation of the False Claims Act**
**31 U.S.C. §3729(a)(1)(G)**
**Failure to Repay Overpayment**

81.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 66 of this Amended Complaint.

82.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

83.     Through the acts described above and otherwise, Defendants and their agents and employees knowingly and improperly failed to timely disclose and repay to Medicare payments Med-Care received for DME equipment that should not have been initially paid by Medicare. Med-Care had a legal obligation to disclose and refund to Medicare overpayments Med-Care received within 60 days of Med-Care becoming aware of the existence of the overpayment.  By failing to timely voluntarily disclose and repay these identified overpayments, Med-Care concealed and avoided an obligation to pay or transmit money to the government in violation of the False Claims Act.

84.     By reason of the Defendants' failure to repay Medicare overpayments, the United States and the Medicare program have been damaged in the amount of tens of millions of dollars.

85.     Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(G).

## Count IV
## False Claims Act Conspiracy
## 31 U.S.C. § 3729(a)(1)(C)

86.     Relator realleges and incorporates by reference the allegations made in Paragraphs 1-66 of the Amended Complaint.

87.     This is a claim for treble damages and for penalties under the False Claims Act, 31 U.S.C. § 3729 *et. seq*. as amended.

88.     Through the acts described above and otherwise, Defendants entered into a conspiracy among themselves and with others to violate the False Claims Act by: 1) presenting or causing the presentation of false and fraudulent claims for payment or approved under the Medicare Program; 2) making and using, or causing the making or using, of false records or statements material to a false or fraudulent claim; and 3) concealing and avoiding an obligation to pay or transmit money to the United States.   Defendants have taken substantial steps in furtherance of the conspiracy including, *inter alia*, making unsolicited phone calls to Medicare beneficiaries, by submitting false claims under the Medicare program for payment or approval, by violating the Medicare Anti-Kickback statute, by directing their agents, consultants, and personnel not to disclose and/or to conceal Defendants' fraudulent practices, and by failing to timely refund to Medicare the overpayments received by Med-Care as a result of the above described scheme.

89.   The United States, Medicare, its fiscal intermediaries, and Medicare Advantage Plans, unaware of Defendants' conspiracy or the falsity of the records, statements and claims made by Defendants and their agents, employees and co-conspirators, and as a result thereof, have paid and continue to pay tens of millions of dollars in Medicare reimbursement that they would not otherwise have paid.  Additionally, Med-Care has failed to repay tens of millions of dollars of overpayments that Med-Care was obligated to, but has failed to timely disclose and repay to Medicare.

90.   By reason of Defendants' conspiracy and the acts taken in furtherance thereof, the United States has been damaged in the amount of tens of millions of dollars in Medicare funds.

91.   Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

**Prayer for Relief**

WHEREFORE, Plaintiff/Relator prays for judgment against defendants as follows:

92.   That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.;

93.   That the Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

94.   That Plaintiff/Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Civil False Claims Act;

95.   That Plaintiff/Relator be awarded all costs and expenses of this action, including attorneys' fees; and

96.     That the United States and Plaintiff/Relator receive all such other relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury.

DATED:  February 10, 2014

Respectfully submitted,


s/ Robert N. Nicholson
Robert N. Nicholson, P.A.
Florida Bar No. 933996
Robert@NicholsonEastin.com
Parker D. Eastin, P.A.
Florida Bar No. 48044
Parker@NicholsonEastin.com
Nicholson & Eastin, LLP
707 NE 3rd Ave., Suite 301
Fort Lauderdale, Florida 33304
Telephone: (954) 634-4400
Facsimile: (954) 634-4418

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

  s/ Robert N. Nicholson