# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 10-81634-CV-RYSKAMP

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. TIFFANY BUMBURY, STANLEY BERNSTEIN, and JAMIE JONES CAMUCCIO, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| MED-CARE DIABETIC & MEDICAL SUPPLIES, INC., a Florida corporation, EAST END ASSOCIATES, INC., a Florida corporation, DANIEL M. PORUSH, Individually, LAWRENCE P. SILVERMAN, Individually, JORDAN SHAMAH, Individually, STEVEN SILVERMAN, Individually, | ) ) ) ) ) ) |
| | ) |
| | ) |
| Defendants. | ) |
| _____/ | |

## THIRD AMENDED COMPLAINT

Plaintiff and Relators Tiffany Bumbury, Stanley Bernstein, and Jamie Jones Camuccio allege as follows:

### I.   Nature of the Case

1.      This case is about a long-running and multifaceted Medicare DME fraud scheme perpetrated by the Defendants for the purpose of submitting false claims to the Medicare Program in order to receive payments from the Medicare Program the Defendants were not entitled to receive.  This action is brought to recover damages and civil penalties on behalf of the United States of America arising from the false statements and false claims made and presented, and caused to be made and presented, by the Defendants in violation of the Federal False Claims

Act, 31 U.S.C. § 3729 *et seq.*, as amended (the "Act") as a result of the scheme.  The violations of the Act involved claims for reimbursement that Defendants made and caused to be made to Medicare since at least 2008 to the present that the Defendants knew were false and/or ineligible for reimbursement, or which the Defendants submitted and caused to be submitted in reckless disregard for the falsity of the claims and statements submitted, and in reckless disregard for the lack of eligibility for payment of the claims submitted.  The Defendants are comprised of the entities that generated and/or submitting the false claims, as well as the principals and operators of the entities that stood to substantially financially benefit from the submission of the false claims and statements.

2.     The three Relators in this matter are all former employees of the Defendants and all personally participated in and have personal knowledge regarding the False Claims Act scheme alleged herein.  Relator Tiffany Bumbury worked at Defendant East End Associates ("East End") in New York, NY, from August through November 2010 under the direction and direct supervision of Defendant Jordan Shamah and Defendant Lawrence Silverman.  Relator Stanley Bernstein worked at Defendant Med-Care Diabetic and Medical Supplies ("Med-Care") in Boca Raton, FL, from May 2010 to April 2014, where he worked under the direction and direct supervision of Defendant Daniel Porush, Defendant Steve Silverman, and for a period of time Defendant Jordan Shamah. Relator Jamie Camuccio worked at Med-Care in Boca Raton, FL, from January 2012 to February 2014, under the direction and direct supervision of Defendant Daniel Porush, Defendant Steve Silverman, and for a period of time Defendant Jordan Shamah.

3.     The Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount

of the false claims submitted to the Government.  The Act allows any person having information regarding a false or fraudulent claim against the Government to bring an action for him or herself (the "relator") and for the Government and to share in any recovery.

4.      Based on those provisions, Relators in this case seek to recover damages and civil penalties arising from the Defendants' presentation of false records, false claims, and false statements to the United States Government and its agents in connection with Defendants' claims for reimbursement for durable medical equipment ("DME") provided and allegedly provided to beneficiaries under the Medicare program.

## II.   Jurisdiction and Venue

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

6.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that, "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred."  *Id.* Section 3732(a) also authorizes nationwide service of process.  During the relevant period, Defendants Med-Care, Daniel Porush, and Steven Silverman, resided in and/or transacted business in the Southern District of Florida.

7.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants Med-Care, Daniel Porush, and Steven Silverman, can be found in, reside in, and or transact business within this district.

### III.    Medicare and Reimbursement

8.       Medicare is a federally-funded health insurance program for the elderly and the disabled.  Medicare was created in 1965 in Title XVIII of the Social Security Act and is codified at 42 U.S.C. § 301 *et seq*.  Medicare is administered by CMS and is funded through HHS.

9.       Claims submitted to Medicare for reimbursement must satisfy the requirements of the Social Security Act, as well as applicable regulations, procedures, and instructions. Providers participating in Medicare are required to familiarize themselves with all applicable laws, regulations, procedures, and instructions and to certify on each claim that it is being submitted in full compliance with governing law.  Federal regulations also require providers to furnish CMS, through its intermediaries, all information necessary to assure proper payment under the Medicare program.

10.      Medicare has multiple "parts."  For example, Medicare Part A, the Basic Plan of Hospital Service, covers the cost of hospital and related ancillary services, such as home health agencies and skilled nursing facilities.  Medicare Part B covers the cost of physician services and related ancillary services, including DME.  Under applicable regulations, to be reimbursable under Medicare Part B, DME orders must be, among other things, ordered by a physician, be medically necessary, be an item or service which is specifically covered by the Medicare Program, and not be the result of prohibited, unsolicited telemarketing.

11.      In some cases, Medicare Part B will cover specific DME items such as diabetic testing supplies, nebulizers, continuous positive airway ("CPAP") devices for apnea, braces and massage therapy devices.  These are examples of the types of DME that Med-Care improperly billed to Medicare (through Medicare's DME fiscal intermediaries in Florida, Palmetto GBA and CIGNA, among others).

12.     At all times relevant to this complaint, Medicare contracted with multiple entities to process claims for DME.  These included, but were not limited to, Palmetto GBA and CIGNA, which served as the contracted DME regional contractor for the Southeast United States. Medicare has contracted with other private contractors to process claims for the other regions of the United States.  As a result, Med-Care was required to and did submit its Medicare claims for payment for the DME to one of Medicare's contractors, which varied depending upon the time period and the location of the supplier or beneficiary.  Those contractors would then request payment from the United States on behalf of Defendants and forward payment to Med-Care.

13.     In addition to submitting claims under Medicare Part B, Med-Care also submitted false and fraudulent claims for DME to a number of Medicare Advantage Plans under Medicare Part C.  The same pertinent marketing and billing restrictions and requirements applicable to Medicare Part B apply to claims submitted under Medicare Part C.  Medicare Part C plans are funded by Medicare Program funds.

**IV.     Nature of the False Claims Act Scheme**

14.     As described more fully herein, each of the Relators personally participated in and has personal knowledge regarding the Defendants' multifaceted scheme to submit false claims to Medicare in connection with Defendant Med-Care's multimillion dollar, nationwide DME business.  Moreover, specific false claims that directly resulted from the scheme are specifically identified in Paragraph 128 of this complaint and, with respect to Medicare beneficiary K.W., are attached hereto as Exhibit 1.   False claims have been submitted to Medicare by Med-Care as a direct result of the following facets of the scheme:

### A.  Illegal Telemarketing

15.     The telemarketing component of the Defendants' scheme uses boiler room telemarketing tactics to make prohibited, misleading, and unsolicited telephone calls from two call centers, one of which is located at Defendant Med-Care's facilities in Boca Raton, FL, and the other of which is located at Defendant East End's facility in New York, NY.  These call centers make prohibited and unsolicited calls to Medicare beneficiaries regarding the provision of DME, and Med-Care submits claims to and receives reimbursement from Medicare for that improperly solicited DME.  As explained in more detail below, any claim resulting from prohibited telemarketing of Medicare beneficiaries is not payable, and therefore, a false claim.

16.     The illegal telemarketing operation was designed and originally orchestrated by Defendant Daniel Porush, who is an expert in running high-pressure telemarketing operations. The Boca Raton telemarketing operation has been run by Defendant Daniel Porush and Defendant Steven Silverman.  Defendant Jordan Shamah began supervising the Boca Raton call center in late 2012 or early 2013. Prior to relocating to Boca, Defendant Jordan Shamah, along with Defendant Lawrence Silverman, ran the telemarketing operation at East End in New York. Defendant Jordan Shamah and Defendant Lawrence Silverman directly supervised and specifically instructed Relator Tiffany Bumbury in 2010 to make prohibited and misleading phone calls to Medicare beneficiaries for the purpose of securing Medicare DME sales.

17.     Relators Stanley Bernstein and Jamie Camuccio, both of whom worked in Med-Care's Boca Raton call center for several years, were directly supervised and specifically instructed by, among others, Defendant Daniel Porush, to make unsolicited and misleading phone calls to Medicare beneficiaries for the purpose of securing Medicare DME sales.

18.     The Relators and other telemarketers were paid, in addition to an hourly wage, a commission that varied of time, but ranged from between $2.50 and $25 per item sold.  The telemarketers had either a quota of 15 to 20 sales a week per telemarketer, or at other times a set dollar amounts of sales as the quota.

19.     The telemarketers in New York, NY, were paid through East End.   A copy of Relator Tiffany Bumbury's pay stub is attached hereto as Exhibit 2.  The telemarketers in Boca Raton, FL, were and are paid through Med-Care.

20.     Relevant here, section 1834(a)(17)(A) of the Social Security Act (codified at Title 42 of the U.S. Code) expressly prohibits suppliers of DME (such as Med-Care) and their agents from making unsolicited telephone calls to Medicare beneficiaries regarding the furnishing of covered items, except in certain limited circumstances not present here.  *See id.* (stating, "A supplier of a covered item under this subsection may not contact an individual enrolled under this part by telephone regarding the furnishing of a covered item to the individual unless 1 of [3 exceptions] . . .  applies:").  More specifically, DME suppliers can engage in telemarketing with respect to Medicare beneficiaries in one of three defined instances: (1) if the supplier has written permission from the beneficiary (which Med-Care generally did not have); (2) if the supplier is only contacting the beneficiary regarding the same item it previously provided (Med-Care routinely contacted beneficiaries that it had initially improperly solicited regarding many different types of DME that it had not previously provided to those beneficiaries); and (3) if the supplier provided DME to that beneficiary in the preceding fifteen months.

21.     **None** of the false claims specifically identified and alleged in this complaint fell within any of the three statutory exceptions.   As is clear from the Medicare beneficiary interviews described herein and conducted as part of the Relator Investigation (discussed *infra* in

Paragraph 128), Med-Care's **first contact** with the Medicare beneficiaries was **unsolicited by the beneficiary and therefore prohibited**. *See*, *e.g.*, Paragraph 128(f) ("B.K.") ("B.K.'s relationship with Med-Care began with unsolicited telemarketing calls."); (g) ("B.C.") ("B.C.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer who offered her 'free' diabetic testing supplies."); (l) ("J.G.") ("J.G. . . . began his relationship with Med-Care through unsolicited calls from Med-Care representatives."); (m) ("S.M.") ("S.M.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer in 2013 who offered S.M. 'free' diabetic testing supplies."); (n) ("S.T."); (p) ("B.C."); and (q) ("J.P."). Additionally, each of the Relators was aware that calls they were making were the product of leads purchased by Med-Care (and thus, in addition to the fact the purchase of the lead violated the Anti-Kickback Statute, the beneficiaries contacted as a result of the leads had not initiated contact with Med-Care to request Med-Care contact them regarding providing DME.)  Further, as detailed more fully below, each of the Relators had beneficiaries specifically deny that they had been requested to be contacted.  Moreover, each of the Relators state that the calls they made on behalf of Med-Care (particularly prior to 2013), were clearly cold-calls wherein they had to "fish" for a product to sell to the customer.  Two of the Relators are experienced telemarketers who have worked in other call centers and are familiar with the difference between cold-calls and non cold-calls.

22.     Section 1834(a)(17)(B) specifically prohibits payment by the Medicare Program to a DME supplier that submits a claim to Medicare which was generated through prohibited telephone solicitation, either directly or through the use of an agent.  *See id.* (stating, "If a supplier knowingly contacts an individual in violation of subparagraph (A), no payment may be made under this part for any item subsequently furnished to the individual by the supplier.").  A

copy of the notice of "Medicare DMEPOS Supplier Standards" recovered during the Relator Investigation from the dumpster outside of Med-Care's Boca Raton facility is attached as Exhibit 3, which specifically provides that, "A supplier must agree not to initiate phone contact with beneficiaries, with a few exceptions allowed.  This standard prohibits suppliers from calling beneficiaries in order to solicit new business."

23.     To assist with their telemarketing efforts and overcome the difficulty inherent in cold-calling Medicare beneficiaries, East End and Med-Care telemarketers were provided various script and sales instructions to follow that contained materially false information, such as the statement that the beneficiary or someone in their family had requested to be called by Med-Care (which was untrue), that they were calling on behalf of a religious or charitable organization, that they were calling on behalf of the Medicare Program, that they were calling regarding a product recall, and/or that the DME would be provided for "free" or at "no cost" (which was likewise false and a violation of the Medicare Anti-Kickback statute), among other misrepresentations.  Examples of the scripts provided to the Relators and other telemarketers are attached hereto as composite Exhibit 4.  In several of the scripts, there is an emphasis (in italics) placed on the initial statement from the telemarketer that *the beneficiary had requested to be called by Med-Care*, which was untrue but an effort to trick the (sometimes vulnerable) beneficiary into thinking it was true and cooperating with the telemarketer to complete a sale.  Also, there is an emphasis placed on the "no cost" portion of the pitch.

24.     Each of the three Relators personally received complaints, and each is aware that other telemarketers routinely received similar complaints, from Medicare beneficiaries they contacted who complained that the telemarketing calls were unsolicited "cold-calls" that were unwanted.  Further, many of the beneficiaries demanded that the calls stop immediately and

asked that they never be contacted again, and other complained about incessant calls from Med-Care.

25.      In addition to the scripts, the Relators and other telemarketers were regularly encouraged by Defendant Jordan Shamah to go off-script and to "say what they had to say" and "use their personality" to make a sale and make other false representations to make sure the sale closed.

26.      Relator Tiffany Bumbury, and the other telemarketers that she worked with at East End, were directed by Defendant Lawrence Silverman and Defendant Jordan Shamah, to utilize the following misrepresentations: 1) telling the beneficiary that they were being provided the product for "free" or "no cost"; 2) telling the beneficiary that the beneficiary or someone in their family had specifically requested and/or authorized Med-Care to call the beneficiary, despite the fact that this was untrue; 3) telling the beneficiary that the beneficiary's physician had asked Med-Care to call the beneficiary, despite the fact that this was untrue; 4) telling the beneficiary that the caller was associated with "Med-Care" but pronouncing it like "Med-i-care" in an effort to trick the beneficiary; 5) telling the beneficiary that they were calling on behalf of the "Christian Healthcare Network" and/or the "Christian Diabetic Network" and that these were religious and/or charitable organizations that donate their proceeds to causes such as veterans groups; 6) telling the beneficiary that they were associated with the "American Diabetic Association"; and 7) telling the beneficiary that the telemarketer was calling on behalf of the beneficiary's current DME supplier to upgrade their diabetic testing equipment, and then the beneficiary would be switched to Med-Care without the beneficiary's knowing consent.

27.      Relators Stanley Bernstein and Jamie Camuccio, and the other telemarketers they worked with at Med-Care, were supervised by Defendant Daniel Porush, and later Defendant

Jordan Shamah, and instructed to make prohibited unsolicited telemarketing calls to Medicare beneficiaries in order to generate DME sales to be billed to Medicare.  These Relators, and the other telemarketers that they worked with, were instructed to represent to Medicare beneficiaries (and others): 1) that they were calling in behalf of Christian Healthcare Network (later changed when Medicare audits of Med-Care claims started in 2012 to "Med-Care"); 2) that the DME was being provided the product for "free" or "no cost" or with no copayments or deductibles; and 3) telling the beneficiary that the beneficiary or someone in their family had specifically requested and/or authorized Med-Care to call the beneficiary, despite the fact that this was untrue.  In addition, Relators Stanley Bernstein and Jamie Camuccio overheard other telemarketers saying: 1) that they were calling on behalf of the Medicare Program; 2) that they were calling to initiate a product recall, and then when they identified through questioning what medical devices the person was using to say that that was the product being recalled; 3) telling the person called that their device was too old and needed to be replaced; and 4) that they were church volunteers calling on behalf of the Christian Healtcare Network, among other misrepresentations.  The calls were generated through an auto-dialer.

28.     Thus, notwithstanding the express statutory prohibition against unsolicited telemarketing of Medicare beneficiaries, Med-Care, through its agents, employees and East End, including the Relators, routinely made unsolicited telephone calls to Medicare beneficiaries regarding the furnishing of DME in violation of section 1834(a)(17)(A), and thereafter improperly submitted false claims for payment that were the result of the prohibited unsolicited telephone calls in violation of section 1834(a)(17)(B).

29.     Pursuant to the False Claims Act, claims submitted to Medicare for DME provided to Medicare beneficiaries that were the result of prohibited, unsolicited telephone calls, such as those submitted by Med-Care, are false claims.

30.     Thus, the claims submitted to Medicare by Med-Care that were the product of the prohibited, unsolicited telephone calls (including the specific claims identified herein) were false and subject the Defendants to liability under the Act.

### B.  Illegal Kickbacks to Patients

31.     Another key component of the Defendants' False Claims Act scheme involved the submission of claims to Medicare that were generated from offering and/or giving of prohibited financial incentives to Medicare beneficiaries in violation of the Medicare Anti-Kickback statute.

32.     The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(b), prohibits the offering or giving of anything of value (including routine waivers of co-payments and deductibles, and providing free or reduced-cost items), either directly or indirectly, to induce the ordering of any item or service which may be covered by the Medicare Program, or to induce the beneficiary to select one provider over another for the ordering of items which may be covered by the Medicare Program.

33.     Notwithstanding this clear prohibition against incentive to Medicare beneficiaries, each of the three Relators, as well as other former Med-Care employees interviewed as part of the Relator Investigation, and the Medicare beneficiaries interviewed as part of the Relator Investigation, confirmed that that Med-Care routinely violated this prohibition through the systematic offer to waive co-payments and deductibles, by systematically offering allegedly "free" or "no cost" DME to Medicare beneficiaries in order to entice them to order DME from

Med-Care, and by soliciting beneficiaries with offers of free gifts such as I-Pads, Wal-Mart gift cards, free diabetic shoes, and other similar items.

34.     Multiple of the Medicare beneficiaries specifically identified in this amended complaint who were identified by the Relator Investigation, and who were wrongfully solicited by Med-Care, state that they were offered "free" or "no cost" DME by Med-Care's telemarketers, an offer that the beneficiaries accepted and which rendered the associated claims submitted by Med-Care tainted as a result of the violation of the Medicare Anti-Kickback Statute.  *See* Paragraph 128 (a) ("K.W."); (b) ("K.M."); (d) ("N.D."); (e) ("B.C."); (f) ("B.K."); (g) ("B.C."); (h) ("C.B."); (j) ("S.B."); (m) ("S.M."); and (n) ("S.T.").   Medicare claims data reflecting these false claims is included in Paragraph 128 and, with respect to beneficiary K.W., is also attached hereto as Exhibit 1.

35.     Pursuant to provisions of the False Claims Act, claims submitted to Medicare for DME orders which were generated through prohibited inducements in violation of the Medicare Anti-Kickback Statutes are not payable by Medicare, and are therefore rendered false claims.

36.     Thus, the claims submitted to Medicare by Med-Care for DME that were generated through prohibited inducements to Medicare beneficiaries (such as routine waivers of co-payments and deductible, the providing of "free" or "no cost" DME, and other offer of free gifts as inducements) were false and subject the Defendants to liability under the Act.

### C.  Illegal Payments to East End for Medicare Beneficiary Referrals

37.     A third mechanism pursuant to which Med-Care was able to generate and submit false claims to Medicare involved the illegal purchasing of Medicare beneficiary referrals from Defendant East End, which conducted telemarketing operations on Med-Care's behalf.  The Medicare Anti-Kickback Statute prohibits the offering or receiving of remuneration in exchange

for the referral of Medicare beneficiaries for items or services that may be covered by the Medicare Program.  The statute's provisions include a prohibition against the buying and selling of Medicare beneficiary referrals or "leads."

38.    Med-Care therefore paid illegal remuneration to East End, which is not a Medicare provider, for telemarketing on Med-Care's behalf and generating Medicare beneficiary referrals to and for Med-Care.  This is precisely the conduct that Relator Tiffany Bumbury was directed to do by Defendants Lawrence Silverman and Jordan Shamah, and which she personally participated in doing and observed other telemarketers doing during her employment at East End.

39.    Internal emails and handwritten notes obtained through trash pulls conducted as part of the Relator Investigation (described more fully below in Paragraph 116) include emails from Lawrence ("Larry") Silverman of Defendant East End to Mr. Daniel Porush divvying up Med-Care's weekly operating expenses between "Danny [Porush]" and "Steve [Silverman]," as well as handwritten notes regarding "Profit Joint Operations," which lists money to be paid to "Danny, "Steve," and "L.S."  According to the note, "L.S." is to receive $80,000, which is a reference to Defendant Lawrence Silverman, who is the President of East End and is in charge its New York telemarketing call center that generated Medicare beneficiary referrals for Med-Care. Because East End received illegal remuneration in exchange for the DME sales it generated for Med-Care, the claims submitted by Med-Care to Medicare resulting from the East End beneficiary referrals (such as those generated by Relator Tiffany Bumbury) were false claims.

40.    The claims submitted to Medicare by Med-Care for DME that were generated through Med-Care's illegal kickback relationship with East End, including the referrals Relator Tiffany Bumbury was personally involved in generating, and those that formed the basis for the

payment from Med-Care to East End identified above, were false and subject the Defendants to liability under the Act.

### D.  Illegal Payments to Third Parties for Medicare Beneficiary Referrals

41.     A fourth but related mechanism pursuant to which Med-Care submitted false claims to the Government involved the illegal purchasing of Medicare beneficiary referrals from various third parties.   As noted above, the Medicare Anti-Kickback Statute prohibits the offering or receiving of remuneration in exchange for the referral of Medicare beneficiaries for items or services that may be covered by the Medicare Program.   The statute's provisions include a prohibition against the buying and selling of Medicare beneficiary referrals or "leads."   As expounded upon below, each of the Relators, as well as other former employees interviewed as part of the Relator Investigation, confirmed that Med-Care purchased referrals ("leads") from various third parties, including but not limited to an entity referred to as "Off Madison Ave," and well as other third parties that would meet with Defendant Daniel Porush at Med-Care.   As related by Relator Stanley Bernstein, Defendant Daniel Porush announced at telemarketer staff meetings that Med-Care had purchased leads.   As a result of the purchase of the referrals, the claims submitted by Med-Care to Medicare resulting from the leads were not eligible for payment under the provisions of the False Claims Act and are therefore "false claims" for purposes of the Act.

### E.  Sending Excessive and/or Unnecessary DME to Medicare Beneficiaries

42.     Med-Care routinely sent and billed Medicare for DME that exceeded the beneficiary's needs in terms of quantity (e.g., Med-Care would send diabetic patients far more diabetic testing strips than needed and/or ordered, and Med-Care would send excessive quantities of items such as albuterol that would expire before they could even be utilized by the

beneficiary); Med-Care would send and bill Medicare for additional types of DME that the beneficiary had not requested and/or that was medically unnecessary (e.g., Med-Care would send a diabetic patient, in addition to diabetic testing supplies, a back brace, a nebulizer, a CPAP machine, a nebulizer, etc.); and/or DME that the beneficiary specifically told Med-Care not to send.   Med-Care would also send Medicare beneficiaries that used an albuterol inhaler a nebulizer knowing that the beneficiary did not use or need a nebulizer.

43.     Each of the three Relators personally received inbound calls while working for the defendants from Medicare beneficiaries (and others) complaining about the receipt of unwanted DME.   Examples of records evidencing rejections of unwanted orders by beneficiaries are attached hereto as Exhibit 5.   Interviews of the Medicare beneficiaries associated with these exhibits were interviewed as part of the Relator Investigation, and they confirmed that the returns were the result of excess and unrequested DME being shipped to them by Med-Care.   *See* Paragraph 128 (a) ("K.W."); (c) ("G.W."); (e) ("B.C."); (f) ("B.K."); (g) ("B.C."); (h) ("C.B."); (i) ("J.G."); (j) ("S.B."); (l) ("J.G."); (m) ("S.M."); (p) ("B.C."); and (q) ("J.P.").

44.   Relators Bernstein and Camuccio witnessed Med-Care, through Defendant Daniel Porush and Defendant Jordan Shamah, direct the telemarketers to write up orders for any all equipment that the telemarketer could possibly justify, even absent an order from a physician for the DME, and even absent the Medicare beneficiary having previously used the item.   Said differently, on the initial cold-call with a Medicare beneficiary, the telemarketers were instructed to ask about any condition the beneficiary or any member of their household might have, and then directed to try to sell the Medicare beneficiary on receiving item(s) associated with the condition.   For instance, if the Medicare beneficiary had a cold, the telemarketer would be told to try to sell the beneficiary as nebulizer.   If the beneficiary used an albuterol inhaler, the

telemarketer would be directed to try to sell the beneficiary on receiving a nebulizer.  If the beneficiary indicated that they had back issues, the telemarketer would be told to try to sell the beneficiary on receiving a back brace.  These orders would then be billed to Medicare even though the equipment order was completely self-generated by Med-Care, and not as a result of a physician making the determination that the time was medically necessary or appropriate for the beneficiary.  Relator Tiffany Bumbury and the telemarketers she worked with in New York were given similar direction by Defendant Lawrence Silverman and Defendant Jordan Shamah.

45.     As evidenced by the experiences of Relators Bernstein and Camuccio regarding patients complaints and the Medicare beneficiaries interviews referred to above, even when the beneficiary declined to receive the product, Med-Care would sometime still process the order and bill Medicare for providing the equipment.

46.     Section 1862(a)(1)(A) of the Social Security Act provides that only medically necessary services, as defined in the Act and associated regulations, provided to Medicare beneficiaries are covered and payable services.  Accordingly, the submission of claims to Medicare for DME which was not medically necessary for the treatment of a covered disease or condition of a Medicare beneficiary is a false claim under the Act.

47.     Thus, the claims submitted to Medicare by Med-Care that were for medically unnecessary DME or otherwise non-covered items of DME, including those specifically identified in this complaint, were false and subject the Defendants to liability under the Act.

### F.     Billing for and Shipping DME with No Prescription

48.     An essential requirement to bill Medicare for DME provided to a Medicare beneficiary is that the equipment or supplies be provided pursuant to prescription from the beneficiary's physician.  Notwithstanding this requirement, up until approximately 2012, Med-

Care routinely billed and shipped for DME without first obtaining a prescription from a physician, which rendered those claims false.

49.     Interviews of Med-Care employees as part of the Relator Investigation has revealed that in early 2012, Medicare began auditing Med-Care's claims and, in response, Med-Care engaged in a concerted effort to obtain the missing but required prescriptions for thousands of DME claims that had already been submitted to and paid by Medicare.  As part of its after-the-fact efforts to retrieve the required documentation, Med-Care sent thousands of "blast faxes" to physicians nationwide, and also engaged a North Carolina company named "The Doc Depot" to assist with the effort.

50.     During his employment at Med-Care, Relator Stanley Bernstein, although not directly involved in the effort to obtain doctor's prescriptions after-the-fact, became aware that the effort had been undertaken by Med-Care to secure the prescriptions to justify the prior claims being audited by Medicare.  Relators Bernstein and Camuccio also received inbound calls while working at Med-Care during this time from physician offices complaining about the number of prescriptions being faxed to their offices from Med-Care.

51.     The claims submitted to Medicare by Med-Care where no physician order existed at the time the claim was submitted were false and subject the Defendants to liability under the Act.

### V.     **The Parties**

52.     Relator Tiffany Bumbury, is a resident of New Jersey, and a former employee of Defendant East End, which maintained office space in New York, NY.  The scheme alleged herein was personally witnessed by Relator Tiffany Bumbury during her employment as a telemarketer for Defendant East End, where Relator Tiffany Bumbury was directed by

Defendants Lawrence Silverman and Jordan Shamah to participate in and carry out important aspects of the fraud scheme through her actions as a telemarketer, including cold-calling Medicare beneficiaries, generating prohibited referrals for Med-Care, offering prohibited inducements to Medicare beneficiaries, and generating orders for medically unnecessary DME. Relator Tiffany Bumbury was personally trained by Defendant Jordan Shamah and reported to Defendants Lawrence Silverman and Jordan Shamah, who both supervised the New York call center.  Relator Tiffany Bumbury brings this action for violations of 31 U.S.C. § 3729 *et seq.*, on behalf of herself and the United States Government and its agency, the United States Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), pursuant to 31 U.S.C. § 3730(b)(1).  Relator Tiffany Bumbury has direct and personal knowledge that the Defendants have engaged in a conspiracy and scheme to submit false claims to the Medicare program for improperly solicited DME sales, for medically unnecessary DME equipment provided to Medicare beneficiaries, for non-rendered DME, and for DME claims generated and resulting from violations from the Medicare Anti-Kickback Statutes, 42 U.S.C. § 1320a-7b(b).

53.     Relator Stanley Bernstein, is a resident of Boca Raton, FL, and a former four year employee of Defendant Med-Care in Boca Raton, FL.  The scheme alleged herein was personally witnessed by Relator Stanley Bernstein during his employment as a telemarketer and patient advocate for Defendant Med-Care, where Relator Stanley Bernstein was directed by Defendant Daniel Porush, Defendant Steven Silverman, Defendant Jordan Shamah and other Med-Care management to participate in and carry out important aspects of the fraud scheme through his actions as a telemarketer, including cold-calling Medicare beneficiaries, generating prohibited referrals for Med-Care, offering prohibited inducements to Medicare beneficiaries, and

generating orders for medically unnecessary DME.  Relator Stanley Bernstein brings this action for violations of 31 U.S.C. § 3729 *et seq.*, on behalf of himself and the United States Government and its agency, the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, pursuant to 31 U.S.C. § 3730(b)(1).  Relator Stanley Bernstein has direct and personal knowledge that the Defendants have engaged in a conspiracy and scheme to submit false claims to the Medicare program for improperly solicited DME sales, for medically unnecessary DME equipment provided to Medicare beneficiaries, for non-rendered DME, and for DME claims generated and resulting from violations from the Medicare Anti-Kickback Statutes, 42 U.S.C. § 1320a-7b(b).

54.     Relator Jamie Camuccio, is a resident of Tamarac, FL, and a former two year employee of Defendant Med-Care in Boca Raton, FL.  The scheme alleged herein was personally witnessed by Relator Jamie Camuccio during her employment as a telemarketer for Defendant Med-Care, where Relator Jamie Camuccio was directed by Defendant Daniel Porush, Defendant Steven Silverman, Defendant Jordan Shamah, and other Med-Care management to participate in and carry out important aspects of the fraud scheme through her actions as a telemarketer, including cold-calling Medicare beneficiaries, generating prohibited referrals for Med-Care, offering prohibited inducements to Medicare beneficiaries, and generating orders for medically unnecessary DME.  Relator Jamie Camuccio brings this action for violations of 31 U.S.C. § 3729 *et seq.*, on behalf of herself and the United States Government and its agency, the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, pursuant to 31 U.S.C. § 3730(b)(1).  Relator Jamie Camuccio has direct and personal knowledge that the Defendants (as defined *infra* in Paragraph 15) have and are engaged in a conspiracy and scheme to submit false claims to the Medicare program for improperly solicited DME sales, for

medically unnecessary DME equipment provided to Medicare beneficiaries, for non-rendered DME, and for DME claims generated and resulting from violations from the Medicare Anti-Kickback Statutes, 42 U.S.C. § 1320a-7b(b).

55.     As required under the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relators, have provided to the Government a statement of all material evidence and information related to this complaint.    These disclosure statements support the existence of the submission of knowingly false or fraudulent claims for payment or approval; the knowing, making, using, and causing to be made and used, false records or statements material to a false or fraudulent claim; and the existence of a conspiracy to do so under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)(B) and (C).

56.     The United States of America is named as a Plaintiff because funds of the United States of America were and are being paid to Defendants as a result of the false claims scheme alleged in this complaint.  The United States remains the true party in interest in this litigation notwithstanding the present lack of intervention.

57.     Defendant Med-Care is a Florida corporation that was registered with the Florida Secretary of State on November 8, 1999, with a principal place of business of 933 Clint Moore Road, Boca Raton, Florida 33487.  The registered agent for the company is Steven Silverman, D.C.  Med-Care filed a fictitious name registration with the Florida Secretary of State on October 3, 2007, to do business in Florida under the name "Christian Healthcare Network."  Med-Care has a NPI number of 1619978434, and it submits claims to Medicare under that number.

58.     Among other things, Med-Care, directly and through its affiliation with Defendant East End, is a national supplier of DME that operated telemarketing call centers in Boca Raton,

FL, and New York, NY.  From 2009 to 2012, Med-Care received more than $84 million from Medicare in connection with its improper and illicit DME marketing and sales scheme.

59.     Defendant East End is a Florida corporation that was registered with the Florida Secretary of State on July 7, 2008, with a principal place of business of 225 East 73rd Street, Apartment 11G, New York, NY 10021.  The registered agent for East End is Defendant Steven Silverman (President of Med-Care), whose address is listed as 3234 Harrington Dr., Boca Raton, FL 33496.  East End filed a fictitious name registration with the Florida Secretary of State on September 8, 2009, to do business in Florida under the name "Christian Diabetic Network."

60.     Defendant East End operated and staffed a telemarketing call center in New York, NY.  Defendant Med-Care paid remuneration to Defendant East End and/or its principals for generating referrals of Medicare beneficiaries, which created an illegal kickback relationship between Defendant Med-Care and Defendant East End, and which tainted the universe of such Medicare referrals from East End.

61.     Defendant Daniel M. Porush is a principal of Med-Care (although his name did not appear as an officer of the company in corporate filings and, upon information and belief, does not appear on any CMS-required documentation, such as CMS-855s, in order to conceal his role at Med-Care from CMS), and he is a driving force behind the illegal telemarketing operation and the submission of false claims and false statements to Medicare by Med-Care. According to a Med-Care payroll that was obtained through the Relators' investigation, Mr. Porush began working at Med-Care on February 6, 2008, and he purportedly had a weekly salary of only $250.00.  A copy of the Med-Care payroll is attached as Exhibit 6.  As confirmed by Relators Bernstein and Camuccio; witness interviews of former Med-Care employees; internal Med-Care emails; and bank records obtained and conducted as part of the Relator Investigation, it is evident

that Mr. Porush was in charge of Med-Care's Boca Raton telemarketing operation, and further that he has a concealed ownership interest in Med-Care and is principally compensated by Med-Care through payments to a third-party entity. Mr. Porush was also previously listed as a managing member, along with Steven Silverman and Lorri Silverman, in a Florida corporation by the name of "Med-Care RX Pharmacy, LLC," which had the same street address as Med-Care. Med-Care RX Pharmacy, LLC, filed a notice with the Florida Secretary of State on November 1, 2010, that it was ceasing to do business as of that date.

62.     Defendant Lawrence P. Silverman is the President of East End and is in charge of East End's New York telemarketing call center. Lawrence P. Silverman managed the New York telemarketing call center and the telemarketers employed by East End. Among other things, Mr. Silverman instructed and directed the New York telemarketers – and personally instructed and directed Relator Tiffany Bumbury – to make prohibited contact with Medicare beneficiaries and further instructs and directs them – and personally instructed and directed Relator Tiffany Bumbury – to make false statements to the improperly solicited Medicare beneficiaries in order to generate DME orders for Med-Care, including medically unnecessary DME orders for Medicare beneficiaries.

63.     Defendant Jordan Shamah was formerly a floor supervisor in charge of East End's New York telemarketing call center, where he was Relator Tiffany Bumbury's direct supervisor during her employment at East End. Defendant Jordan Shamah currently works at Med-Care's facility in Boca Raton, FL, where he trains new telemarketers and helps manage telemarketing activities. Attached as Exhibit 7 is a sample training agenda that reflects Defendant Jordan Shamah's role at Med-Care in Boca Raton, FL. Among other things, Defendant Jordan Shamah instructed and directed the telemarketers – and personally instructed and directed Relator Tiffany

Bumbury – to make prohibited contact with Medicare beneficiaries and further instructed and directed them – and personally instructed and directed Relator Tiffany Bumbury – to make false statements to the Medicare beneficiaries who are improperly contacted in order to generate DME orders for Med-Care, including medically unnecessary DME orders for Medicare beneficiaries. Defendant Jordan Shamah previously worked closely with Mr. Porush at a high-profile telemarketing operation in New York.

64.     Defendant Steven Silverman, D.C., is a corporate officer and registered agent of Med-Care, the entity which has submitted the false claims and false statements to Medicare.  As discussed below, after first refusing to voluntarily appear, Defendant Steven Silverman was subpoenaed to appear and testify at a May 2013 Congressional hearing that was investigating, among other things, Med-Care's aggressive and improper Medicare marketing activities.  During that hearing, Mr. Silverman made false statements regarding Med-Care's marketing activities, including falsely denying that Med-Care employees told beneficiaries that DME is being provided to them for "free"; falsely denying that Med-Care cold-calls Medicare beneficiaries; falsely claiming that Defendant Daniel Porush was merely an "employee" of Med-Care as opposed to a principal/owner of the company; and falsely claiming that telemarketers are not paid commissions on their sales.  Upon information and belief, Defendant Steven Silverman is a resident of Boca Raton, FL.

65.     Each of the Defendants is a knowing participant in the scheme to submit false claims to Medicare, and to create false statements and records material to the submitted false claims.  As described herein, the Defendants engaged in a coordinated and collaborative effort to generate and submit false claims and document to the Medicare Program for their financial benefit.

66.     The term "Defendants" as used herein refers collectively to the aforementioned entities (i.e., Med-Care and East End), who acted by and through their officers, principals and managerial employees, the aforementioned individuals (i.e., Daniel Porush, Lawrence Silverman, Jordan Shamah, and Steven Silverman), and each of them.

67.     The corporate officers, principals and managerial employees of the Defendant entities (i.e., Daniel Porush, Lawrence Silverman, Jordan Shamah, and Steven Silverman), in doing the acts and things described in this complaint, were acting within the course and scope of their respective agencies and/or employment with the Defendant entities, and each of them, with the knowledge and consent of all the Defendants.

68.     At all relevant times, each Defendant was the authorized agent of each other Defendant in carrying out the scheme described in this complaint.

**VI.     Relator Tiffany Bumbury's Direct and Personal Knowledge of the Fraud**

69.     Relator Tiffany Bumbury has direct and personal knowledge of the violations alleged herein as a result of her employment as a telemarketer for the Defendants.  Relator Tiffany Bumbury was employed in Defendant East End's New York call center, which was located at 336 W 37th Street, Suite 300, New York, NY 10016. During the scope and course of her employment, and as specifically instructed and directed by Defendants Jordan Shamah and Lawrence Silverman, Relator Tiffany Bumbury personally participated in the fraudulent conduct and improperly solicited Medicare beneficiaries (as well as private insurance beneficiaries) to market and sell DME on behalf of Defendant Med-Care, including medically unnecessary DME.

70.     More specifically, Relator Tiffany Bumbury worked as a telemarketer in the New York, NY, call center (which worked in concert with Med-Care to generate prohibited Medicare referrals), between August 4, 2010, and November 1, 2010.  Relator Tiffany Bumbury and the

other telemarketers at Defendant East End were directed by Defendants Lawrence Silverman and Jordan Shamah to engage in the unsolicited telemarketing of Medicare beneficiaries for the purpose of marketing DME for Med-Care, which she did.   As instructed and directed by Defendants Lawrence Silverman and Jordan Shamah, Relator Tiffany Bumbury and the other telemarketers routinely made false statements to Medicare beneficiaries to facilitate these sales, and they were paid a commission for each item they sold.

71.     Relator Tiffany Bumbury was employed by Defendant East End after she responded to an ad on Craigslist for a telemarketing position located in Midtown West in New York, NY.   The advertisement stated that the base pay was $12/hour but indicated that employees could easily double that with commissions.   When Relator Tiffany Bumbury went to the orientation, there were about 30 other people sitting in a circle, and in the middle was Defendant Jordan Shamah standing on top of a desk giving a speech.   Defendant Jordan Shamah stated that he was the hiring manager and that he was only looking to hire about 10 or so people. He went around the room and asked questions such as: "On a scale from 1-10, how motivated are you by money?"; "How comfortable are you with making lots of cold calls a day?"; "Do you get discouraged if people curse you out or hang up the phone on you?"   Relator Tiffany Bumbury observed that depending on how well/poorly people answered the questions, they were asked to stay or leave.   Relator Tiffany Bumbury recalls that Defendant Jordan Shamah decided to keep about 12 in the group and told them of his past and how he had made "millions" making cold calls and that he started out "hungry" just like us.

72.     Following the orientation, Defendant Lawrence Silverman came out, explained the pay structure, and explained that the telemarketers would earn commissions on items sold. Defendant Lawrence Silverman then handed out a script and Relator Tiffany Bumbury recalls

that the first or second line was that we they calling from the "Christian Healthcare Network." The group was also instructed by Defendant Jordan Shamah to explain to the call recipient that their contact information was obtained from their doctor, which was false.  Shortly thereafter, Relator Tiffany Bumbury overheard Defendant Lawrence Silverman tell Defendant Jordan Shamah that the leads that they bought from "Consumer B" were better than some older leads that they had purchased.

73.     Defendant Jordan Shamah told Relator Tiffany Bumbury during a private conversation that he had been sent to New York by the "head of the company," Defendant Daniel Porush, to make sure that Defendant Lawrence Silverman did not "run the company into the ground" like he had done with another office.

74.     Relator Tiffany Bumbury observed that Defendant Jordan Shamah would pace back and forth in the office listening to calls and giving tips on how to get more commissions. Defendant Jordan Shamah would say things such as, "mute your phone and find out if his wife, kids, grandkids, neighbors, mistress or friends at church have sleep apnea, diabetes, COPD, etc. If they have none of the above just send them an aqua massage therapy kit, anyone can use one." Defendant Jordan Shamah would also say things like, "Guys, you can literally make 20 sales on one call!"

75.     As training for her job, Relator Tiffany Bumbury – along with the other telemarketers – were provided a written "script" to use during the calls which included false statements, including that the beneficiary was being contacted because the beneficiary had requested to be contacted regarding medical equipment (which was false but was emphasized in order to appear compliant with the Medicare statute).  Example scripts containing the false statement regarding the beneficiary requesting to be contacted and offering DME at "no cost" are

attached hereto as composite Exhibit 4.  Further, although a script was provided for Relator Tiffany Bumbury to use in making the calls, Relator Tiffany Bumbury was also personally instructed by Defendant Jordan Shamah, as were the other telemarketers with whom she worked, that they did not need to follow the script and should "say whatever we needed to say," and make whatever representations they needed to make, to obtain Medicare billing information and to secure a sale for Med-Care, which they did.

76.     The specific types of false representations that were used included: 1) telling beneficiaries that they were being provided the product for "free" (which is a violation of the Medicare Anti-Kickback Statute); 2) telling the beneficiary that the beneficiary or someone in their family had specifically requested or authorized Med-Care to call the beneficiary; 3) telling the beneficiary that the beneficiary's physician had asked Med-Care to call the beneficiary; 4) telling the beneficiary that the caller was associated with "Med-Care" but pronouncing it like "Med-i-care" in an effort to trick the beneficiary; 5) telling the beneficiary that they were calling on behalf of the "Christian Healthcare Network" (which is a registered fictitious name for Med-Care Diabetic) or the "Christian Diabetic Network" (which is a registered fictitious name for East End) and that these were charitable organizations that donate their proceeds to causes such as veterans groups; 6) telling the beneficiary that they were associated with the "American Diabetic Association;" and 7) telling the beneficiary that the telemarketer was calling on behalf of the beneficiary's current DME supplier to upgrade their diabetic testing equipment, and then the beneficiary would be switched to Med-Care without the beneficiary's knowing consent.

77.     Using these techniques that she had been taught be Defendant Jordan Shamah and Defendant Lawrence Silverman, Relator Tiffany Bumbury successfully secured the sale of DME to improperly solicited Medicare beneficiaries on behalf of Med-Care.

78.     Relator Tiffany Bumbury is also personally aware that Medicare beneficiaries would be shipped orders for product from Med-Care that they subsequently complained they did not request or need, and she personally spoke with beneficiaries complaining about the receipt of unwanted product from Med-Care.

79.     Relator Tiffany Bumbury was told by Defendant Jordan Shamah there was a quota of 15 to 20 sales per week per telemarketer.  Relator Tiffany Bumbury was also told by Defendants Lawrence Silverman and Jordan Shamah that this quota was generally met by the telemarketers in New York, and that the telemarketers in Florida regularly exceeded this quota. Relator Tiffany Bumbury was also informed that the Boca Raton call center employs approximately 100 telemarketers, who also make unsolicited contact with Medicare beneficiaries, and she was told that the billing for and distribution of medical supplies occurs at the Boca Raton office.

80.     At the time of the Relator Tiffany Bumbury's employment, the New York telemarketing call center ran two shifts of approximately 17 telemarketers a day, Monday through Thursday, and a single shift of telemarketers on Fridays and Saturdays.  The telemarketers made unsolicited contact with prospective purchasers, including Medicare beneficiaries, sometimes through the use of autodialing telephone equipment.

81.     As previously noted, the telemarketers, including Relator Tiffany Bumbury, were provided a "script" by the Defendants to use which included materially false statements including, but not limited to, that the beneficiary was being contacted because the beneficiary had requested information regarding DME.  However, no such request was actually made by the beneficiary, and the beneficiaries regularly confirmed to Relator Tiffany Bumbury that they had not requested to be contacted, nor had they ever heard of Med-Care, the Christian Healthcare

Network (which is a registered fictitious name for Med-Care), or the Christian Diabetic Network (which is a registered fictitious name for East End). Relator Tiffany Bumbury estimates based upon her experience at East End that approximately 70% of the unsolicited calls made by the East End telemarketers are to Medicare beneficiaries.

82.     Thus, Relator Tiffany Bumbury became personally aware of the nature and specifics of the scheme during her employment at East End through: 1) the directions received from Defendants Lawrence Silverman and Jordan Shamah to engage in prohibited telephone solicitations of Medicare beneficiaries; 2) the directions received from Defendants Lawrence Silverman and Jordan Shamah to offer product to Medicare beneficiaries for free or waiving co-payments and deductibles (in violation of the Anti-Kickback Statute) and to make false statements to them regarding the call; 3) her observance of the other telemarketers she worked with being directed to and engaging in the same conduct; 4) Defendants Lawrence Silverman and Jordan Shamah's admissions that the orders were being referred to Med-Care (in violation of the Anti-Kickback statute); 5) Defendants Lawrence Silverman and Jordan Shamah's admissions that Med-Care was billing for the DME orders that resulted from the solicitations; 6) from her personal awareness from speaking to Medicare beneficiaries that she called on behalf of the Defendants that they had not requested to be solicited; 7) from her personal awareness from speaking to Medicare beneficiaries that they received DME that they had not requested; 8) Defendant Danny Porush's admission that referrals were being purchased by Med-Care from third-parties (in violation of the Anti-Kickback statute); and 9) that Med-Care operated a separate call center, billing office and shipping facility in Florida.

83.     In sum, Relator Tiffany Bumbury gained significant personal knowledge regarding the methods, purpose and execution of the fraudulent scheme through her personal

participation in the scheme as a telemarketer for East End generating prohibited referrals and fraudulent Medicare DME orders for Med-Care.

### VII.   **Relator Stanley Bernstein's Direct and Personal Knowledge of the Fraud**

84.     Relator Stanley Bernstein has direct and personal knowledge of the violations alleged herein as a result of his employment as a telemarketer for Defendant Med-Care.  More specifically, Relator Stanley Bernstein was employed for approximately four years in Med-Care's Boca Raton call center, which is located at 933 Clint Moore Road, Boca Raton, Florida 33487.  During the scope and course of his employment, and as specifically instructed and directed by Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management including Steven Silverman and others, Relator Stanley Bernstein personally participated in the fraudulent conduct and improperly solicited Medicare beneficiaries (as well as private insurance beneficiaries) to market and sell DME on behalf of Defendant Med-Care, including medically unnecessary DME.

85.     Relator Stanley Bernstein worked as a telemarketer in the Boca Raton, FL, call center between May 2010 and April 2014.  On his first day of training at Med-Care, Relator Stanley Bernstein recalls being instructed to sit next to and learn from another telemarketer.  Relator Stanley Bernstein further recalls that the first words out of the telemarketer's mouth during his telemarketing calls was, "Hello, my name is Mel.  I'm with the Christian Healthcare Network.  All my children are diabetics (which was false), and I'm volunteering here for free (which was also false)."

86.     Relator Stanley Bernstein and the other telemarketers at Med-Care were directed by Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management to engage in the unsolicited telemarketing of Medicare beneficiaries for the purpose of marketing DME for

Med-Care, which he did.  As instructed and directed by Defendant Daniel Porush, Defendant Jordan Shamah, and other Med-Care management, Relator Stanley Bernstein and the other telemarketers routinely made false statements to Medicare beneficiaries to facilitate these sales, and they were paid a commission for each item they sold. Relator Stanley Bernstein, who is an experienced telemarketer, has personal knowledge that he and the other Med-Care telemarketers were "absolutely cold-calling" based on among other things, the reception he received from the call recipients.  Relator Stanley Bernstein relates that on the calls the telemarketers would have to "fish" to determine what medical devices the person called (or someone in their house) might use or be willing to order.  Many of the calls yielded no sale because the person had not requested to be called, they did not use or need DME, or were already getting DME from another provider.

87.    The specific types of false representations that Relator Stanley Bernstein was instructed by the aforementioned Defendants to utilize included: 1) telling the caller that they were being provided the product for free; 2) telling the caller that we were calling from the Christian Healthcare Network; 3) telling the caller that we were calling on behalf of "Medicare"; and 4) telling the caller that they would not be required to pay a deductible or co-pay and/or that the supplies were being provided at "no cost."  The telemarketers, including Relator Stanley Bernstein, were also instructed to identify any other products, supplies, and/or health issues that the person on the phone or anyone known to them may need.

88.    Relator Stanley Bernstein – along with the other telemarketers – were provided a written "script" to use during the calls which included false statements.  However, Relator Stanley Bernstein was personally instructed by the aforementioned Defendants, as were the other telemarketers, that the "script" did not always need to be followed and that the telemarketers,

including Relator Stanley Bernstein, should "say whatever he needed to say," and make whatever representations they needed to make, to obtain billing information and to secure a sale. Attached as Exhibit 8 is a copy of a script from when Relator Stanley Bernstein first began working at Med-Care.  The script, with accompanying handwritten notes, refers to no cost product, Christian HealthCare Network, the American Diabetes Association, and is in the form of a cold-call script.   Attached as Exhibit 9 is a second script provided to Med-Care telemarketers to assist them on closing diabetic supply sales.

89.     Using these techniques, Relator Stanley Bernstein successfully secured the sale of DME to improperly solicited Medicare beneficiaries on behalf of Med-Care.

90.     Relator Stanley Bernstein is aware there was no compliance monitoring of the calls until very recently, and that more Medicare beneficiaries were contacted than patients with private insurance.

91.     Relator Stanley Bernstein has personal knowledge that the contact information for the Medicare beneficiaries (leads) was purchased from third-parties.  Relator Stanley Bernstein personally heard Defendant Daniel Porush state to the telemarketers in sales meetings that "we pay a lot of money for the leads."

92.     Relator Stanley Bernstein is also aware that more recently Med-Care began utilizing website promotions (either directly or through third parties) in order to obtain contact information for potential DME customers.  The promotions included offers of gifts in exchange for contact information: free I-Pad, free diabetic socks, Wal-Mart gift card, etc.  In order to qualify for the promotion, a contact form would have to be completed that contained the person's name, date of birth, and phone number, among other things.  Relator Stanley Bernstein personally received complaints from callers that they had not received their promotional gift

and/or that they checked on the form they did not want to be contacted, but were nevertheless contacted.

93.     Relator Stanley Bernstein is also personally aware that Medicare beneficiaries would regularly complain that they did not request to be called, that there was no one at that number requested to be contacted, or that they were told the products and suppliers were free, but in fact they were not.  Many inbound callers requested that they stop being "harassed."

94.     Relator Stanley Bernstein regularly attended sales meetings run by Defendants Daniel Porush, or Jordan Shamah, which were also regularly attended by Defendant Steven Silverman.  Relator Stanley Bernstein observed that Defendant Daniel Porush often ran the meetings while standing on a desk to address the telemarketers.  Relator Stanley Bernstein personally observed Defendant Daniel Porush wearing a headset with a microphone during these meetings so that he could simultaneously address Med-Care's "New York office," which was actually Defendant East End.  During one such sales meeting, Relator Stanley Bernstein recalls a telemarketer asking Defendant Daniel Porush what to say if the call recipient said they did not have diabetes, and Defendant Daniel Porush's response was that "they're lying to you" and for the telemarketer to "shut up."  Relator Stanley Bernstein was also told by Defendant Jordan Shamah upon Mr. Shamah's arrival in Boca Raton, FL, that Mr. Shamah was "relocating from Med-Care's New York office."

95.     Relator Stanley Bernstein is aware that Med-Care regularly received audit requests from Medicare and private insurance companies which required Med-Care to compile and submit supporting documentation for claims.  Relator Stanley Bernstein became aware that Med-Care staff were assigned to obtain physician orders after-the-fact relating to orders that had been shipped and billed without first obtaining the required order from the physician.

96.     After receiving one such audit from Medicare in or around early 2013, Relator Stanley Bernstein and the other telemarketers were informed by Defendant Danny Porush that "Medicare is changing" and that there had been a "mistake in billing" and therefore that Med-Care could no longer operate as it had been.

97.     Relator Stanley Bernstein is aware that many of the other telemarketers in the Boca Raton call center were convicted felons, or persons hired from drug rehab programs. Relator Stanley Bernstein was informed that by employing these people, Med-Care received a tax deduction or other financial incentive.  These individuals were often only employed for short periods of time before they were terminated because they could not obtain the required Florida telemarketing license.

98.     Thus, Relator Stanley Bernstein is personally aware of the nature and specifics of the scheme during his employment as Med-Care through: 1) the directions received from Defendant Daniel Porush, Defendant Jordan Shamah and other Med-Care management, to engage in prohibited solicitations of Medicare benficiaries; 2) the directions received from Defendant Daniel Porush, Defendant Jordan Shamah and other Med-Care management, to offer product to Medicare beneficiaries for free or without copayment or deductibles; 3) his observance of the other telemarketers he worked with being directed to and engaging in the same conduct; 4) Defendant Danny Porush's admission that referrals were being purchased by Med-Care from third-parties (in violation of the Anti-Kickback statute); 5) from his personal awareness from speaking to Medicare beneficiaries that he called on behalf of the Defendants that they had not requested to be solicited; 6) from his personal awareness from speaking to Medicare beneficiaries that Med-Care was generating leads by offering prohibited incentives such as free I-Pads, socks, Wal-Mart gift cards, and other items, which required the Medicare

beneficiary to provide contact information in order to be entered; 7) from his personal awareness from speaking to Medicare beneficiaries that they had received unrequested and/or unnecessary DME; 8) from his personal receipt of complaints from physicians about the receipt of numerous faxed requests for physician orders from Med-Care around the time the Medicare audits began; and 9) that Med-Care operated a separate call center in New York, NY.

99.     In sum, Relator Stanley Bernstein gained significant personal knowledge regarding the methods, purpose and execution of the fraudulent scheme through his personal participation in the scheme as a telemarketer for Med-Care.

### VIII.   Relator Jamie Camuccio's Direct and Personal Knowledge of the Fraud

100.    Relator Jamie Camuccio has direct and personal knowledge of the violations alleged herein as a result of her employment as a telemarketer for the Defendant Med-Care. More specifically, Relator Jamie Camuccio was employed for approximately two years in Med-Care's Boca Raton call center, which is located at 933 Clint Moore Road, Boca Raton, Florida 33487.  During the scope and course of her employment, and as specifically instructed and directed by Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management including Steven Silverman, Relator Jamie Camuccio personally participated in the fraudulent conduct and improperly solicited Medicare beneficiaries (as well as private insurance beneficiaries) to market and sell DME on behalf of Defendant Med-Care, including medically unnecessary DME.

101.    Relator Jamie Camuccio worked as a telemarketer in the Boca Raton, FL, call center between January 2012 and February 2014.  Relator Jamie Camuccio and the other telemarketers at Med-Care were directed by Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management to engage in the unsolicited telemarketing of Medicare

beneficiaries for the purpose of marketing DME for Med-Care, which she did.  As instructed and directed by Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management, Relator Jamie Camuccio and the other telemarketers routinely made false statements to Medicare beneficiaries to facilitate these sales, and they were paid a commission for each item they sold in addition to their hourly wage.

102.    Relator Jamie Camuccio is aware that there were approximately 100 telemarketers at the Boca Raton call center while she was employed there, some of which were hired from nearby halfway houses.  Defendant Daniel Porush and Defendant Jordan Shamah ran the call center, and Relator Jamie Camuccio observed that Defendant Steven Silverman often worked "behind the scenes."

103.    As part of her training, Relator Jamie Camuccio, along with the other telemarketers, were provided an electronic script to follow that was generated by computer software known as "5-9."  Although a script was provided, Relator Jamie Camuccio observed that the calls were not monitored and that telemarketers were encouraged to go off-script if necessary to make a sale.

104.    The telemarketers, including Relator Jamie Camuccio, were encouraged to make false representations in order to close a sale including, but not limited to: 1) telling the caller that they were being provided the DME for "free" or "at no cost"; 2) telling the caller that we were calling on behalf of the Christian Healthcare Network; 3) telling the caller that we were calling on behalf of "Medicare" or the "pharmacy section of Medicare"; and 4) telling the caller that they would not be required to pay a deductible or co-pay.  The telemarketers, including Relator Jamie Camuccio, were also instructed to "fish" for sales, and identify any other products and/or

supplies the caller or anyone known to them may need.   Defendant Jordan Shamah instructed Relator Jamie Camuccio to "clear" at least 20 sales per week.

105.   Using these techniques, Relator Jamie Camuccio successfully secured the sale of DME to improperly solicited and induced Medicare beneficiaries on behalf of Med-Care. Relator Jamie Camuccio also observed that more Medicare beneficiaries were contacted than patients with private insurance.

106.   Relator Jamie Camuccio also has personal knowledge that Medicare beneficiary referrals were purchased from third-parties.   Relator Jamie Camuccio personally heard Defendant Daniel Porush discuss the purchasing of leads.

107.   Relator Jamie Camuccio also has personal knowledge that Med-Care would also utilize online website promotions, either directly or through third parties, in order to obtain contact information for potential DME customers.   The promotions included the offer of the following in exchange for contact information: free I-Pads and Wal-Mart gift cards.   In order to qualify for the promotion, a contact form had to be completed that identified the person's name, date of birth, address, and phone number, among other things.   Relator Jamie Camuccio personally received complaints from callers that they had not received their gifts and/or that they checked on the form that they did not want to be contacted, but were contacted by Med-Care anyhow.

108.   Relator Jamie Camuccio is also personally aware that Medicare beneficiaries would regularly complain that they did not request to be called, that Medicare beneficiaries had received products such as CPAP's and nebulizers that they did not need, that there was no one at that number who was diabetic, and that they were told the products and suppliers were "free" or "no cost."

109.    In addition to beneficiary complaints, Relator Jamie Camuccio also is aware that physicians would contact Med-Care to complain about orders they received for items such as nebulizers, which were not medically necessary for their patients.

110.    Relator Jamie Camuccio is aware that Defendant Danny Porush broadcast his sales meetings to Med-Care's "New York call center."  Defendant Jordan Shamah told Relator Jamie Camuccio that he had relocated from the "New York call center" and now handled the hiring and general operations of the Boca Raton call center.

111.    In or around early 2013, Relator Jamie Camuccio was informed there was an issue with Medicare and that Med-Care could no longer accept Medicare patients.  This freeze lasted for approximately 2-3 months.

112.    Thus, Relator Jamie Camuccio became personally aware of the nature and specifics of the scheme during her employment as Med-Care through: 1) the directions received from Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management to engage in prohibited solicitations of Medicare beneficiaries; 2) the directions received from Defendant Daniel Porush, Defendant Jordan Shamah, and Med-Care management to offer product to Medicare beneficiaries for free, no cost or without co-pays and deductibles; 3) her observance of the other telemarketers she worked with being directed to and engaging in the same conduct; 4) Defendant Danny Porush's admission regarding Med-Care's purchasing of referrals from third-parties (in violation of the Anti-Kickback statute); 5) from her personal awareness from speaking to Medicare beneficiaries that she called on behalf of the Defendants that they had not requested to be solicited; 6) from her personal awareness from speaking to Medicare beneficiaries that Med-Care was obtaining leads by offering prohibited inducements such as free I-Pads and Wal-Mart gift cards, which required the Medicare beneficiary to provide

contact information in order to be entered; 7) from her personal awareness from speaking to Medicare beneficiaries that they had received unrequested and/or unnecessary DME; and 8) that Med-Care operated a separate call center in New York, NY.

113.    In sum, Relator Jamie Camuccio gained significant personal knowledge regarding the methods, purpose and execution of the fraudulent scheme through her personal participation in the scheme as a telemarketer for Med-Care.

### IX.    Relator Investigation of the Defendants' Scheme

114.    Having acquired personal knowledge of the fraud scheme during her employment for the Defendants, in 2010 Relator Tiffany Bumbury engaged legal counsel to assist Relator in investigating the Defendants' activities in support of the filing of the instant action (referred to herein as the Relator Investigation).

115.    The investigation, which began prior to Relator Tiffany Bumbury filing this action in 2010, included: collecting documents from the discarded trash from the dumpster located in the plaza parking lot behind Med-Care's offices in Boca Raton; witness interviews of former employees of Med-Care; and conducting witness interviews of Medicare beneficiaries serviced by Med-Care.

### A.  Trash Pulls

116.    The trash pulls conducted as part of the Relator Investigation occurred from the dumpster located in the parking lot behind Defendants' facilities in Boca Raton.  The trash pulls yielded a number of documents evidencing the Medicare billing by Medicare, and confirming the Relators' allegations, including the nature and scope of the fraudulent scheme, as well and the relationships of the parties.  More specifically, the following documents were obtained by the Relator Investigation from the trash pulls that demonstrate a number of critical facts:

➢ Internal e-mails between principals of the two entities (including "Danny" [Porush] and "Steve" [Silverman]) divvying up weekly expenses, as well as handwritten notes regarding "Profit Joint Operations," which lists money to be paid to "Danny, "Steve," and "L.S."   According to the note, "Steve" is to receive $171,674, "Danny" is to receive $143,410 through an ACH payment to a third party entity, and "L.S." is to receive $80,000, which is an obvious reference to Defendant Lawrence Silverman, who is the President of East End and is in charge of the New York telemarketing call center.  These are attached hereto as composite Exhibit 10.  Among other things, this email is evidence of the conspiracy between these three principals and evidence of the kickback relationship between Med-Care and East End.

➢ Example call scripts for Med-Care and the Christian Healthcare Network, as well as handwritten call scripts used by Med-Care employees during unsolicited telemarketing calls that showed the unlawful inducement of "no cost" DME.  These are attached hereto as composite Exhibit 4.

➢ Recent Med-Care quality control form confirming Med-Care telemarketers are still making offers of "no cost" product in 2014.  This is attached hereto as Exhibit 11.

➢ Handwritten calls notes by Med-Care Diabetic employees describing beneficiary complaints about receiving DME which were never ordered.  This is attached hereto as composite Exhibit 12.

➢ Shipping labels from returned DME some of which contain messages including that the item(s) was not requested, Med-Care Diabetic should not to send any more item(s), and that the conduct was going to be reported to Medicare.  This is attached hereto as composite Exhibit 5.

➢ Correspondence from a customer, including a Med-Care Diabetic & Medical Supplies, Inc. Customer Satisfaction Questionnaire, describing the fraudulent provision of medically unnecessary and unrequested product. This is attached hereto as composite Exhibit 13.

➢ Medicare DMEPOS Supplier Standards Form which describes standards DMEPOS suppliers must meet in order to obtain and retain their billing privileges. This is attached hereto as Exhibit 3.

➢ Sample "blast" letters to physicians requesting they return a completed Physician Order form for DME supplies for their patient. This is attached hereto as composite Exhibit 14.

➢ ADP payroll records for Med-Care Diabetic & Medical Supplies, Inc. that show commissions being paid to telemarketers and that was used to identify persons with knowledge of Med-Care Diabetic's operations. This is attached hereto as Exhibit 6.

➢ Internal Med-Care spreadsheet identifying breakdown of payments from various insurance carriers including Medicare, Med-Care's highest payer by a significant margin. This is attached hereto as Exhibit 15.

➢ Med-Care flyer to patients nationwide describing Med-Care's program indicating supplies require "no out of pocket costs" which is consistent with Med-Care's operations to routinely waive deductibles and co-pays. This is attached hereto as Exhibit 16.

➢ Internal e-mail dated March 5, 2014, from Michael G. Silverman, General Counsel for Med-Care Diabetic & Medical Supplies, Inc., to all Med-Care Diabetic employees regarding the employees' confidentiality obligations to Med-Care and its patients in

an effort to silence Med-Care Diabetic's employees.  The e-mail is attached hereto as Exhibit 17.

➢ Medicare Electronic Remittance Advice for Med-Care which is attached hereto as composite Exhibit 18.

### B.  Med-Care Employee Witness Interviews

117.    As part of the Relator Investigation, former Med-Care employees were identified and interviewed.  These interviews confirmed and/or expounded upon what the Relators have alleged here.  More specifically, the following witnesses were able to verify the following:[1]

### (a)    Former Employee #1

118.    Former Employee #1 worked at Med-Care from approximately 2007 to 2013 and began working there when there were only twenty employees.   She worked closely with Defendants Steve Silverman, Danny Porush, and (more recently) Jordan Shamah, and she left Med-Care approximately one year ago over concern about what she described as rampant illegal and unethical conduct.   She confirmed that Med-Care's telemarketers cold-called Medicare beneficiaries, and used misleading scripts and were encouraged to utilize false and misleading information to secure sales.   She was specifically asked by Mr. Steven Silverman to prepare a short script for the telemarketers to utilize that began, "Medicare wants you to have a free meter."  Employee #1 stated that a typical introduction included the following:

> ▪ Hi, I'm ******** from Med-Care and I understand that there is a diabetic in the home.  Do you know that Medicare wants you to have a free meter every year?

---

[1]    The identities of these former employees are temporarily being withheld at their request out of fear of anticipated retaliatory conduct from the Defendants, who initiated litigation against Relator Bumbury upon learning of this lawsuit and have threatened to sue anyone who seeks to expose their misconduct.  Their identities will be revealed once an appropriate protective order is in place.

119.    Employee #1 stated that while she would instruct telemarketers to act ethically, Defendant Jordan Shamah would tell the telemarketers to ignore her instructions and "do what you need to do" to secure a sale and "use your personality."

120.    Employee #1 also confirmed that Medicare referrals were purchased by Defendant Daniel Porush from various third parties, and that she observed several individuals come to Med-Care over the years to meet with Defendant Daniel Porush to broker the sale of referrals at various prices.  Employee #1 believes that, based upon his level of involvement in the operation of the company and general demeanor, Defendant Daniel Porush owns the company but that due to his past could not own the company on paper.  Employee #1 also observed that Defendant Daniel Porush would often stand on his desk and berate the telemarketing employees ostensibly in an effort to motivate them to produce more sales.

121.    Employee #1 confirmed that she and other telemarketers were instructed by Defendant Daniel Porush to offer to waive co-pays to Medicare beneficiaries.  She also noted that the company is currently using online promotional giveaways to in order obtain contact information from Medicare beneficiaries.

122.    Employee #1 stated that she was informed that returned/unwanted items were being placed on pallets and stored in a building near the call center for resell.  She added that it was her understanding the Med-Care principals or family members of Defendant Daniel Porush were purchasing several pharmacies around the country in order to resell the returned items, including a pharmacy in Boca Raton, FL, that is in close proximity to Med-care.

123.   Shortly before her separation from Med-Care, Employee #1 complained that many of the telemarketers being hired by Med-Care are convicted felons and/or recovering drug addicts, but she was told to mind her own business.

### (b)   Former Employee #2

124.   Employee #2 was employed by Med-Care for two years as a telemarketer and as a patient advocate, and resigned in early 2014.   Employee #2 confirmed that telemarketers routinely used the phrases "free" and "no cost to you" in order to secure Medicare DME sales. He also observed that many telemarketers had makeshift scripts that included the phrase, "I have great news for you, you just got a meter," which lead people to believe that the items were free of charge.   Telemarketers would attempt to make "upsales" on initial calls, which included trying to get the customer to agree to receive other DME.

125.   Employee #2 confirmed that patients routinely complained about the receipt of unsolicited items, and that telemarketers were paid both an hourly rate and a commission for every item sold, although he speculated that the owners of Med-Care intentionally underpaid the commissions due and withheld information regarding the actual sales numbers.   Pay stubs only listed gross amounts paid, and did not list the hours worked or the commissions earned.

### (c)   Former Employee #3

126.   Employee #3 was employed by Med-Care approximately three years ago as a telemarketer.   She confirmed that she was provided with a script but that she was encouraged to deviate it from it in order to secure a sale, including saying "no money out of your pocket." Employee #3 recalled that all her calls were cold calls and that her typical opening was, "I am calling from Med-Care and we know that you need . . . ," and was instructed to tell patients that there was no co-pay.   Employee #3 recalled that Defendant Daniel Porush announced to the

Med-Care telemarketers that "Medicare" would be supplying them with the names and contact information of the beneficiaries they would be contacting.  Employee #3 related, however, that no such list was provided, and they continued to make cold-calls from purchased leads.

### C.  Medicare Beneficiary Interviews and Specific Claims Data

127.    Med-Care also routinely discarded patient identifiable information in the trash dumpster behind its Boca Raton facility, including documents and records containing thousands of its patients' medical information, such as Medicare billing records, prescription requests, as well empty boxes of refused and/or returned DME supplies.  As part of the Relator Investigation, Medicare beneficiaries who had returned DME to Med-Care and who had complained and/or accused Med-Care of committing fraud were identified and contacted for interviews.

128.    These beneficiaries, who were identified exclusively by the Relator Investigation trash pulls, and who are identified by their initials below, confirmed that Med-Care and/or its agents made unsolicited contact with them in direct violation of Federal law, that these communications involved inducements prohibited by the Anti-Kickback statute in the form of offers of free product, that there were billing to Medicare for DME not retained by the Medicare beneficiary, that there were billings to Medicare for medically necessary and excessive DME shipped to them, and/or were a combination thereof.  More specifically:

(a)     Medicare beneficiary "K.W." of Cedar Rapids, Iowa 52404, was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  Beginning in approximately February 2013, K.W. began receiving both unsolicited telemarketing phone calls and unsolicited DME from Med-Care.  During the first unsolicited telemarketing call, a Med-Care telemarketer told K.W. that Med-Care was "Medicare approved" and that Med-Care could send her "free" diabetic testing supplies, an offer which

K.W. accepted.   K.W. thereafter began receiving numerous unsolicited calls from Med-Care offering a variety of DME items, including a new CPAP machine and nebulizer.   K.W. stated that she specifically told the Med-Care telemarketer that she did not need or want a new CPAP or nebulizer because she already had one of each.   Notwithstanding her rebuff, in March 2013, Med-Care shipped a new CPAP and nebulizer to K.W., along with 675 doses of albuterol.   With respect to the 675 doses of albuterol for her nebulizer, K.W.'s prescription only called for usage three times a day as needed.   At three times a day, K.W. would only need 180 doses every three months (at maximum), and most of the stock sent by Med-Care would have expired in the next three months.   K.W. called Med-Care to complain and was told by Med-Care that she could "just keep" the items.   K.W. nevertheless shipped the DME back to Med-Care and demanded to be reimbursed for her shipping expenses.   Along with the shipment, K.W. included a completed "Customer Satisfaction Questionnaire" in which she complained about the recent receipt of "very heavy" packages containing a new CPAP and nebulizer that she had not requested, and which Med-Care had discarded in its trash.   K.W. stated on the questionnaire that, "It will cost me an arm and a leg to return these because they are so heavy.  SO, here's my deal – you reimburse me my postage OR I will turn you in for Medicare fraud.  I do not need these and I told you that. You sent them anyway, so that is wasting of Medicare Money which costs us all.  I will give you until May 1st to get a check to me or I will turn you in.  If you think I am joking, you better think again."   Med-Care paid K.W. for the shipping.   Attached as composite Exhibit 13 are K.W.'s questionnaire and an April 18, 2013, letter K.W. sent to Noridian Administrative Services (a CMS contractor) complaining of Med-Care's fraudulent conduct.   Med-Care nonetheless billed Medicare for the equipment and supplies.   The specific false claims include the following, and copies of the CMS billing data are attached hereto as Exhibit 1:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Medicare Paid | Wellmark BlueCross Paid (Medicare Supp.) |
|---|---|---|---|---|---|---|
| 13060846588000 | 02/21/13 | 1.0 Pos airway press headgear (A7035-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $50.00 | $29.66 | |
| 13060846588000 | 02/21/13 | 1.0 Pos airway pressure tubing (A7037-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $46.00 | $30.62 | |
| 13060846588000 | 02/21/13 | 6.0 Pos airway pressure filter (A7038-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $36.96 | $24.19 | |
| 13060846588000 | 02/21/13 | 1.0 Filter, non disposable w/ pap (A7039-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $15.64 | $11.44 | |
| 13060846588000 | 02/21/13 | 1.0 CPAP full face mask (A7030-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $226.37 | $140.83 | |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $226.37 | $140.83 | $35.21 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $195.00 | $156.00 | $39.00 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $50.00 | $29.66 | $7.42 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $46.00 | $30.62 | $7.65 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $36.96 | $24.19 | $6.05 |
| 05130776483600 | 02/21/13 | Home Medical Equipment | Med-Care Diabetic | $15.64 | $11.44 | $2.86 |
| 13060846586000 | 02/23/13 | 6.0 Disposable nebulizer sml vol (A 7004-NU)  NEW EQUIPMENT | Med-Care Diabetic | $60.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 6.0 Disposable compressor filter (A 7013-NU) NEW EQUIPMENT | Med-Care Diabetic | $12.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 3.0 Aerosol mask used w/ nebulizer | Med-Care Diabetic | $15.00 | $0.00 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | (A 7015-NU) NEW EQUIPMENT | | | | |
| 13060846586000 | 02/23/13 | 1.0 Nebulizer with compression (E0570-RRKH) Rental | Med-Care Diabetic | $30.00 | $0.00 | |
| 13060846586000 | 02/23/13 | 675.0 Albuterol non-comp unit (J7613-KO) | Med-Care Diabetic | $1,012.50 | $0.00 | |
| 13060846586000 | 02/23/13 | 1.0 Disp fee inhal drugs/90 days (Q0514) | Med-Care Diabetic | $66.00 | $8.50 | |
| 13060846586000 | 02/23/13 | 6.0 Nebulizer administration set (A7003-NU) NEW EQUIPMENT | Med-Care Diabetic | $60.00 | $0.00 | |
| 05130776483500 | 02/23/13 | Home Injections | Med-Care Diabetic | $1,012.50 | $0.00 | $33.08 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $60.00 | $0.00 | $17.82 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $60.00 | $0.00 | $11.76 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $15.00 | $0.00 | $6.12 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $12.00 | $0.00 | $5.40 |
| 05130776483500 | 02/23/13 | Home Medical Care | Med-Care Diabetic | $66.00 | $8.50 | $57.50 |
| 05130776483500 | 02/23/13 | Home Medical Equipment | Med-Care Diabetic | $30.00 | $0.00 | $17.44 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $450.00 | $165.46 | $41.36 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $200.00 | $57.87 | $14.47 |
| 05130806431900 | 03/01/13 | Home Medical Equipment | Med-Care Diabetic | $96.00 | $27.00 | $6.75 |
| 1306584198400 | 03/01-05/31/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | |
| 1306584198400 | 703/01-05/31/13 | 1.0 Blood glucose monitor home (E0607-NUKX) NEW EQUIPMENT | Med-Care Diabetic | $200.00 | $57.87 | |
| 05131016338400 | 03/23/13 | Home Medical Equipment | Med-Care Diabetic | $30.00 | $13.95 | $3.49 |
| 13086858577000 | 03/23/13 | 1 Nebulizer, with | Med-Care | $30.00 | $13.95 | |

| | | compressor (E0570) | Diabetic | | | |
|---|---|---|---|---|---|---|
| 05131196348500 | 03/25/13 | Home Medical Equipment | Med-Care Diabetic | $500.00 | $224.88 | $56.22 |
| 05131196348500 | 03/25/13 | Home Medical Equipment | Med-Care Diabetic | $150.00 | $83.40 | $20.85 |
| 13102840342000 | 03/25/13 | 1 Humidifier, heated, used with positive airway pressure device (E0562) | Med-Care Diabetic | $500.00 | $224.88 | |
| 13102840342000 | 03/25/13 | 1 Continuous airway pressure (cpap) device (E0601) | Med-Care Diabetic | $150.00 | $83.40 | |

(b)     Medicare beneficiary "K.M." of Salisbury, MO 65281 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  Beginning in approximately 2012 and continuing into 2013, K.M. received unsolicited telemarketing phone calls and unsolicited DME from Med-Care.  K.M. agreed to accept the "free" DME from Med-Care.  During at least one of these unsolicited calls, Med-Care telemarketers pronounced "Med-Care" like "Med-i-care."  The Med-Care sales pitch also included the assertion that, "You don't have to pay for this."  K.M. subsequently noticed that a bill for the "free" DME was submitted to both Medicare and her private insurer, which upset K.M. based on the representation that the DME was "free" and because K.M. never gave Med-Care her Medicare number.  K.M. also learned that Med-Care called her personal physician (whose name she had not given to Med-Care) and falsely informed the physician that KM desired to switch to Med-Care as her DME supplier.  The specific false claims include, but are not limited to, the following:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Medicare Paid | United of Omaha Paid (Medicare Supp.) |
|---|---|---|---|---|---|---|
| 12303875963000 | 09/14-12/13/12 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS | Med-Care Diabetic | $28.00 | $7.90 | |

| | | ITEM DELIVERED VIA MAIL | | | | |
|---|---|---|---|---|---|---|
| 12303875963000 | 09/14/12 | 1.0 Lancet device each (A4258-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $0.00 | |
| 12303875963000 | 09/14/12 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $1.18 | |
| 12359861283000 | 12/14-03/13/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.90 | |
| 12359861283000 | 12/14-03/13/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $26.78 | |
| 12359861283000 | 12/14-03/13/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $145.49 | |
| 583720938500 | 12/14-03/13/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.90 | $1.97 |
| 583720938500 | 12/14-03/13/13 | 3.0 Lancets per box (A4259-KLKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $26.78 | $6.70 |
| 583720938500 | 12/14-03/13/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DMEPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $145.49 | $36.37 |
| 13085831166000 | 03/22/13 | 1.0 Lancet device each (A4258-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $3.70 | |
| 13085831166000 | 03/22-06/21/13 | 3.0 Lancets per box (A4259-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | |
| 13085831166000 | 03/22-06/21/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) | Med-Care Diabetic | $450.00 | $146.64 | |

| | | DEMPOS DELIVERED VIA MAIL | | | | |
|---|---|---|---|---|---|---|
| 13085831166000 | 03/22-06/21/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.96 | |
| 13085831166000 | 03/22/13 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $0.00 | |
| 583871960800 | 03/22/13 | 1.0 Lancet device each (A4258-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $38.00 | $3.70 | $12.85 |
| 583871960800 | 03/22-06/21/13 | 3.0 Lancets per box (A4259-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $96.00 | $27.00 | $6.75 |
| 583871960800 | 03/22-06/21/13 | 6.0 Blood glucose/reagent strips (A4253-KLNUKX) DEMPOS DELIVERED VIA MAIL | Med-Care Diabetic | $450.00 | $146.64 | $36.66 |
| 583871960800 | 03/22-06/21/13 | 1.0 Calibrator solution/chips (A4256-KLKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $28.00 | $7.96 | $1.99 |
| 583871960800 | 03/22/13 | 2.0 Alkalin batt for glucose mon (A4233-KLUNKX) DEMPOS ITEM DELIVERED VIA MAIL | Med-Care Diabetic | $5.00 | $0.00 | $1.50 |

(c)    Medicare beneficiary "G.W." of Muskegon, MI 49941 was identified as a

potential witness as a result of the trash pulls and was contacted and interviewed as part of the

Relator Investigation.  G.W. has received many unsolicited packages from Med-Care containing

diabetic testing supplies.  G.W. called Med-Care and instructed them to not send her anything

else unless she called them first.  Med-Care has sent G.W. so many unnecessary items that G.W.

has a "big bag full of stuff" that G.W. was considering giving away.  Pictures of the unnecessary

DME are attached hereto as Exhibit 19.  Med-Care billed G.W.'s Medicare Advantage plan for the DME.  The specific false claims include, but are not limited to, the following:

| Claim Number | Date of Service | Item | Biller | Amount Charged | Amount Paid (Medicare Supp.) |
|---|---|---|---|---|---|
| 59605043259622 | 03/09/13 | Blood glucose test or reagent strips for home blood glucose (A4253) | Med-Care Diabetic | $600.00 | $273.60 |
| 59605043259622 | 03/09/13 | Lancets, per box of 100 (A4259) | Med-Care Diabetic | $128.00 | $0.00 |
| 59605043259622 | 03/09/13 | Normal, low and high calibrator solution/chips (A4256) | Med-Care Diabetic | $28.00 | $10.30 |

(d)     Medicare beneficiary "N.D." of Osceola, IN 46561 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  N.D. is disabled and diabetic.  N.D. was solicited by phone by Med-Care without his request, which made N.D. upset.  N.D. asked the Med-Care representative several times how they got N.D.'s name, phone number, and how they knew N.D. had diabetes because N.D. had not solicited Med-Care.  The Med-Care telemarketer had difficulty answering N.D.'s questions and suggested that N.D.'s wife had made a request via computer, which was false.  N.D. nevertheless agreed to receive the "free" items from Med-Care, and Med-Care has since that time sent him numerous diabetic testing supplies and a CPAP device.  Med-Care has been supplying N.D. with DME for more than a year.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to N.D. as a result of the prohibited solicitation.

(e)     Medicare beneficiary "B.C." of Matthews, NC 28105 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator

Investigation.   B.C. is diabetic and received unsolicited telemarketing calls from Med-Care representatives, as well as unsolicited DME from Med-Care, which B.C. returned to Med-Care. B.C. did agree to receive the "free" diabetic testing supplies, but Med-Care began sending more supplies than B.C. needed and additional DME that B.C. never requested, such as COPD-related items.   The normal sales pitch to B.C. included statements such as, "It's all free, you don't pay a penny."   B.C. alerted her physician about her receipt of the unsolicited DME items and suspected that Med-Care was committing Medicare fraud.   The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(f)     Medicare beneficiary "B.K." of Cleveland, TN 37323 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.   B.K.'s relationship with Med-Care began with unsolicited telemarketing calls. B.K. accepted Med-Care's offer to provide her with "free" diabetic testing supplies, which Med-Care provided.   B.K. often thereafter received more testing supplies than she needed and demanded on several occasions that Med-Care stop sending her packages.   Beginning approximately a year ago, on numerous occasions, B.K. would receive an unsolicited shipment of DME from Med-Care, which B.K. would send back to Med-Care, and that Med-Care would then turn around and send back to B.K.   The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.K. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(g)      Medicare beneficiary "B.C." of Angleton, TX 77515 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  B.C.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer who offered her "free" diabetic testing supplies.  The telemarketer falsely told B.C. that Med-Care received her name and number from B.C.'s personal physician, who the telemarketer claimed had informed Med-Care that B.C. needed diabetic testing supplies.  B.C. agreed to receive the testing supplies, which Med-Care provided.  Following this initial shipment, B.C. received many unsolicited phone calls from Med-Care, as well as a second, unsolicited shipment of diabetic testing supplies that contained an excessive amount of supplies that she did not need.  After receiving this second, large shipment B.C. called Med-Care to demand that they not send her anything else unless she requested it.  B.C. saw billing records from "Texan Plus," her Medicare Advantage plan, associated with the Med-Care DME.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(h)      Medicare beneficiary "C.B." of Payson, UT 84651 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  C.B. is diabetic and received unsolicited telemarketing calls from Med-Care and eventually accepted Med-Care's offer to provide her with "free" diabetic testing supplies.  After the initial shipment, C.B. often received more testing supplies than she needed and asked Med-Care on several occasions to stop sending such a large quantity.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to

C.B. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(i)    Medicare beneficiary "J.P." of Pass Christian, MS 39571 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  J.P. has received many unsolicited packages from Med-Care containing diabetic testing supplies in 2012 and 2013.  J.P. is homebound and has had her niece take them to the post office in town to send them all back.  On one of the returned packages, the following note is written: "Please do not send this without my permission I'm reporting this to Medicare." The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.P. as a result of the billing for medically unnecessary DME.

(j)    Medicare beneficiary "S.B." of Sullivan, IL 61951 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  S.B. is diabetic and confirmed that she received unsolicited telemarketing calls from Med-Care in 2012 but refused Med-Care's offer to provide her with "free" diabetic testing supplies.  Med-Care sent her diabetic testing supplies anyway, which S.B. returned.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.B. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(k)    Medicare beneficiary "L.M." of Carthage, MO 64836 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  L.M. is diabetic and over the course of approximately a year, routinely received diabetic testing supplies from Med-Care that he never requested.  The specific false claims are all

claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to L.M. as a result of the billing for medically unnecessary DME.

(l)     Medicare beneficiary "J.G." of Lake Oswego, OR 97035 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.   J.G. is diabetic and began his relationship with Med-Care through unsolicited calls from Med-Care representatives.   Med-Care has also sent J.G. unsolicited DME, which he has generally returned to Med-Care unopened.   Med-Care has specifically sent J.G. unneeded diabetic testing supplies that he had not asked for and did not need.   J.G. recently called Med-Care and expressly told them, "Do not send me anything else unless I ask for it." The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.G. as a result of the prohibited solicitation and the billing for medically unnecessary DME.

(m)     Medicare beneficiary "S.M." of Woodridge, IL 60517 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  S.M.'s first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer in 2013 who offered S.M. "free" diabetic testing supplies.  S.M. agreed to receive the testing supplies, which Med-Care provided.  Med-Care thereafter started sending S.M. additional DME that S.M. did not request and did not want, including a CPAP machine for sleep apnea.  S.M. specifically told the Med-Care telemarketer that she did not want or need a new CPAP device because she already had one, and that she returned the CPAP device to Med-Care. The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.M. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(n)      Medicare beneficiary "S.T." of Bedford, IN 47421 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  S.T. is diabetic, and her first contact with Med-Care was an unsolicited phone call from a Med-Care telemarketer who offered her "free" diabetic testing supplies in 2012.  S.T. agreed to receive the testing supplies, which Med-Care provided.  Med-Care also offered to provide S.T. with a new CPAP machine and related DME, which S.T. agreed to receive.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to S.T. as a result of the prohibited solicitation and the prohibited inducement.

(o)      Medicare beneficiary "L.E." of Imlay City, MI 48444 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.  L.E., who is diabetic, has routinely received unsolicited DME from Med-Care, which he has generally returned to Med-Care unopened.  Med-Care first began sending unsolicited boxes of DME to his residence "two or three years ago."  L.E. observed that after he returned unsolicited DME to Med-Care, his Medicare billing summary notice showed that Med-Care had billed Medicare for those items anyway.  L.E. called Medicare to complain about Med-Care.  Med-Care also sent L.E. an unsolicited brace for L.E.'s back, despite the fact that L.E. did not have any back problems and did not need it.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to L.E. as a result of the prohibited solicitation, the prohibited inducement, and the billing for medically unnecessary DME.

(p)      Medicare beneficiary "B.C." from Montrose, WV 262983 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the

Relator Investigation.  B.C. is disabled and diabetic, and his first contact with Med-Care was an unsolicited phone call from Med-Care regarding his interest in receiving diabetic testing supplies.  Following this initial call, B.C. stated that Med-Care began sending him diabetic testing supplies "over and over" without his consent.  B.C. recalls that Med-Care called him "at least a dozen times" in a short period of time and so he called them back and instructed Med-Care not to call him anymore and to not send him anything else "ever again."  B.C. stated that after he instructed Med-Care to stop calling him, Med-Care began "harassing" him and calling him even more frequently.  B.C. stated that he recently called Med-Care again and had to speak to "at least four different people" regarding his situation, and that Med-Care has now stopped calling him.  The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to B.C. as a result of the prohibited solicitation and the billing for medically unnecessary DME.

(q)      Medicare beneficiary J.P., from Sheridan, IN 46069 was identified as a potential witness as a result of the trash pulls and was contacted and interviewed as part of the Relator Investigation.    J.P. is diabetic, and his first contact with Med-Care was an unsolicited telemarketing call approximately two years ago.  J.P. recalled that the telemarketing representative explained during that initial call that J.P.'s doctor has asked Med-Care to give J.P. a call, which J.P. questioned.  Nevertheless, J.P. accepted Med-Care's offer to provide him with diabetic testing supplies.  J.P. stated that Med-Care thereafter started sending him "too much" and that he felt like Med-Care was "shoving it" at him. J.P. also stated that he called Med-Care and told the representative to stop sending DME.  J.P. observed that Med-Care sometimes called him "5 times a week."  J.P. stated that he therefore called and repeatedly complained to Med-Care demanding they stop calling him.  J.P. also recalled that Med-Care wanted to send him a

CPAP, but he refused. The specific false claims are all claims submitted by Med-Care to Medicare in connection with DME supplied by Med-Care to J.P. as a result of the prohibited solicitation and the billing for medically unnecessary DME.

### X.    Additional Fraudulent Conduct Directed at Physicians

129.   In furtherance of the scheme, Med-Care routinely sent correspondence to physicians nationwide stating that Med-Care had received (as opposed to solicited) a request to supply the physician's patient with DME such as diabetic testing supplies, CPAPs, nebulizers and braces, and asking the physician to complete the enclosed "Physician Order Form."  In doing so, Med-Care actively concealed its fraudulent scheme from the ordering physicians.  Examples of these letters are attached hereto as composite Exhibit 14. In fact, these types of bogus communications to physicians were part of the impetus for a separate 2013 Congressional investigation into Med-Care's improper marketing activities (described below) that was led by the U.S. Senate's "Committee On Homeland Security and Governmental Affairs (Subcommittee on Financial and Contracting Oversight)."  Attached as Exhibit 20 is a January 16, 2013, letter from Dr. Charlotte Kennedy to HHS-OIG (cc'd to U.S. Senators Claire McCaskill and Roy Blunt) cited during the Congressional investigation, which complained about Med-Care's marketing tactics ("Please be advised that every single one of these patients did not request and of these devices or products.  There were cold calls to their homes and, in fact at one point, one patient was badgered several times over several days . . . .").

### XI.    Medicare Billing and Specific False Claims

130.   Defendant Med-Care, through the actions and design of the other Defendants, including the specific acts described throughout this compliant, submitted false claims and statements to the Medicare Program in connection with each of the Medicare beneficiaries

identified in Paragraph 128 of this complaint.  Specific false claim examples are identified in Paragraph 128, as well as in Exhibit 1 to this complaint.  The Defendants, as a result of their actions described in this complaint that generated non-reimbursable claims, knew or acted in reckless disregard of the fact that false claims were being submitted to the Medicare Program in connection with these and other Medicare beneficiaries.

131.    In addition to these specifically identified false claims to Medicare, the Defendants submitted and caused to be submitted thousands of additional false claims to the Medicare as a result of: 1) the prohibited telephone solicitation of Medicare beneficiaries and the submission of claims resulting from those prohibited solicitations; 2) the improper inducement of Medicare beneficiaries to order DME through Med-Care as a result of Med-Care offering free or no cost DME and the routine waiver of co-pays and deductibles in violation of the Anti-Kickback statute and the subsequent submission of claims to the Medicare resulting from those inducements; 3) the payment of prohibited remuneration to Defendant East End and others for referrals of Medicare beneficiaries in violation of the Medicare Anti-Kickback Statute and the subsequent submission of claims to the Medicare resulting from those referrals; 4) the submission of claims to Medicare for medically unnecessary DME; 5) the submission of claims to Medicare for DME when no physician order had been obtained prior to the submission of the claim to Medicare; 6) the submission of claims to Medicare, or the failure to refund payments received, when Medicare beneficiaries returned unwanted or unordered DME; and 7) the improper inducement of Medicare beneficiaries to order DME through Med-Care as a result of Med-Care offering gifts such as I-Pads and gift cards in violation of the Anti-Kickback statute and the subsequent submission of claims to the Medicare Program resulting from those inducements.

132.     As described throughout this complaint, Relators had direct and personal knowledge that Med-Care was in the business of soliciting and inducing orders for DME from Medicare beneficiaries, and then submitting claims to the Medicare Program in connection with those prohibited solicitations and inducements.  As demonstrated in Exhibit 15, the majority of Med-Care's business was the solicitation and submission of claims to the Medicare Program.

133.  Each of the Relator's were aware that the majority of the orders that they generated were from Medicare beneficiaries, and the Relators received commissions once those claims were paid by Medicare.

134.     Additionally, recovered from Med-Care's trash were numerous Medicare remittance advice forms reflecting payments from Medicare to Med-Care for providing DME.  Attached as Exhibit 18 are samples of some of the recovered Remittance Advices.  Also recovered from Med-Care's trash were audit requests and other correspondence concerning audits of claims submitted by Med-Care to the Medicare.

135.     The defendants purposefully compartmentalized the billing function within Med-Care to limit the dissemination of knowledge about its fraudulent billing activities.  Non-billing staff were prohibited from entering into the billing department, and the billing and audit departments were staffed with what Relators Stanley Bernstein and Jamie Camuccio describe as employees trusted by the Defendants, and referred to among Med-Care employees as "friends and family" of Defendants Daniel Porush and Steven Silverman.  Notwithstanding this compartmentalization of the billing function by Med-Care, Relators were aware of the importance and extent of the Medicare business to Med-Care, Relators Stanley Bernstein and Jamie Camuccio were informed by the Defendants when Med-Care temporarily lost its Medicare billing privileges in 2013 (which resulted in a significant reduction in Relators' pay by

approximately 50%).  Relator Stanley Bernstein was aware that when the Medicare payment audits began in 2012, there was a concerted effort by Med-Care to obtain physician orders after-the-fact to justify previously billed claims to Medicare.

### XII.  U.S. Congressional Investigation of Med-Care Confirms Relators' Allegations

136.    Although the Relators' allegations are not based upon the 2013 Congressional Investigation, and the Relators have direct and independent knowledge of the Defendants' false claims scheme as a result of their employment at East End or Med-Care, reference is made to the Congressional Investigation in this complaint because it independently corroborates, in several important respects, the substance of the Relators' allegations.  The Congressional investigation of Med-Care by the U.S. Senate's Committee On Homeland Security and Governmental Affairs (Subcommittee on Financial and Contracting Oversight), scrutinized Med-Care's Medicare-related, illegal DME marketing tactics as a result of physician complaints.  Defendant Steven Silverman, D.C., a Med-Care principal, was subpoenaed to testify before the Subcommittee after he refused to voluntarily appear and/or provide any other information regarding Med-Care's operations and/or marketing tactics, and where he provided false testimony regarding commission payments to telemarketers at Med-Care, purchasing leads and Defendant Daniel Porush's role with Med-Care.

137.    On April 23, 2013, the Majority Staff published a "Memorandum" to the Members of the Subcommittee on Financial and Contracting Oversight regarding the hearing on "Oversight and Business Practices of Durable Medical Equipment."   A copy of the Memorandum is attached hereto as Exhibit 21.  With respect to Med-Care, the Majority Staff Memorandum specifically observed the following:

(a)     "Med-Care, a medical company based in Boca Raton, Florida, is a national supplier of durable medical equipment to Medicare beneficiaries.  From 2009 to 2012, Med-Care received more than $84 million from Medicare for durable medical equipment.  Over that time, period, Med-Care's annual payments increased by more than 270%, from $9.3 million in 2009 to $34.8 million in 2012."  *Id.*, p. 8.

(b)     "A sample of claims paid to Med-Care revealed that approximately 68% of Med-Care's claims were improper.  CMS' regional Recovery Audit Contractor, a contractor charged with identifying and recovering improper payments and making fraud referrals, found that over 400 of the more than 590 Med-Care claims reviewed were improper and demanded that Med-Care return $146,689 in overpayments.  If CMS were to determine that the same rate of error exists throughout Med-Care's claims, Med-Care could owe up to $57 million in overpayments to the federal government."  *Id.*

(c)     "Sample reviews of Med-Care claims by Medicare Administrative Contractors (MACs), contractors responsible for Medicare claims processing and payment reviews, have resulted in very high error rates.  Since 2011, Noridian, one of several MACs working for CMS, has reviewed more than 3,300 claims by Med-Care and denied 62% to 99% of claims depending on the review.  Another MAC, National Government Services, reviewed a sample of 1,202 Med-Care claims and denied payment for 1,186, or approximately 99%.  A third MAC, National Heritage Insurance Company, reviewed 138 Med-Care claims for diabetic testing supplies since August 2012 and denied payment for 85%."  *Id.*

138.    On May 22, 2013, Defendant Silverman, after being subpoenaed, appeared before the Subcommittee.  Defendant Silverman testified, and a transcript of his testimony is attached

hereto as Exhibit 22.  Defendant Silverman falsely testified under oath that Med-Care does not engage in prohibited telemarketing, that it does not wrongfully acquire Medicare beneficiary information for use in marketing by purchasing leads, that Defendant Daniel Porush was merely and employee of Med-Care, and that Med-Care has the proper back-up "documentation" to justify each call it makes.  *Id.* at p. 30.

139.   Although Defendant Steven Silverman agreed to provide proof of authorization to contact patients that were the subject of the hearing, as well as other Med-Care data, Med-Care never provided the promised information to the Committee.

**Count I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**False Claims**

140.   Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 139 of this complaint.

141.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

142.   Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or with reckless disregard to the truth or falsity thereof) submitted or caused to be submitted false claims to Medicare (under both Medicare Parts B and C) for payment by the United States from approximately 2008 to present.

143.   The United States, Medicare, its fiscal intermediaries, and Medicare Advantage plans, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

144.    By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged in the amount of tens of millions of dollars in Medicare funds.

145.    Thus, Defendants violated the False Claims Act, in that they knowingly presented and to caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

<u>**Count II**</u>
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**
**False Statements**

146.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 139 of this complaint.

147.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

148.    Through the acts described above and otherwise, Defendants and their agents and employees knowingly (or at least with reckless disregard to the truth or falsity thereof) made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(B).

149.    The United States, Medicare, its fiscal intermediaries, and Medicare Advantage plans, unaware of the falsity of the records, statements, and claims made or submitted by Defendants and their agents and employees, paid and continue to pay Defendants for claims that would not be paid if the truth were known.

150.    By reason of the Defendants' false records, statements, claims, and/or omissions, the United States and the Medicare program have been damaged in the amount of tens of millions of dollars in Medicare funds.

151.    Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(B).

**Count III**
**False Claims Act Conspiracy**
**31 U.S.C. § 3729(a)(1)(C)**

152.    Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 139 of the complaint.

153.    This is a claim for treble damages and for penalties under the False Claims Act, 31 U.S.C. § 3729 *et. seq*. as amended.

154.    Through the specific acts, actions, manner and means of the Defendants described in the paragraphs above and otherwise, the Defendants intentionally entered into a conspiracy and joint effort among themselves and with others to violate the False Claims Act and to receive money from the Medicare Program they knew they were not entitle to receive by: 1) presenting or causing the presentation of false and fraudulent claims for payment or approved under the Medicare Program; 2) making and using, or causing the making or using, of false records or statements material to a false or fraudulent claim; and 3) concealing and avoiding an obligation to pay or transmit money to the United States.  The Defendants have taken substantial steps in furtherance of the conspiracy including, *inter alia*, making and causing others to make unsolicited phone calls to Medicare beneficiaries, by paying for referrals in violation of the Medicare Anti-Kickback Statute, by submitting false claims under the Medicare program for payment or approval, by making and causing others to make prohibited inducements to Medicare

beneficiaries in violation of the Medicare Anti-Kickback statute, and by failing to timely refund to Medicare the overpayments received by Med-Care as a result of the receipt of returned DME from Medicare beneficiaries.

155.    The United States, Medicare, its fiscal intermediaries, and Medicare Advantage Plans, unaware of Defendants' conspiracy or the falsity of the records, statements and claims made and caused to be made by Defendants, and as a result thereof, have paid tens of millions of dollars in Medicare reimbursement that they would not otherwise have paid.  Additionally, Med-Care has failed to repay claims that Med-Care was obligated to as a result of returned DME.

156.   By reason of Defendants' conspiracy and the acts taken in furtherance thereof, the United States has been damaged in the amount of tens of millions of dollars in Medicare funds.

157.    Thus, Defendants violated the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

### Prayer for Relief

WHEREFORE, Plaintiff/Relator prays for judgment against defendants as follows:

158.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.;

159.    That the Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

160.    That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the Civil False Claims Act;

161.    That Relators be awarded all costs and expenses of this action, including attorneys' fees; and

162.    That the United States and Relators receive all such other relief as the Court deems just and proper.

**Jury Demand**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands trial by jury.

DATED:  July 24, 2014

Respectfully submitted,

s/ Robert N. Nicholson
Robert N. Nicholson, P.A.
Florida Bar No. 933996
Robert@NicholsonEastin.com
Parker D. Eastin, P.A.
Florida Bar No. 48044
Parker@NicholsonEastin.com
Nicholson & Eastin, LLP
707 NE 3rd Ave., Suite 301
Fort Lauderdale, Florida 33304
Telephone: (954) 634-4400
Facsimile: (954) 634-4418

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2014, a true and correct copy of the foregoing was filed and served via electronic case filing (ECF) on all counsel of record who have consented to electronic service and is available for viewing and downloading from the ECF system.

s/ Robert N. Nicholson
Robert N. Nicholson, P.A.