**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 10-81634-Civ-RYSKAMP/HOPKINS

UNITED STATES OF AMERICA, *ex rel*.,
TIFFANY BUMBURY, *et al*.,

      Plaintiffs,

v.

MED-CARE DIABETIC & MEDICAL
SUPPLIES, INC.,  a Florida corporation, *et al*.,

      Defendants.

## DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL, FOR SANCTIONS AND REFERRAL TO THE FLORIDA BAR FOR DISCIPLINARY INVESTIGATION WITH SUPPORTING MEMORANDUM OF LAW

Defendants Med-Care Diabetic & Medical Supplies, Inc. ("Med-Care"), East End Associates, Inc. ("East End"), Daniel M. Porush, Lawrence P. Silverman, Jordan Shamah, and Steven Silverman (collectively "Defendants"), hereby move to disqualify Plaintiffs' counsel, for sanctions and referral to the Florida Bar for disciplinary investigation based upon egregious  breach of fiduciary duty to a former client and blatant conflict of interest, and state:

## INTRODUCTION

This case presents a shocking and inexcusable breach of fiduciary and professional duties by Med-Care's former counsel, which has caused irreparable economic and reputational harm to the Defendants. This is not just an unfortunate circumstance. It is a complete travesty.

Parker Eastin, Esq. ("Eastin")  and his firm Nicholson & Eastin, LLP must be disqualified, sanctioned and referred to the Florida Bar due to an egregious breach of fiduciary duty and a blatant conflict of interest involving Med-Care -- Eastin's former client. While at Broad and Cassel, Eastin worked for Med-Care on Medicare telemarketing and compliance issues in September 2010 and advised others at Broad and Cassel who billed Med-Care in October of 2010. Eastin then left Broad and Cassel to join Robert Nicholson's firm in November 2010. Literally two months and one day

after Eastin worked on the Med-Care telemarketing and regulatory matters at Broad and Cassel, Nicholson's firm sued the Defendants in this case for the same issues that Eastin analyzed.

Renowned Florida professional ethics expert, Anthony Alfieri, Esq., opines herein that Eastin and Nicholson & Eastin committed professional ethics violations and must be disqualified. *See Notice of Filing -Declaration of Expert Witness Anthony Alfieri dated January 15, 2015 filed contemporaneously herewith.*

## STATEMENT OF FACTS

1.     In 2005, Eastin commenced employment as an attorney with Broad and Cassel in its Fort Lauderdale office. After several years with King & Spaulding in Atlanta, Eastin "was recruited to join Broad and Cassel, a regional law firm that specializes in health care regulatory matters and white collar criminal defense, where he worked closely with Mr. Robert Nicholson." *See Notice of Filing – Nicholson & Eastin Composite of Website and Linked-In Pages.*

2.     Robert N. Nicholson, Esq. ("Nicholson") was employed as an attorney with Broad and Cassel in Fort Lauderdale from July 2007 to June 2009. (Nicholson's firm bio at Nicholson & Eastin LLP). Nicholson worked in Broad and Cassel's health care regulatory, white collar criminal defense and civil litigation practice groups. "Nicholson is a former state and federal prosecutor with extensive experience in health care compliance, white collar and regulatory enforcement matters." *Id*. Nicholson left Broad and Cassel in June of 2009 to open his own firm. *Id*.

3.     On or before September of 2009, Med-Care hired Broad and Cassel for health care regulatory advice. During the period on or before September 2009 through October of 2010, Broad and Cassel rendered advice to Med-Care on such issues, *inter alia*, as: (1) Medicare application, enrollment, and ownership disclosure issues; (2) compliance with a Medicare inquiry into Med-Care's marketing practices; (3) CMS and HIPAA marketing restrictions; and (4)   marketing of non-health care services to Medicare beneficiaries.

4.     Lester Perling, Esq. (partner) and Vanessa Reynolds (associate) were the primary Broad and Cassel attorneys who handled the Med-Care matter. They employed a team approach that involved other attorneys' expertise as necessary or appropriate.

5.     Eastin was directly involved in Broad and Cassel's representation of Med-Care in September and October 2010 concerning Medicare, telemarketing and regulatory compliance issues and communicated with the client. On September 3, 2010, Eastin billed Med-Care for:

> ***Conference with L. Perling regarding telemarketing issues; legal research and analysis regarding telemarketing issues and potential criminal implications; call with L. Perling and client regarding marketing and solicitation issues.***

On October 19, 2010, Lester Perling billed Med-Care for:

> Review correspondence from Medicare regarding site visit and brief related research; telephone conference with Mr. Silverman, Mr. Porush and Ms. Weil regarding response. ***Instruct Attorney Eastin regarding follow up***. Review correspondence related to response.

On October 27, 2010, Vanessa Reynolds billed Med-Care for:

> Conference with Lester Perling regarding response to Palmetto GBA notice of violations. Review correspondence, file and CMS supplier standards. Begin preparation of response an Corrective Action Plan. ***Conference with Parker Eastin regarding same***. Prepare memo to Ellen Weill regarding same.

*See Notice of Filing – Declaration of Michael Ortenau, Exhibit A.*

      6.     In November of 2010, Eastin left Broad and Cassel to join Nicholson's firm. *See Notice of Filing – Nicholson & Eastin Composite of Website and Linked-In Pages.*

      7.     On December 28, 2010, Nicholson filed a qui tam/whistleblower complaint under seal for allegedly unlawful claims and telemarketing practices against Med-Care and other defendants, including certain officers and directors of Med-Care. (the Original Complaint). In particular, the *USA ex rel. Bumbury v. Med-Care, et al.* action sought "to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made and presented, and caused to be made and presented, by the Defendants and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et sq., as amended. (the "Act"). The violations of the Act [as alleged] involve claims for reimbursement that Defendants made and caused to be made to Medicare since at least 2004 that Defendants allegedly knew were false and/or ineligible for reimbursement." [Original Complaint, para. 1].

      8.     The Original Complaint included, *inter alia*, specific allegations of unlawful telemarketing practices involving Medicare beneficiaries, to wit:

> 37.    Ms. Bumbury has direct and personal knowledge of the violations alleged herein as a result of her employment as a ***telemarketer*** between August 4, 2010, and November 1, 2010, for the

above entities and individuals. During the scope and course of Ms. Bumbury's employment, and as instructed and directed by the Defendants, she personally solicited Medicare beneficiaries (as well as private insurance beneficiaries) to market and sell DME [Durable Medical Equipment]. Ms. Bumbury was employed in the New York call center, which is located at 336 W 37th S Street, Suite 300, New York, NY 10016.

38. The Defendants have been and are engaged in a conspiracy and scheme to submit false claims to the Medicare Program for DME including, but not limited to, diabetic supplies, nebulizers, CPAP devices and massage therapy devices. Upon information and belief, the individual Defendants manage and operate the entity Defendants (i.e., Med-Care Diabetic and East End Associates) as a joint venture and partnership, with Med-Care Diabetic submitting Medicare claims for DME sales generated at both centers. Attached as Exhibit 2 are internal e-mail correspondence between principals of the two entities divvying up expenses, as well as hand-written notes calculating the combined profits and expenses from the NY and FL operations.

39. Upon information and belief, the New York telemarketing call center runs to shifts of approximately 17 telemarketers a day, Monday through Thursday, and a single shift of telemarketers on Fridays and Saturdays. ***The telemarketers make unsolicited contact with prospective purchasers, including Medicare beneficiaries, through the use of autodialing telephone equipment.***

40. Upon information and belief, there is a second, larger call center located at 933 Clint Moore Road, Boca Raton, Florida 33487. ***The Boca Raton call center employs approximately 100 telemarketers, which also make unsolicited contact with prospective purchasers, including Medicare beneficiaries, through the use of autodialing telephone equipment.*** Distribution of medical supplies principally occurs from the Boca Raton office, as well as at least some of the administrative functions of Med-Care Diabetic.

41. ***The telemarketers, including Ms. Bumbury, were provided a "script" by the Defendants to use which included materially false statements including, but not limited to, that the beneficiary was being contacted because the beneficiary had requested information regarding medical equipment. However, no such request was actually made by the beneficiary, and the beneficiaries regularly confirmed to Ms. Bumbury that they had not requested to be contacted, nor had they ever heard of Christian Healthcare Network (which is a registered fictitious name for Med-Care Diabetic), or Christian Diabetic Network (which is a registered***

4

*fictitious name for East End Associates). Upon information and belief, approximately 70% of the unsolicited calls made by the <u>telemarketers</u> are to Medicare beneficiaries.*

42. Ms. Bumbury was also instructed by the Defendants, as were the other telemarketers she worked with, that the telemarketers did not need to always follow the script and should say whatever they needed to say, and make whatever representations they needed to make, to obtain billing information (including Medicare billing information) and to secure a sale.

43. The false representations that were used by the telemarketers included, but were not limited to: 1) telling the caller that they were being provided the product for free; 2) telling the caller that the Christian Healthcare Network and/or the Christian Diabetic Network was a charitable organization that donates its proceeds to causes such as veterans groups; 3) telling the caller that they were associated with the American Diabetic Association; and 4) telling the caller that the telemarketer was calling on behalf of the beneficiary's current supplier to upgrade their diabetic testing equipment, and then the beneficiary would be switched to Med-Care Diabetic without the beneficiary's knowing consent.

44. On the basis of relator's direct and personal knowledge of the Defendants' business practices, relator alleges on information and belief that these prohibited practices are widespread in Defendants' business practices.

45. In furtherance of the scheme, Med-Care Diabetic routinely sent false correspondence to physicians nationwide stating that Med-Care Diabetic had received (as opposed to solicited) a request to supply the physician's patient with, for example, diabetic testing supplies, and asking the physician to complete the enclosed "Physician Order Form." In doing so, Med-Care Diabetic also actively concealed its fraudulent scheme from the ordering physicians, who would not have ordered the equipment if they knew the truth. Examples of these letters are attached hereto as composite Exhibit 3.

46. As a consequence of some of these tactics, Medicare beneficiaries would be shipped orders for product from Med-Care Diabetic that they did not request, desire and/or need. Ms. Bumbury is personally aware of beneficiaries complaining about the receipt of unwanted product. Examples of records confirming rejections of unwanted orders by beneficiaries are attached hereto as Exhibit 4.

47. The telemarketers were paid, in addition to an hourly wage, a commission of between $2.50 and $10 per item sold. The

telemarketers had a quota of 15 to 20 sales a week per telemarketer. Payroll records reflecting commission and other payments to the Defendants' employees and/or agents are attached hereto as Exhibit 5.

48.   These quotas were generally met by the telemarketers in New York, and upon information and belief, the telemarketers in Florida regularly exceed this quota. Therefore, upon information and belief, Med-Care Diabetic is originating 5,000 or more new orders a month. Attached as composite Exhibit 6 are documents reflecting substantial Medicare billing by Med-Care Diabetic, including one showing over $500,000 in Medicare claims during the fourth quarter of 2010.

49.   The telemarketers in New York, NY, are paid through East End Associates.  A copy of Ms. Bumbury's pay stub is attached hereto as Exhibit 7.  The telemarketers in Boca Raton, FL, are paid through Med-Care Diabetic.  Payroll records for Med-Care Diabetic are attached hereto as Exhibit 5.

50.   Claims submitted by Med-Care Diabetic to Medicare are false because they are generated through prohibited telephone solicitation.

51.   Claims submitted by Med-Care Diabetic to Medicare are false because the DME it provides to Medicare beneficiaries (e.g., massage devices) are not medically necessary.

52.   Claims submitted by Med-Care Diabetic to Medicare are false because they are generated in violation of the Medicare Anti-kickback Statute as a result of the DME having been offered to Medicare beneficiaries at no-cost to them (routine waiver of co-payments and deductibles) or are allegedly offered for "free," but then billed to the Medicare program.

9.   Eastin's name is on Bumbury's First Amended Complaint that was filed under seal by Nicholson & Eastin on September 3, 2013. [D.E. 27]. On November 12, 2013, Bumbury's First Amended Complaint was unsealed.  [D.E. 31]. On November 13, 2013, summons were issued to all Defendants. [D.E. 32-39].

10.   On January 12, 2015, in connection with Med-Care's due diligence in answering the Third Amended Complaint, Med-Care first discovered Eastin's direct representation of Med-Care while he was at Broad and Cassel. *See Notice of Filing- Declaration of Michael Ortenau.*

11.   Specifically, in connection with Med-Care's preparation of its Answer to the Third Amended Complaint, on Monday, January 12, 2015, Med-Care's General Counsel, Michael Ortenau, located and reviewed historic bills rendered to Med-Care by Broad and Cassel. *Id*. Those bills were

in storage at Med-Care and dated back to the fall of 2009, at which time Med-Care consulted Lester Perling, a partner at Broad and Cassel, with respect to Medicare compliance and related issues. *Id.* Mr. Ortenau is also informed and therefore believes that Mr. Perling and at least one of his colleagues were also consulted about the potential negative ramifications on Med-Care's business and its relationship with Medicare of <u>The Wolf of Wall Street</u> and <u>Catching the Wolf of Wall Street</u> as well as the movie anticipated with respect to the former publication. *Id.*

12.     In the course of that bill review, Med-Care's General Counsel discovered that in September and October 2010, Plaintiffs' counsel Parker Eastin, then at Broad and Cassel, had billed Med-Care for legal advice with respect to Medicare compliance and telemarketing issues and had been consulted by other lawyers at Broad and Cassel with respect to Med-Care issues for which Med-Care was billed. *Id.* Redacted versions of those bills reflecting Mr. Eastin's work on Med-Care's behalf are attached to the Declaration of Michael Ortenau as <u>Exhibit A</u>. *Id.*

13.     Given that Lester Perling. Esq. was Med-Care's primary contact at Broad and Cassel and the lengthy (more than three year) period from the date that Eastin rendered professional services to Med-Care, until the date that the Second Amended Complaint was ultimately unsealed, no one at Med-Care recalled Eastin's prior representation of Med-Care; nor did it occur to Med-Care that its former lawyer would participate in a lawsuit brought against it just two months after he rendered advice to Med-Care on the very same issues. *Id.* Similarly, when Med-Care consulted with Mr. Perling last year concerning this action, Mr. Perling made no mention of Eastin's prior representation of Med-Care. *Id.*

14.     Renowned Florida professional ethics expert, Anthony Alfieri, Esq., opines herein that Eastin and Nicholson & Eastin committed professional ethics violations and must be disqualified. *See Notice of Filing - Declaration of Expert Witness Anthony Alfieri.* In Mr. Alfieri's opinion, (a) Eastin violated his fiduciary obligations and professional duties to Med-Care; (b) Nicholson & Eastin violated its professional duties under Florida law and ethics rules; and (c) Florida law and ethics rules require the disqualification of Nicholson & Eastin in this matter. *Id.*

## LEGAL ARGUMENT AND MEMORANDUM OF LAW

<u>Standard of Review</u>. A motion to disqualify counsel is the proper method for party-litigants to bring before the court issues of conflict of interest of breach of ethical duties. *See Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980); *Bonner v. City of Prichard*, 661 F.2d

1206, 1209 (11th Cir. 1981)(adopting as binding precedent all decisions of the Former Fifth Circuit rendered prior to October 1, 1981).

The party moving to disqualify counsel bears the burden of proving the grounds for disqualification. *In re: BellSouth Corp*., 334 F.3d 941, 961 (11th Cir. 2003). When ruling on a motion to disqualify, a court must "be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely choose counsel." *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976). Disqualification of one's chosen counsel is a drastic remedy that should be resorted to sparingly. *Norton v. Tallahassee Mem'l Hosp*., 689 F.2d 938, 941 n.4 (11th Cir. 1982). "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist." *In re: BellSouth Corp*., 334 F.3d at 961 (internal quotations omitted).

Where an alleged ethical violation exists, the district court must identify the applicable rule of professional conduct and determine whether the charged attorney violated that rule. *See Schlumberger Tech. Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). The Florida Rules of Professional Conduct provide the standard for determining whether counsel should be disqualified in a given case. *State Farm Mut. Auto Ins. Co. v. K.A.W*, 575 So. 2d 630, 633 (Fla. 1991).

## I. EASTIN VIOLATED HIS FIDUCIARY OBLIGATIONS AND PROFESSIONAL DUTIES TO MED-CARE

Eastin violated his fiduciary obligations and professional duties to Med-Care under the Florida common law of agency and the Florida Rules of Professional Conduct, specifically the rules governing conflicts of interest and confidentiality.

Florida Rule 4-1.9 regulates conflicts of interest with a former client. Fla. Rules of Prof'l Conduct 4-1.9 (2014). Subdivision (a) of the rule prohibits "[a] lawyer who has formerly represented a client in a matter" from "afterwards" *representing* "another person in the same or a substantially related[1] matter[2] in which that person's interests are materially adverse[3] to the interests of the former client unless the former client gives informed consent[.]"

---

[1] Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014) ("Matters are 'substantially related' for purposes of this rule if they involve the same transaction or legal dispute, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client.").

[2] *See* Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014) ("The scope of a 'matter' for purposes of rule 4-1.9(a) may depend on the facts of a particular situation or transaction.").

Fla. Rules of Prof'l Conduct 4-1.9 (a) (2014).  To be effective, informed consent must be "confirmed in writing." Fla. Rules of Prof'l Conduct 4-1.7 (b) (4) (2014). *See also* Fla. Rules of Prof'l Conduct 4-1.7 (b) (4) (2014); Fla. Rules of Prof'l Conduct pmbl. (2014) ("'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.").

Because Eastin was directly involved in the representation of Med-Care at Broad & Cassel specific to the regulatory matters at issue in *USA ex rel. Bumbury v. Med-Care, et al*., subsequent representation of other clients (i.e., the instant Plaintiff) with materially adverse interests to Med-Care is prohibited. Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014). Indeed, because Eastin was so involved in the same or substantially related Med-Care matters at Broad & Cassel, the subsequent representation of the Plaintiff in *USA ex rel. Bumbury v. Med-Care, et al*. can be regarded as an improper changing or switching of sides. Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014) ("[A] lawyer who has prosecuted an accused person could not properly represent the accused in a subsequent civil action against the government concerning the same transaction.").

Moreover, subdivision (b) of Rule 4-1.9 prohibits "[a] lawyer who has formerly represented a client in a matter" from "afterwards" *using* "information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known[.]" Fla. Rules of Prof'l Conduct 4-1.9 (b) (2014). Linked to Florida Rule 4-1.6, this prophylactic rule broadly "applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Fla. Rules of Prof'l Conduct 4-1.6 cmt. (2014). By definition, the duty of confidentiality continues after the termination of the client-lawyer relationship. Fla. Rules of Prof'l Conduct 4-1.6 cmt. (2014). Thus, a lawyer like Eastin engaged in "changing professional association has a continuing duty to preserve confidentiality of information about a client formerly represented," namely Med-Care. Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014).

Further, subdivision (c) of Rule 4-1.9 prohibits "[a] lawyer who has formerly represented a client in a matter" from "afterwards" *revealing* "information relating to the representation except as these rules would permit or require with respect to a client." Fla. Rules of Prof'l Conduct 4-1.9 (c)

---

[3] *See* Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014) ("The principles in rule 4-1.7 determine whether the interests of the present and former client are adverse.").

(2014). *See also* Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014) ("Lawyers owe confidentiality obligations to former clients, and thus information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client without the former client's consent.").[4] In this respect, Florida Rule 4-1.6 expressly prohibits a lawyer from "reveal[ing] information relating to representation of a client except as stated in subdivisions (b), (c), and (d), unless the client gives informed consent." Fla. Rules of Prof'l Conduct 4-1.6 (2014). None of the relevant disclosure provisions within these subdivisions apply in these circumstances. Fla. Rules of Prof'l Conduct 4-1.6 (2014). By regulation, "in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation." Fla. Rules of Prof'l Conduct 4-1.6 cmt. (2014). *See also* Fla. Prof'l Ethics Comm., Formal Op. 95-4 (1997); *Gerlach v. Donnelly*, 98 So.2d 493 (Fla. 1957). Significantly, as Eastin's former client, Med-Care is not required to reveal the confidential information learned by Eastin in order to establish a substantial risk that he may use or reveal confidential information to the advantage of his subsequent client in *USA ex rel. Bumbury v. Med-Care, et al*. Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014). A reasonable conclusion about Eastin's possession and potential use of confidential information may be based on the nature of the legal services that he provided to Med-Care and the information that would in ordinary practice be learned by a lawyer providing such services. Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014).

In this case, Eastin and his law firm represent the Plaintiff in the same or a substantially-related matter involving Med-Care's alleged telemarketing practices in which the Plaintiff's interests are materially adverse to the interests of Eastin's former client, Med-Care, without any evidence of Med-Care's informed consent or any evidence of appropriate former client communication or consultation with Med-Care of any kind. On its face, Eastin's representation violates Florida Rule 4-1.9 and warrants his disqualification and the imputed disqualification of his law firm. *See Young v. Achenbauch*, 136 So.3d 575, 583 (Fla. 2014); *Armor Screen Corp. v. Storm Catcher*, 709 F. Supp. 2d 1309 (S.D. Fla. 2010) (Ryskamp, J.).

In *Young*, a group of attorneys jointly represented a number of flight attendants in individual progeny suits against tobacco companies, following a class action settlement for compensatory damages against the companies. *Id.* at 576-77. On behalf of a handful of these flight attendants,

---

[4] There is no evidence that the information at issue here should be considered generally known. Fla. Rules of Prof'l Conduct 4-1.9 cmt. (2014).

two attorneys from this group filed a petition against the Flight Attendant Medical Research Institute ("FAMRI"), accusing FAMRI of misusing funds and seeking an accounting and injunction against FAMRI. *Id.* Two of the flight attendants represented by these attorneys in the individual progeny suits were also board members of FAMRI and moved to disqualify the attorneys, claiming that they had shared confidences about FAMRI with their attorneys. *Id.* at 578. Although the attorneys withdrew from representation of these two flight attendants upon learning of the conflict, the Supreme Court affirmed the trial court's disqualification of the attorneys. *Id.* at 583. Where (1) the action against FAMRI, the individual progeny suits, and original class action settlement were substantially related because they involved the same transaction or legal dispute; (2) the interests of those participating in the action against FAMRI were materially adverse to the interests of the flight attendant board members of FAMRI; and (3) the former clients did not give their informed consent, the Supreme Court concluded that the attorneys violated rule 4-1.9(a) and that their disqualification was warranted. Id.

In *Armor Screen Corp. v. Storm Catcher*, 709 F. Supp. 2d 1309 (S.D. Fla. 2010) (Ryskamp, J.), the defendants moved to disqualify plaintiff's counsel, who had learned confidential information about defendants from defendants' prior counsel, though he never in fact represented the defendants. *Id.* at 1311. Even so, the district court disqualified the attorney, holding that Rule 4-1.9, governing former clients, still applied. *Id.* As the court concluded, where an attorney, acting in a non-attorney capacity, obtains confidential information from a party that would put that party at an unfair disadvantage if the attorney were to represent the other side, that attorney may not later represent the other side in that same case. *Id.* at 1311-12. Here, Eastin obtained confidential information from Med-Care material to the instant action, that clearly placed the Defendants at an unfair disadvantage such that Eastin cannot properly represent the other side, *i.e.,* the Plaintiffs. Following the clear dictates of Young and Armor Screen, as applied to the facts presented here, disqualification of Eastin is necessary and warranted.

## II.   NICHOLSON & EASTIN VIOLATED ITS PROFESSIONAL DUTIES UNDER FLORIDA LAW AND ETHICS RULES

Nicholson & Eastin violated its professional duties under Florida law and ethics rules governing the declination of representation and the responsibilities of partners, managers, and supervisory lawyers.

Florida Rule 4-1.16 regulates declining representation. Fla. Rules of Prof'l Conduct 4-1.16 (2014). A central "aspect of loyalty to client is the lawyer's obligation to decline subsequent representations involving positions adverse to a former client arising in substantially related matters." Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014). Subdivision (a) of Rule 4-1.16 prohibits the representation of a client, and in cases where the representation has commenced, requires the withdrawal from the representation of a client "if . . . the representation will result in violation of the Rules of Professional Conduct or law . . . ." Fla. Rules of Prof'l Conduct 4-1.16 (2014). *See also* Fla. Rules of Prof'l Conduct 4-1.16 (b) (5) (2014) ("[A] lawyer may withdraw from representing a client if: . . . other good cause for withdrawal exists.").[5] In this case, Nicholson & Eastin cannot accept, and should not have accepted, representation of the instant Plaintiff in *USA ex rel. Bumbury v. Med-Care, et al.* precisely because the representation cannot be performed "without improper conflict of interest." Fla. Rules of Prof'l Conduct 4-1.16 cmt. (2014).

Additionally, Florida Rule 4-5.1 regulates the responsibilities of partners, managers, and supervisory lawyers. Fla. Rules of Prof'l Conduct 4-5.1 (2014). Subdivision (a) of the rule requires adherence to the Florida Rules, mandating that "[a] partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers therein conform to the Rules of Professional Conduct." Fla. Rules of Prof'l Conduct 4-5.1 (a) (2014). *See also* Fla. Rules of Prof'l Conduct 4-5.1 cmt. (2014) Here, at a minimum, subdivision (a) required Nicholson and Eastin to make reasonable efforts to establish internal firm policies and procedures designed to detect and resolve conflicts of interest. There is no evidence of such individual or institutional efforts.

Furthermore, subdivision (c) of Rule 4-5.1 assigns clearcut responsibility for ethical violations, dictating that "[a] lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders the specific conduct or, with knowledge thereof, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices or has direct supervisory authority over the other

---

[5] Fla. Rules of Prof'l Conduct 4-8.4 (a) (2014) ("A lawyer shall not . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another[.]"). *See also* Fla. Rules of Prof'l Conduct 4-8.4 (d) (2014) ("A lawyer shall not: . . . engage in conduct in connection with the practice of law that is prejudicial to the administration of justice . . . .").

lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." Fla. Rules of Prof'l Conduct 4-5.1 (c) (2014). Here, there is no evidence that Nicholson made any effort to intervene to prevent the avoidable consequences of Eastin's individual and Nicholson & Eastin's firm-wide misconduct even though Nicholson knew of and ratified the conduct involved and also knew of the conduct at a time when its consequences could have been avoided or mitigated yet failed to take reasonable remedial action.

### III. FLORIDA LAW AND ETHICS RULES REQUIRE THE DISQUALIFICATION OF NICHOLSON & EASTIN IN THIS MATTER UNDER THE PRINCIPLE OF IMPUTATION

Florida law and ethics rules require the disqualification of Nicholson & Eastin in this matter under the principle of imputation. *See State Farm Mut. Auto Ins. Co. v. K.A.W.*, 575 So. 2d 630, 633 (Fla. 1991).

Florida Rule 4-1.10 regulates the imputation of conflicts of interest to all lawyers in a firm and through the former clients of a newly associated lawyer in a firm. Fla. Rules of Prof'l Conduct 4-1.10 (2014). Subdivision (a) of the rule prohibits lawyers while associated in a firm from "knowingly represent[ing] a client when any 1 of them practicing alone would be prohibited from doing so by rule 4-1.7 or 4-1.9 . . . ." Fla. Rules of Prof'l Conduct 4-1.10 (a) (2014). In this way, it "gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm." Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014). Here, Med-Care must be reasonably assured that the principle of client loyalty is not compromised. Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014).

Subdivision (b) of the rule also prohibits a firm, when a lawyer becomes newly associated with it, from "knowingly represent[ing] a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by rules 4-1.6 and 4-1.9(b) and (c) that is material to the matter." Fla. Rules of Prof'l Conduct 4-1.10 (b) (2014).

Narrowly tailored, subdivision (d) of the rule permits the waiver of a conflict-based law firm disqualification by the affected client only under the conditions set forth in Rule 4-1.7 governing informed consent. Fla. Rules of Prof'l Conduct 4-1.10 (d) (2014). Those conditions require the

lawyer to obtain the former client's informed consent to the representation, confirmed in writing. Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014).

In this case, Nicholson & Eastin should be vicariously disqualified not only because its lawyers failed to preserve the confidentiality of Med-Care's material information, but also because its lawyers advanced a litigation position adverse to Med-Care's material interests. The burden of proof pertaining to confidentiality and access to information rests upon the firm whose disqualification is sought. Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014). In Florida and elsewhere, access to information "is essentially a question of fact in particular circumstances, aided by inferences, deductions, or working presumptions that reasonably may be made about the way in which lawyers work together." Fla. Rules of Prof'l Conduct 4-1.10 (d) cmt. (2014). When a lawyer, as here, may gain "general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients." *Id.* On this well-accepted inference, Nicholson & Eastin must be disqualified altogether. *See Castro v. State*, 597 So.2d 259, 260 (Fla. 1992); *In re Captran Creditors Trust*, 104 B.R. 442, 445 (Bankr. M.D. Fla. 1989).

## CONCLUSION

The foregoing demonstrates an incredible, indefensible breach of fiduciary and professional duties by Med-Care's former counsel and Plaintiffs' counsel that has caused permanent economic and reputational harm to the Defendants beyond repair. The ethical violations are clear, compelling and disturbing.  This situation is not an understandable, good-faith disconnect where an attorney leaves a firm, joins a large firm and unknowingly a new colleague sues a former client of the attorney in an unrelated matter. Eastin advised Med-Care on Medicare telemarketing and regulatory compliance issues, left to join a four person law firm and two months later that firm sued Med-Care for the same subject matter of Eastin's legal advice. This egregious conduct deserves nothing short of immediate disqualification, sanctions and referral to the Florida Bar for appropriate disciplinary investigation as appropriate.

WHEREFORE, for the foregoing reasons, Defendants Med-Care Diabetic & Medical Supplies, Inc. ("Med-Care"), East End Associates, Inc. ("East End"), Daniel M. Porush, Lawrence P. Silverman, Jordan Shamah, and Steven Silverman respectfully request a hearing on this matter and that this Court disqualify Robert Nicholson, Esq., Parker Eastin, Esq., Nicholson & Eastin, LLP as

counsel for Plaintiffs in the instant action, award sanctions and any other relief deemed appropriate, and refer this matter to the Florida Bar for disciplinary investigation.

### LOCAL RULE 7.1(a)(3)(A) COMPLIANCE

I hereby certify that the undersigned counsel for the Defendants and has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Respectfully submitted,

COUNSEL FOR DEFENDANTS

FOWLER WHITE BURNETT, P.A.
Espirito Santo Plaza, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile:  (305) 789-9201

By: s/Christopher E. Knight
    Christopher E. Knight
    Florida Bar No. 607363
    Email:cknight@fowler-white.com
    June Galkoski Hoffman
    Florida Bar No. 050120

Of Counsel:

Hal K. Litchford
Florida Bar No. 272485
Email: hlitchford@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida 32802
Telephone:  (407) 422-6600
Telecopier:  (407) 841-0325

Robert E. Hauberg, Jr. (MSB No. 8958)
(Appearing Pro Hac Vice)
Post Office Box 14167
Jackson, Mississippi 39236
Telephone: (601) 351-2400
901 K Street, Suite 900
Washington, D.C. 20001
Telephone: (202) 508-3400
Email: rhauberg@bakerdonelson.com

Wayne F. Dennison
(Appearing Pro Hac Vice)
Email: wdennison@brownrudnick.com
Brown Rudnick, LLP
One Financial Center Boston, MA 02111
Telephone: (617) 856-8200
Facsimile:  (617) 856-8201

Stephen A. Best
(Subject to Pro Hac Vice Admission)
Email: sbest@brownrudnick.com
Brown Rudnick, LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile:  (617) 856-8201

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 16, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to the persons identified in the Service List below.

s/Christopher E. Knight
Christopher E. Knight

CASE NO. 10-81634-Civ RYSKAMP/HOPKINS

**SERVICE LIST**

Elisa Castroluga
Assistant U.S. Attorney
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
elisa.castrolugo@usdoj.gov

Erin Michelle Bengelle
Nicholson & Eastin, LLP
707 N.E. 3rd Avenue, Suite 301
Fort Lauderdale, FL 33304
erin@chicholsoneastin.com

Robert N. Nicholson
Nicholson & Eastin, LLP
707 N.E. 3rd Avenue, Suite 301
Fort Lauderdale, FL 33304
robert@nicholsoneastin.com

Parker D. Eastin
Nicholson & Eastin, LLP
707 N.E. 3rd Avenue, Suite 301
Fort Lauderdale, FL 33304
parker@nicholsoneastin.com

Robert E. Hauberg, Jr.
Baker, Donelson, et al.
4268 Interstate 55 North
Jackson, MS 39211
rhamberg@bakerdonelson.com

Hal K. Litchford
Baker, Donelson, et al.
Post Office Box 1549
Orlando, FL 32802
Hlitchford@bakerdoneslon.com

Stephen A. Best
Brown Rudnick, LLP
One Financial Center
Boston, MA 02111
sbest@brownrudnick.com

Wayne F. Dennison
Brown Rudnick, LLP
One Financial Center
Boston, MA 02111
wdennison@brownrudnick.com

Christopher Edson Knight
Fowler White Burnett, P.A.
1395 Brickell Avenue, Suite 1400
Miami, FL 33131-3302
cknight@fowler-white.com

Susan H. Aprill
Fowler White Burnett, P.A.
100 Southeast Third Avenue, Suite 2100
Fort. Lauderdale, FL 33394
sa@fowler-white.com

Michael J. Drahos
Fowler White Burnett, P.A.
515 N. Flagler Drive, Suite 2100
West Palm Beach, FL 33401
mdrahos@fowler-white.com

4843-2883-7153, v. 1