**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 10-cv-81634-ROSENBERG

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* TIFFANY BUMBURY, *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| MED-CARE DIABETIC & MEDICAL SUPPLIES, INC., *et al.* | ) ) ) |
| Defendants. | ) |
| _____ / | |

**NICHOLSON & EASTIN, LLP's, RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFFS' COUNSEL**

Nicholson & Eastin, LLP, respectfully files its response to Defendants' January 16, 2015, Motion to Disqualify Plaintiffs' Counsel, For Sanctions and Referral to the Florida Bar for Disciplinary Investigation ("The Motion") [DE 122].

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Contrary to the spurious allegations and innuendo regarding the origin and prosecution of this lawsuit contained in the Defendants'[1] *untimely* motion for disqualification, there has been no breach of any ethical rule by Nicholson & Eastin and its attorneys, there has been no improper use or disclosure of client confidences, and there is no conflict requiring disqualification. As explained more fully *infra*, this False Claims Act case was initiated after Ms. Tiffany Bumbury contacted Mr. Nicholson for representation in this matter because of Mr. Nicholson's experience as a federal prosecutor and because of his expertise with Medicare fraud cases. Moreover, Mr. Eastin's minimal involvement with Med-Care (totaling approximately 4 hours), essentially boils

_____

[1] Although the motion is filed on behalf of all the Defendants, it appears that only Med-Care has standing to raise the disqualification issue since Broad & Cassel only represented Med-Care.

down to a one-time, brief legal research project regarding a telemarketing regulation that he performed as an associate at Broad & Cassel on September 3, 2010, and his minimal participation in Med-Care's response to a Medicare contractor "site visit" report approximately six weeks later, which concerned issues unrelated to and not forming a basis for any of the False Claims Act liability in this case.

In short, neither of those two brief projects can properly be considered "substantially related" to the pending False Claims Act case – which originated from a former employee of Defendant East End in New York – which alleges a massive, multi-year, Medicare fraud scheme that involved a multitude of violations, including violations of the Anti-Kickback Statute, the submission of false claims for medically unnecessary services, the submission of false claims for non-rendered services, the failure to refund payments on returned medical equipment, as well as claims being rendered false due to telemarketing violations.  Those issues were never considered or analyzed during Mr. Eastin's minimal involvement with Med-Care while at Broad and Cassel.

As will be further elucidated during the evidentiary hearing on this motion, should one be necessary, the telemarketing research Mr. Eastin engaged in concerned regulatory requirements that were subsequently modified and which are <u>not</u> at issue in the False Claims Act case. Similarly, the "site visit" report and Broad & Cassel's response thereto (both of which are *public records* and are subject to discovery, and with respect to which Mr. Eastin was *not* a signatory), almost exclusively dealt with issues that are wholly unrelated to the allegations in this False Claims Act case (such as having proper state licensing, having properly posted business hours, having properly disclosed product lines, etc.).  Mr. Porush's criminal history has already been determined by the court in a prior order to "have no bearing on whether any defendant submitted false or fraudulent claims" to this case.  *See*, DE 93 at 2.

Mr. Porush's role at Med-Care, an issue which the Defendants now appear to place great significance, is a matter that is "generally know," and is even publicized by Mr. Porush.  Mr.

Porush is a high-profile individual whose criminal past and role at Med-Care have been a matter of general knowledge since 2007-2008 as a result of news media, internet blogs, and public records. This, and additional information, was disclosed to Mr. Nicholson by Relator Bumbury. These and other documents, including from the Relator's initial trash pulls, are addressed more fully *infra* and in Mr. Nicholson's Declaration. Such "generally known" information cannot serve as a basis to disqualify.

Contrary to the Defendants' assertion, Mr. Eastin was not the source of information for the allegation regarding the lack of disclosure of Mr. Porush's role at Med-Care to CMS. Inconsistent with the Defendants assertion is the fact that this allegation does <u>not</u> appear in the Relator's initial December 2010 Complaint. The initial complaint does not reference the lack of a CMS-855 disclosure, but rather only references Mr. Porush's lack of appearance in state corporate filings. *See* Exhibit 1. The allegation regarding the failure to disclose Mr. Porush on a CMS-855 did not appear until 3 years later in the September 2013 Amended Complaint; and that allegation was based upon Dr. Silverman's May 22, 2013, testimony before Congress regarding Med-Care's abusive marketing and billing practices, during which he testified that Mr. Porush was an "employee." *See* Exhibit 2. Moreover, the CMS-855 allegation in the Relator's Amended Complaint, which was made upon information and belief, is apparently <u>inaccurate</u>. Based on the attachments to Mr. Perling's Declaration, Mr. Porush's purported role was disclosed to CMS on October 29, 2010. *See* DE 128-3 (Perling Declaration), pp. 17-22.

Moreover, in June 2014, Mr. Stephen Best, counsel for Med-Care, is quoted in the press as stating, "Medicare was never defrauded regarding Mr. Porush's role at Med-Care. Years ago, CMS fully reviewed Mr. Porush's role at the company and Med-Care's disclosure regarding his prior adjudications and closed the matter without further issue." Attached as Exhibit 3 is an article capturing Mr. Best's quote. Therefore, in light of this full disclosure to and review by CMS regarding Mr. Porush, it is unclear what confidential information Mr. Eastin could possess

regarding Mr. Porush's role at Med-Care that would warrant disqualification here. As attested to in his Declaration, he has none. *See* Declaration of Parker Eastin ("Eastin Decl."), pp. 2-5.

Further, the Defendants' disqualification motion, filed twelve months after they were on actual notice of Mr. Eastin's involvement in the case, is untimely.

Moreover, as noted above, the purportedly confidential information Mr. Eastin is alleged to have been exposed to regarding Med-Care's telemarketing practices and Mr. Porush's role and criminal history were already in the public domain and generally known because of media coverage *prior* to Mr. Eastin's brief contact with Med-Care while at Broad and Cassel, thus obviating any confidentiality concerns. Further, the 2013 Congressional investigation of both Med-Care's telemarketing practices and Mr. Porush's role at Med-Care, as well as postings and disclosures by the defendants themselves, have disclosed additional information into the public domain, rendering any confidentiality concerns moot.

Additionally, subsequent to when the Defendants purportedly identified Mr. Eastin's alleged conflict, the Defendants affirmatively waived attorney-client privilege, which renders any confidential communications to Broad and Cassel discoverable and further moots any concerns regarding any purportedly confidential information held by Mr. Eastin.

Finally, the timing and manner of the motion itself – a year into this hotly litigated case (which involved collateral litigation by the Defendants against the Relator in New York, and two rounds of motions to dismiss and amendments to the complaint); two days after the execution of federal search warrants at the Defendants' facilities; just as the Relators were seeking to begin depositions, and without a meaningful pre-filing inquiry by the Defendants regarding the potential conflict, strongly suggests that the purpose of the motion is tactical. Such improper tactical use of this motion would be consistent with the heavy-handed litigation approach employed to date by the Defendants.

**FACTUAL BACKGROUND**

This False Claims Act case originated from Ms. Bumbury after her employment at East End Associates in New York ended in November 2010.  In November 2010, Ms. Bumbury began interviewing potential qui tam attorneys and, during that process, identified and contacted Mr. Robert Nicholson.  *See* Declaration of Tiffany Bumbury ("Bumbury Decl."), p. 2; Declaration of Robert Nicholson ("Nicholson Decl."), p. 3[2].   Ms. Bumbury specifically approached Mr. Nicholson because of his former experience as a federal prosecutor and because of his expertise with Medicare fraud.  *See* Bumbury Decl., p. 2; a copy of Mr. Nicholson's CV is attached hereto as Exhibit 4.  Mr. Nicholson personally performed the intake on Ms. Bumbury's matter and personally made the decision to take the case.  *See* Nicholson Decl., pp. 3-8.

At the time Ms. Bumbury contacted Mr. Nicholson regarding this case, she provided Mr. Nicholson with an oral and written summary of her work experience at East End and a summary of her suspicions regarding the Defendants' relationships and fraudulent conduct that she had personally witnessed (and that she had identified through her research).  *See* Nicholson Decl., pp. 3-8; Bumbury Decl., p. 2.  Ms. Bumbury also provided Mr. Nicholson with a 2008 Forbes magazine article discussing Mr. Porush's criminal history and his role at Med-Care, as well as a link to an internet blog discussing the telemarketing tactics employed by Med-Care, improper patient inducements in violation of the Anti-Kickback Statute, and even a post  by "Dr. Steve" from Med-Care defending Mr. Porush's role at the company, confirming that Med-Care offered free medical equipment to Medicare beneficiaries (in violation of the Anti-Kickback Statute), and offering $50 gift cards (also in violation of the Anti-Kickback Statute).  *See id.*

Contemporaneous with Mr. Nicholson's decision to accept Ms. Bumbury's matter, Mr. Nicholson notified Mr. Eastin of the new False Claims Act case, including the names of the various potential Defendants.  In response, Mr. Eastin notified Mr. Nicholson that Med-Care was

---

[2] Declarations of Mr. Nicholson, Mr. Eastin, the Relators, and Relators' expert, Timothy Chinaris, are being filed separately from this Response but are linked to it in CM/ECF.

a client of Broad & Cassel, and that he had previously performed limited work for Mr. Perling relating to that client. *See* Nicholson Decl., p. 9; Eastin Decl., p. 4. Mr. Nicholson asked Mr. Eastin if he perceived a conflict, and Mr. Eastin's opinion was that there was not. *See* Nicholson Decl., p. 9; Eastin Decl., p. 4. That opinion remains unchanged today.

After deciding to take Ms. Bumbury's case, Mr. Nicholson contemporaneously hired private investigation firms to begin conducting trash pulls at the defendants' businesses and he conducted public records searches regarding the defendants. Mr. Eastin's first communication with Ms. Bumbury occurred on December 27, 2010. *See* Eastin Decl., p. 4; Bumbury Decl., p. 2.

While at Broad and Cassel, Mr. Eastin had minimal contact with Med-Care; Mr. Eastin was provided only minimal facts in connection with his work that are either not relevant to this False Claims Act case or which are "generally known;" the two projects he participated in involved a client with respect to whom Mr. Eastin was not previously familiar; and Mr. Eastin did not sign any letter, pleading, response, or otherwise take any public position on any legal issue or matter on behalf of Med-Care. *See* Eastin Decl., p. 4. Mr. Eastin has never disclosed the subject matter of the research or any other confidential information regarding the Defendants. *See* Nicholson Decl., pp. 9-10; Eastin Decl., p. 5.

The Defendants first raised the suggestion of a conflict on the day they filed the instant motion, which involved them providing Mr. Nicholson with a redacted copy of the Broad & Cassel time sheets 4 years later, and a year into the litigation of this case. *See* Nicholson Decl., p. 18.

No fact in this case was sourced from Mr. Eastin, and every allegation in the Complaint is directly tied to information received from the Relators, former employee interviews, Medicare beneficiaries, trash pulls, and publically available information. *See* Nicholson Decl., pp. 8-10.

## **ARGUMENT**

### I.   **The Defendants' Motion is Untimely**

As an initial defect, the law is clear that disqualification motions must be timely made. *See Zayas-Bazan v. Marcelin*, 40 So. 3d 870, 872-873 (Fla. 3d DCA 2010) (quashing an order disqualifying counsel based on the tardiness of the motion and observing that, "A party can waive his right to seek disqualification of the opposing party's counsel by failing to promptly move for disqualification upon learning of the facts leading to the alleged conflict."). A timely motion was not made here.

More specifically, the Defendants raised the conflict issue twelve months after they were on notice of Mr. Eastin's active involvement in this False Claims Act case. Mr. Eastin's name was on the Amended Complaint they obtained in January 2014 (both in the signature block and the footer), and Mr. Eastin has likewise been named in all correspondence, motions, etc., circulated among the parties since that time.

Moreover, Mr. Eastin and Mr. Nicholson's former employment at Broad & Cassel has been conspicuously displayed on their firm's website biographies throughout these proceedings, and it is reasonable to assume that their biographies were reviewed by both the Defendants and their counsel. The Defendants also acknowledge that the Broad & Cassel billing records they used to identify the purported conflict have been in the Defendants' possession the entire time, but they purportedly failed to review them until now. *See* Motion, pp. 6-7; *see also Rahman v. Jackson*, 992 So. 2d 390 (Fla. Dist. Ct. App. 1st Dist. 2008) (quashing an order disqualifying counsel based on the tardiness of the motion and observing that, "When Petitioner hired his attorney, the facts supporting the motion to disqualify were readily available to Respondent through a deposition that was taken before Petitioner was ever named as a defendant.").

A twelve month delay under the circumstances is legally untenable. *See Transmark, USA v. Department of Ins.*, 631 So. 2d 1112, 1116 (Fla. 1st DCA 1994) (ten month delay deemed waiver); *see also Cox v. American Cast Iron Pipe Co.*, 847 F. 2d 725, 731 (11th Cir. 1988) (nineteen month delay deemed waiver); *Glover v. Libman*, 578 F. Supp. 748, 767 (N.D. Ga.

1983) (one year delay deemed waiver); *Jackson v. J.C. Penney Co., Inc.*, 521 F. Supp. 1032, 1035 (N.D. Ga. 1981) (fifteen month delay deemed waiver).  The same result is compelled here.

## II.    Rule 4-1.9 Does Not Require Disqualification

The limited work identified in the billing records and declarations the Defendants rely upon do not require disqualification under Rule 4-1.9(a).   Where, as here, an associate lawyer had a minimal role and degree of participation on a project that is not the "same or a substantially related matter," disqualification is not required.  Moreover, there exist a number of exceptions and relevant factors under Rule 4-1.9 that are directly applicable here.

### A.  The False Claims Act Case is Not "Substantially Related"

According to the "Comment" section to Rule 4-1.9(a), "Matters are 'substantially related' for purposes of this rule if they involve the same transaction or legal dispute, or if the current matter would involve the lawyer attacking work that the lawyer performed for the former client." *Id.*  This False Claims Act case is clearly not the "same transaction or legal dispute" that Mr. Eastin performed work on at Broad and Cassel because this False Claims Act case did not exist until December 2010, which was subsequent to his departure from Broad & Cassel.  Moreover, this False Claims Act case is not "substantially related" because it concerns the submission of numerous factually distinct false claims, the falsity of which resulted from a variety of violations of the law, including violations of the Anti-Kickback Statute, the submission of claims for medically unnecessary services and non-rendered services, as well as claims being rendered false due to telemarketing violations.  Thus, although there is allegedly overlap regarding a type of legal *issue* addressed by Mr. Eastin's research project and *one* of the Relator's theories of False Claims Act liability, they cannot fairly be considered to be "substantially related" matters (i.e., transaction or legal dispute), factually or otherwise.

An instructive case in this regard is *Morgan Stanley & Co. v. Solomon*, 2009 U.S. Dist. LEXIS 15799 (S.D. Fla. Feb. 19, 2009), which involves a former associate of Greenberg Traurig

named Neil B. Solomon, who worked at Greenberg Traurig from November 2001 through June 2006. Mr. Solomon worked on Morgan Stanley matters from approximately November 2001 through November 2003, during which time he billed approximately 1500 hours of time to Morgan Stanley. Mr. Solomon's job responsibilities with respect to Morgan Stanley included responding to discovery, ranking arbitrators, research and writing, attending meetings and preparing prehearing memoranda for in-house attorneys. As part of his responsibilities, he would confer with Morgan Stanley brokers, branch office managers, branch administrative managers and in-house attorneys. Mr. Solomon tried two arbitrations and participated in one mediation on behalf of Morgan Stanley. Furthermore, while at Greenberg Traurig, Mr. Solomon handled settlement of cases which exposed him to Morgan Stanley's settlement evaluations. He became familiar with the compensation structure at Morgan Stanley and the personalities of the in-house legal department. He also learned what factors in-house attorneys felt was significant in terms of case settlement. Mr. Solomon worked on legal arguments that supported Morgan Stanley's position in the arbitrations.

Based on this substantial level of involvement, the court observed, "Mr. Solomon has the type of 'general knowledge' referenced in the 2006 *Bradley* case; namely, an understanding of Morgan Stanley's policies and practices. Furthermore, the Court finds that Mr. Solomon's knowledge of Morgan Stanley's discovery procedure, organizational structure and internal policies falls under the category of information that any reasonably prudent lawyer who had not previously represented Morgan Stanley would obtain by virtue of filing suit against Morgan Stanley and conducting discovery." *Id.* at *16-17 (internal citations omitted).

Mr. Solomon subsequently left Greenberg Traurig and began taking opposing legal positions in his representation of clients suing Morgan Stanley. Morgan Stanley sought an injunction against Mr. Solomon, claiming that he was violating Rule 4-1.9. The court disagreed:

> After careful review, the Court finds that Mr. Solomon has not run afoul
> of Rule 4.1-9(a). In making this ruling, the Court has examined the comment to

this Rule. The comment states that, in applying this rule, it is necessary to determine "whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." The comment distinguishes between a lawyer who has been "directly involved in a specific transaction" and a lawyer who "recurrently handled a type of problem for a former client." In the latter circumstance, the lawyer would not be precluded from "later representing another client in a wholly distinct problem of the type even though the subsequent representation involves a position adverse to the prior client." Rule 4.1-9 (cmt). Based on the evidence presented, the Court finds that Mr. Solomon's representation falls in the latter category.

Here, the claims are the same type; that is, claims arising in the context of arbitrations brought by investors in securities against Morgan Stanley. Given that the claim is the same type, Morgan Stanley is correct that the same theories of recovery and legal arguments are being used by Mr. Solomon against Morgan Stanley. Likewise, the same individuals, i.e., members of Morgan Stanley's Fort Lauderdale branch and in-house counsel, are involved in the current law suits. These facts, however, do not demonstrate that the cases are "substantially related."

*Id.* at *8-10. Here, with respect to the telemarketing research, at most, the "type" of *issue* is arguably similar, but the *matter* itself is not "substantially related." More specifically, as can be elucidated at an evidentiary hearing, the telemarketing "issue" which was the subject of Mr. Eastin's research is not actually the same "issue" as presented in the False Claims Act case. *See Jackson v. J. C. Penney Co*., 521 F. Supp. 1032, 1035-1036 (N.D. Ga. 1981) (denying a request for disqualification and explaining that, "In the instant case, four out of the five cases with which Mr. Schulman was involved dealt with defects other than batteries, which is the subject matter of the instant case. In the one case dealing with an allegedly defective battery, Mr. Schulman's involvement was strictly limited to a determination of whether General Motors in fact ever manufactured the battery, not whether it was defective, which is the issue in the instant case. While this court agrees that there are important similarities between the subject matter of the instant suit and of these prior cases, it is not of the belief that a substantial relationship has been shown between the present and the former representations so as to warrant the disqualification of Mr. Schulman."); *see also Hernandez v. Royal Caribbean Cruises LTD*, 2010 U.S. Dist. LEXIS 98113, at *18 (S.D. Fla. Sept. 7, 2010) (denying a motion for reconsideration and explaining

that, "The defendant argues that 'as a result of the attorney-client relationship with RCL, [Mr.] Aronson was privy to confidential information that is not generally known or discoverable.' That is the case with **any** attorney-client relationship.  Yet, Rule 4-1.9 does not disqualify an attorney by virtue of the existence of a prior attorney-client relationship.  There must also be a substantial relationship between the prior representation and the instant matter.").

As noted by the court in *Solomon*, the case of *Health Care & Retirement Corp. of Am., Inc. v. Bradle*y, 961 So. 2d 1071 (Fla. 4th DCA 2007) is also instructive.  In *Bradley*, the court affirmed the denial of a motion to disqualify counsel who represented the estate of a former nursing home patient, which had filed suit for negligence due to a fall and the existence of decubitus ulcers.  Prior to that representation, the lawyer had defended the same nursing home in over sixty cases, many of which were negligence matters relating to decubitus ulcers and patient falls.  The *Bradley* court, relying on the comment to Rule 4.1-9, found that while the lawyer had handled the same type of problem for its former client, the current case raised a "wholly distinct" problem.  In reaching this determination, the court in *Bradley* noted that "each negligence case turns on its own facts."  *Id.* at 1073-74.  Here, similarly, the false claims which are the subject of this case likewise turn on their own facts, and there is no substantial connection between the general telemarketing research and CMS site visit work performed by Mr. Eastin in 2010 and the specific facts pertaining to the specific false claims at issue now.

With respect to the CMS site visit response, Mr. Eastin's involvement was even more limited.  *See* Eastin Decl., p. 3.  Mr. Eastin did not author the response letter, he did not sign the letter, and he is not referenced in the response letter.  *See* Eastin Decl., p. 3 and Exhibit 5.  With the exception of the reference to Mr. Porush's role at Med-Care, there is absolutely no relationship between the CMS site visit and the instant False Claims Act case.  Moreover, the disclosure or lack thereof of Mr. Porush's criminal history and exact "role" at Med-Care to CMS is not the basis for any theory of False Claims Act liability in the case.  Indeed, the issues raised

in the site visit letter concern Medicare conditions of participation, *none* of which form the basis for any of the theories of liability in the False Claims Act case.  *See* Nicholson Decl., pp. 14-16.

Finally, Mr. Eastin is not attacking the work he previously performed.  *See Morgan Stanley & Co. v. Solomon*, 2009 U.S. Dist. LEXIS 15799, at *12-13 (S.D. Fla. Feb. 19, 2009) ("However, unlike *Stansbury*, there is no evidence demonstrating that Mr. Solomon would be attacking his own legal work. . . . *See* Restatement (Third) of Law Governing Lawyers § 132 (2000) (cmt.) ("a lawyer may master a substantive area of the law while representing a client, but that does not preclude the lawyer from later representing another client adversely to the first in a matter involving the same legal issues, if the matters factually are not substantially related.")).  Here, Mr. Eastin took no public position on behalf of Med-Care, and the Defendants have not alleged that this case involves Mr. Eastin taking a substantively different position from what his prior legal research revealed.  Although Defendants allege the same type of legal issue is in play (which it is not), the identified issues are not even close to being substantially related from a factual perspective to Mr. Eastin's prior work at Broad & Cassel.

**B.  Mr. Eastin Never Represented the Defendants in a "Matter"**

Not all work a lawyer does for a client rises to the level of representation in a matter.  In the Comment section of the Rule 4-1.9, it explains that, "The scope of a ***matter*** for purposes of Rule 4-1.9(a) may depend on the facts of a particular situation or transaction.  The lawyer's involvement in a matter ***can also be a question of degree***." *Id.* (emphasis added).  Here, Mr. Eastin's "degree" of involvement with Med-Care was quite limited and pertained to general legal research on an issue of law and minimal participation in assisting with the preparation of a response to a Medicare "site visit."  In other words, Mr. Eastin's involvement did not rise to the level of "representing" Med-Care in a "matter" in the first place.  *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 756-57 (2d Cir. 1975) (analyzing a former associate's role, denying a disqualification motion, and observing that, "[T]here is reason to

differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose related solely to legal questions.  In large firms at least, the former are normally the more seasoned lawyers and the latter the more junior.  This is not to say that young attorneys in large firms never become important figures in certain matters but merely to recognize that some of their work is often of a far more limited variety.  Under the latter circumstances the attorney's role cannot be considered 'representation' within the meaning of *T.C. Theatre Corp.* and *Emle* so as to require disqualification.") (internal citations omitted).

Mr. Eastin's minimal involvement in Broad & Cassel's representation of Med-Care is highlighted by the fact that the Defendants claim they did not recognize Mr. Parker Eastin's (unique) name and/or the potential conflict until a year into the prosecution of this False Claims Act case.  This alleged ignorance flies in the face of Mr. Eastin's direct and conspicuous involvement in the False Claims Act case from the outset.

The minimal degree of Mr. Eastin's involvement is further highlighted by the Defendants' acknowledgement that when the Defendants approached Broad & Cassel regarding the False Claims Act case in August 2014, Mr. Perling, the lawyer for whom Mr. Eastin performed the work, apparently did not identify the alleged conflict.  *See* DE 122 (Motion), p. 7.

The Comment section to Rule 4-1.9 also clarifies that, "The underlying question is whether the lawyer was ***so involved*** in the matter that the subsequent representation can be justly regarded as a ***changing of the sides*** in the matter in question."  *Id.* (emphasis added).  Mr. Eastin was not "so involved" in any matter that he can properly be viewed as "changing sides."  He never made an appearance on behalf of Med-Care in any matter, hearing, action, nor has he taken any public position regarding Med-Care on its behalf on any issue in any forum.  The present action does not cause Mr. Eastin (or Nicholson & Eastin) to take any position contrary to any other position previously taken by Mr. Eastin, nor for that matter, contrary to any legal position

taken by Broad & Cassel that appears in the site visit response letter.  Nor does this action cause

Mr. Eastin to take any position contrary to any other position he has taken regarding

telemarketing requirements. Because Mr. Eastin is not switching sides, Rule 4-1.9 is not violated.

### C.  The Purportedly Confidential Information is Generally Known

Also relevant to this analysis is the "generally known" component of the "Comment" to

section to Rule 4-1.9(b) that explains:

> [T]he fact that a lawyer once served a client does not preclude the lawyer from
> using ***generally known*** information about that client when later representing
> another client.  Information that has been widely disseminated by the media to the
> public, or that typically would be obtained by any reasonably prudent lawyer who
> had never represented the former client, should be considered generally known
> and ordinarily will not be disqualifying.  The essential question is whether, but for
> having represented the former client, the lawyer would know or discover the
> information.

*Id.* (emphasis added).

Here, there has been widespread dissemination of information in the media to the public

regarding Med-Care's telemarketing practices, as well as Mr. Porush's criminal history and role

at Med-Care, beginning as early as 2007-2008.  Examples of such public disseminations are

attached hereto as composite Exhibit 6, and include an article in Forbes magazine, and blog

entries of consumers complaining about being contacted by Med-Care and Christian Diabetic, a

company owned by Mr. Porush.  The Defendants themselves acknowledge the public disclosure

of Mr. Porush's involvement in Med-Care to CMS in October 2010 – *prior to* the filing of the

December 2010 False Claims Act Complaint.  *See* DE 128-3 (Perling Declaration), pp. 17-22.

Furthermore, in May 2013, Steven Silverman, President of Med-Care, testified before

Congress regarding Med-Care's marketing activities and Mr. Porush's role at Med-Care, as well

as regarding Medicare audits, site visits, and corrective action plans.  A copy of the transcript of

Dr. Silverman's testimony and the committee report are attached as Exhibits 7 and 8,

respectively.  Finally, Mr. Porush publicizes his title and tenure at Med-Care on his own

LinkedIn page, a copy of which is attached as Exhibit 9.  It is eminently reasonable to assume

that these articles, blogs, websites, and testimony regarding such "generally known" issues would be obtained by any reasonably prudent lawyer.

Finally, in the Comment section of the Rule 4-1.9(b), it is also observed that, "Information acquired in a prior representation may have been rendered obsolete by the passage of time." Such obsolescence has also occurred here. *See State ex rel. Ogden Newspapers v. Wilkes*, 566 S.E. 2d 560, 566 (W. Va. 2002) (finding no substantial relationship between two representations in part because of intervening changes in the law and the passage of time).

In sum, in light of the ample public disclosure regarding Med-Care's telemarketing activities and Mr. Porush's role and criminal history, both pre and post-filing of the Complaint, any purportedly confidential information regarding these issues were and remain "generally known" and cannot serve as a basis to disqualify here. *See Leslie Dick Worldwide, Ltd. v. Soros*, 2009 U.S. Dist. LEXIS 63192, at *57 (S.D.N.Y. July 22, 2009) ("Yet, even taking Mr. Dick's representations at face value, none of the topics that he himself claims to have discussed would have likely encompassed any confidential information that can now be used against him. In fact, most are now matters of public record, and many were already part of the record in the state court action at the time.").

### D.  The Defendants Have Affirmatively Waived Attorney-Client Privilege

The Defendants have also affirmatively waived attorney-client privilege through four separate actions in this case, thus mooting any alleged concerns regarding the subsequent use or disclosure of confidential information purportedly held by Mr. Eastin.

First, in the Defendants' Answer and Affirmative Defenses [DE 125], the first Affirmative Defense asserted by the Defendants is "good faith." More specifically, the Defendants aver the following:

> Defendants assert that the claims set forth in the Third Amended Complaint are barred because Defendants acted at all relevant times in good faith, and not with any improper or illegal purpose, intent or knowledge. Each and every act or omission that Defendants are alleged to have undertaken or failed to undertaken in

> the Third Amended Complaint was done or omitted in good faith and not with any improper or illegal purpose, intent or knowledge, in conformity with all applicable federal and state statutes, and all applicable rules and CMS guidance promulgated thereunder, and to the extent any claims were incorrect, it was due to innocent mistake and without any improper intent or knowledge.

*See* DE 125, p. 23.  In the Eleventh Circuit, the assertion of a "good faith" affirmative defense of this nature operates to affirmatively waive attorney-client privilege.  *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994).  Thus, pursuant to this waiver, even if Mr. Eastin did possess any relevant non-public confidence of the Defendants – those confidences are no longer confidential and cannot serve as a basis to disqualify.

Second, and directly on point, in their Answer and Affirmative Defenses [DE 125], the Eleventh Affirmative Defense asserted by the Defendants is "good faith reliance on the advice of counsel."  More specifically, the Defendants aver the following:

> Plaintiffs' claims are barred because Defendants relied in good faith on the advice of counsel and others, including CMS, regarding the propriety and regulatory compliance of Med-Care's marketing practices was due to innocent mistake and without any improper intent or knowledge.

*See* DE 125, p. 24.  Under Eleventh Circuit precedent, the assertion of a "good faith reliance on the advice of counsel" affirmative defense operates to affirmatively waive attorney-client privilege.  *See U.S. ex rel. Barker v. Columbus Reg'l Healthcare Sys.*, 2014 U.S. Dist. LEXIS 120504, *6-7 (M.D. Ga. Aug. 29, 2014).  Here, again, any purported non-public confidences held by Mr. Eastin are no longer confidential and cannot serve as a basis to disqualify.

Third, following the execution of federal search warrants at Med-Care by the FBI, IRS, HHS-OIG on January 14, 2015, the Defendants' counsel, Stephen Best, unambiguously declared to the national media in response to questions regarding the allegations in this lawsuit, that, "*At the end of the day, I've looked into every specific allegation.  I've never found there to be a problem.*"  Attached as Exhibit 10 is an article capturing Mr. Best's quote.  This public statement, which goes beyond a mere general denial, constitutes a waiver of the attorney-client privilege.  *See generally Server Tech., Inc. v. Am. Power Conversion Corp.*, 2011 U.S. Dist.

LEXIS 42980, at * 23-24 (D. Nev. Apr. 14, 2011) ("[The lawyer's] opinion is protected by the attorney-client privilege; therefore, when he elected to share his impression, he waived the privilege as to other protected information particular to the subject matter.").

Fourth, in connection with their Motion to Disqualify, the Defendants have included Declarations from both Dr. Silverman and Mr. Porush that specifically describe and set forth the substance of the confidential information purportedly communicated to Mr. Perling in 2010, which likewise constitutes a waiver of the attorney-client privilege. *See* DE 128-4, pp. 2-3; De 128-2, pp. 1-2; *see*, *e.g.*, *Maplewood Partners, L.P. v. Indian Harbor Ins. Co.*, 2013 U.S. Dist. LEXIS 103309, at *109 (S.D. Fla. July 16, 2013) ("A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person voluntarily discloses . . . or consents to disclosure of, any significant part of the matter or communication.").

In sum, the law is clear that a party cannot use the attorney-client privilege as both a sword and a shield; but that is precisely what the Defendants are attempting to do here. *See Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1418-19 (11th Cir. 1994); *see also United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. N.Y. 1991) ("However, the attorney-client privilege cannot at once be used as a shield and a sword."). More specifically, the Defendants seek to invoke the privilege to remove Relators' preferred counsel from the case, and simultaneously to waive the privilege as a shield to liability for False Claims Act violations. The Defendants cannot have it both ways, and their disqualification motion must fail.

### III.   Rule 4-1.10(b) Does Not Require Imputed Disqualification

Even if the Court concluded there was a conflict for Mr. Eastin under Rule 4-1.9, which there is not, the rules governing imputed disqualification would allow for the continued representation of the Relators by the Nicholson & Eastin firm. More specifically, in this context, the issue then becomes whether the purportedly confidential information received by Mr. Eastin

is **material to** the False Claims Act matter, an issue that cannot be determined through application of the irrefutable presumption doctrine. *See AGIC, Inc. v. North American Risk Services*, 120 So.3d 189 (Fla. 5th DCA 2013); *Solomon v. Dickison*, 916 So.2d 943 (Fla. 1st DCA 2005); *Scott v. Higginbotham*, 834 So.2d 221 (Fla. 2d DCA 2003). Thus, even assuming that the Court finds that Mr. Eastin received confidential information during his limited work that is "substantially related" to the False Claims Act lawsuit, imputed disqualification would not be required because that information is not **material to** the False Claims Act lawsuit.

## IV. The Relators' Preference of Counsel Must Be Considered

As acknowledged in the Defendants' Motion, disqualification is a drastic remedy that should only be used sparingly. *See* Motion, p. 8. Here, each of Relators wants Nicholson & Eastin to remain as their counsel. *See* Bumbury Decl., p. 2; Declaration. of Stanley Bernstein, p. 1; and Declaration of Jamie Camuccio, p. 1.

## V. Disqualification Motions Are Not To Be Used for Tactical Advantage

The Defendants' motion (which gratuitously requests sanctions and a referral to the Florida Bar for a disciplinary investigation, and was communicated with a threat of a lawsuit against the firm) is a continuation of a pattern of heavy-handed litigation tactics by the Defendants in this case. This motion is the second attempt the Defendants have made to shut Relator's counsel down, as well as at least the fourth threat the Defendants have made to sue Ms. Bumbury, Relators' Counsel, their employees and the media in connection with this case. *See* Nicholson Decl., pp. 16-19.

More specifically, shortly after being served with the complaint, the Defendants issued a gag order to their employees and threatened to sue any media who dared to continue covering such a "baseless and frivolous" lawsuit, including specifically threatening the Palm Beach Post with a defamation action. *Id.*

Shortly thereafter, on April 22, 2014, the Defendants filed an *ex parte* injunction and

damages action against Relator Bumbury in New York state court seeking to enjoin her – and the Nicholson & Eastin law firm – from any further participation in the False Claims Act lawsuit; demanding that she pay the legal fees incurred in their defense of the False Claims Act case and the prosecution of the NY injunction action; seeking punitive damages; and seeking a constructive trust over any future FCA recovery.  *See* Exhibit 12.

The NY state court case was removed by the Relator to federal court and, after a hearing on the merits of the Defendants' motion in front of U.S. District Judge Deborah A. Batts, the Defendants' request for an injunction was denied.  The Defendants were assessed costs by Judge Batts.  The Defendants subsequently voluntarily dismissed the NY case without prejudice. *See* Nicholson Decl., pp. 16-19.

Next, on June 23, 2014, Judge Ryskamp issued an Order dismissing the Second Amended Complaint in this case but allowing for the Relator to file a third amended complaint.  In response to the Relators' request for an extension of time, the Defendants sent a letter threatening the Relator and the firm if they proceeded with filing an amended complaint.  A copy of the letter, as well as the firm's response, is attached hereto as composite Exhibit 13.

Notwithstanding the Defendants' threats, the Relator(s) filed their Third Amended Complaint on July 24, 2014, with respect to which the Defendants moved to dismiss and the Government filed a Statement of Interest and Objection to Dismissal.  On December 23, 2014, Judge Ryskamp issued an Order granting in part and denying part the motion to dismiss, which was largely favorable to the Relators.  *See* DE 119.

On January 2, 2015, Mr. Nicholson contacted the Defendants' counsel regarding the several pending discovery requests Relators had served on the defendants, and during a call on January 7, 2015, the parties discussed the pending discovery requests and the Relators' intent to begin scheduling depositions.  The parties were next set to discuss discovery during a meet and confer scheduled for January 16, 2015.  *See* Nicholson Decl., p.18.

The Defendants claim to have identified the conflict issue on Monday, January 12, 2015, but the Defendants chose not to notify Nicholson & Eastin until approximately 11:30 a.m. on Friday, January 16, 2015, during the in-person discovery meet and confer.  Moreover, instead of inviting a factual inquiry into the potential conflict, counsel for the Defendants informed Nicholson & Eastin that they had until 5:00 p.m. that same day to either file a notice of voluntary withdrawal or the Defendants would be filing their already-prepared motion to disqualify, and threatened yet another lawsuit.  *See* Nicholson Decl., pp 18-19; Exhibit 14.

Thus, a year after being on actual notice of Mr. Eastin's involvement in the case; after the conduct of considerable litigation and interaction between counsel in this case and immediately before depositions were set to scheduled; and two days after the execution of federal search warrants at the Defendants' facilities (which likely implicated Fifth Amendment concerns); the Defendants filed their motion to disqualify Relators' counsel based on an alleged conflict that they purportedly "just" identified, and without a meaningful pre-filing inquiry.  The timing and heavy-handed approach employed by the Defendants suggests that their motion is a tactical move on the Defendants' part after getting an unfavorable ruling on their Motion to Dismiss, and to frustrate and delay discovery in this case.

## CONCLUSION

The Defendants' motion is untimely, improperly tactical, unfounded – both factually and legally – and Relators and the progress of this case, would be severely prejudiced by the unjustified disqualification of Nicholson & Eastin, which has approximately 1,300 (contingency fee) hours invested into the case, and which has an intimate understanding of the facts, witnesses, and documents developed through considerable investigation by the Relators and Relators' counsel.  The Defendants' Motion to Disqualify should be denied.

Respectfully submitted,

/s/ Bruce E. Reinhart
Bruce E. Reinhart, Esquire
McDonald Hopkins LLC
505 South Flagler Drive
Suite 300
West Palm Beach, Florida 33401
Telephone: 561-472-2121
Facsimile: 561-472-2122
Email:  breinhart@mcdonaldhopkins.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of January, 2015, I electronically filed the

foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this date via U.S. mail and/or some other authorized manner for those

counsel or parties, of any, who are not authorized to receive electronically Notices of Electronic

Filing.

/s/ Bruce Reinhart